Mike Arias, Esq. (CSB #115385)
Alfredo Torrijos (CSB #222458)
ARIAS, OZZELLO & GIGNAC, LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045-7504
Tel.: (310) 670-1600
Fax: (310) 670-1231

LIDDLE & DUBIN, P.C.
Steven D. Liddle (Pro Hac Vice to be submitted)
Nicholas A. Coulson (Pro Hac Vice to be submitted)
975 E. Jefferson Avenue
Detroit, Michigan 48207
Phone: (313) 392-0015
Fax: (313) 392-0025
sliddle@mldclassaction.com
ncoulson@mldclassaction.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW PHILLIBEN, individually and on behalf of all others similarly situated; and BYRON McKNIGHT, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT AND JURY DEMAND** |
| vs. | <u>CLASS ACTION</u> |
| UBER TECHNOLOGIES, INC., a Delaware Corporation; and RASIER, LLC, a Delaware Limited Liability Company, | |
| Defendants. | |

**CLASS ACTION COMPLAINT**

Plaintiffs Matthew Philliben and Byron McKnight ("Plaintiffs"), on behalf of themselves and on behalf of a class of similarly situated individuals, complain against Defendants Uber Technologies, Inc. and Rasier, LLC (collectively "Defendants" or "Uber") as follows:

## I. Nature of the Case

1.      Uber provides a smartphone application that establishes a platform for consumers to obtain transportation services. Plaintiffs bring this action on behalf of themselves and a class of similarly situated individuals who were subjected to Uber's illegal and deceptive practice of misrepresenting to consumers its "Safe Rides Fee" and the nature and character of the background checks and safety measures conducted in association therewith.

2.      Uber offers multiple levels of service, depending on location. Two of the Uber platform's options are known as UberX and UberXL, and allow nearly any person with a late-model vehicle to provide transportation in exchange for compensation.

3.      Uber adds a charge in the amount of one dollar to every ride on the UberX and UberXL platforms.  It represents that this charge supports its "industry leading" background check process and safety measures. However, Uber's background check procedures and safety measures are woefully inadequate and fall well short of what is required for other commercial providers of transportation.

4.      Uber's uniform conduct is equally applicable to the class and constitutes an unfair, unlawful and fraudulent business practice in violation of the Unfair Competition Law, California Business and Professions Code § 17200, *et seq*. and Untrue or Misleading Statements in violation of California Business and Professions Code § 17500, *et seq*.

## II. Jurisdiction and Venue

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are numerous class members who

**CLASS ACTION COMPLAINT**

are citizens of states different from Defendant. The number of members of the proposed class is in the aggregate greater than 100 and more than two-thirds of the class members reside in states other than the state in which Defendant is a citizen.

6.     This Court has personal jurisdiction over Defendants because they are headquartered in San Francisco, California, they conduct business in California and a substantial portion of the acts complained of took place in San Francisco, California.

7.     Venue is proper in the Northern District of California (San Francisco Division) because Defendants are headquartered in this District, conduct business in this District and many of the acts complained of occurred in this District.

8.     The deceptive practices alleged herein were conceived, reviewed, approved and otherwise controlled from Defendants' headquarters in San Francisco, California. The misrepresentations and omissions alleged herein were contained on and transmitted from Defendants' website and smartphone application, which are maintained in California. The transactions entered into by Plaintiffs and the class with Defendants utilized those platforms and their payments were processed by Defendants' California servers.

### III.     Parties

9.     Plaintiff Matthew Philliben is an individual and a citizen of Michigan. Plaintiff Byron McKnight is a citizen of California.

10.     Defendant Uber Technologies LLC is a Delaware Limited Liability Company with its principal place of business located in San Francisco, California.

11.     Defendant Rasier LLC is a Delaware Limited Liability Company and a subsidiary of Uber Techologies LLC.

### IV.     Factual Allegations

#### *Background*

12.     Uber's smartphone application ("app") allows users to summon a vehicle to transport them much in the way a taxicab would. Users download the app, create an account, enter payment information, and are able to press a button to call for a ride.

**CLASS ACTION COMPLAINT**

1    13.    Payment for rides on Uber's platforms is automatic; the user must place a

2    credit card on file through the app before being allowed to obtain transportation. At the end

3    of the ride, Uber automatically charges the user's credit card and the user is e-mailed a

4    receipt for the transaction. Uber retains a portion of every fare, which is typically 20% but

5    may be a greater amount.

6                              *Uber's Safety Representations*

7    14.    Likely acknowledging that many consumers may have concerns about getting

8    into the vehicle of a stranger who is not professionally licensed as a driver, Uber makes a

9    number of representations on its webpages, in communications with customers, and in the

10   media, in order to convey the message that Uber takes every measure possible to ensure the

11   safety of its riders.

12   15.    On Uber's "Safety" webpage (www.uber.com/safety), Uber represents that

13   "Wherever you are around the world, Uber is committed to connecting you with the safest

14   ride on the road." "That means setting the strictest safety standards possible, then working

15   hard to improve them every day. The specifics vary, depending on what local governments

16   allow, but within each city we operate, we aim to go above and beyond local requirements

17   to ensure your comfort and security - and what we're doing in the US is an example of our

18   standards around the world."

19   16.    The "Safety" webpage also describes Uber's background checks. Beneath a

20   headline of "BACKGROUND CHECKS YOU CAN TRUST," through the end of October,

21   2013, Uber made the representation that "Every ridesharing and livery driver is thoroughly

22   screened through a rigorous process we've developed using industry-leading standards. This

23   includes a three-step criminal background screening for the U.S. - with county, federal and

24   multi-state checks that go back as far as the law allows - and ongoing reviews of drivers'

25   motor vehicle records throughout their time on Uber." In November, 2014, the words

26   "industry-leading" were changed to "constantly improving."

27   17.    A link entitled "read more" beneath the section on background checks takes

28

**CLASS ACTION COMPLAINT**

users to a blog post dated April 25, 2014. (http://blog.uber.com/driverscreening) attributed to Lane Kasselman, Uber's Head of Communications for the Americas. Until at least December 10, that page stated that "Uber ridesharing and livery partners must go through a rigorous background check that leads the industry." As of December 15, 2014, the words "that leads the industry" were no longer present. Still present, however, was Uber's representation that their background checking process and standards are "often more rigorous than what is required to become a taxi driver."

18.     The page concludes "Uber works hard to ensure that we are connecting riders with the safest rides on the road. The current efforts we are undertaking to protect riders, drivers, and cities are just the beginning. We'll continue innovating, refining, and working diligently to ensure we're doing everything we can to make Uber the safest experience on the road."

19.     Consistent with Uber's theme, Kasselman is quoted in a June, 2014 NBCBayArea.com news report as saying "We're confident that every ride on the Uber platform is safer than a taxi." (http://www.nbcbayarea.com/investigations/SF-DA-Wants-Stricter-Rules-for-Rideshare-Companies-261754071.html).

20.     The need for proper background screening of UberX drivers is arguably higher than with other commercial providers of transportation, because Uber's drivers may have access to riders' full names and/or other personal information.

21.     Uber has consistently opposed and resisted the various state and local regulations which are applied to other transportation services, such as Taxi operators.

22.     Uber does not conduct inspections of their drivers' cars, but simply requires drivers to submit photographs of the vehicles to the company.

### The Safe Rides Fee

23.     Uber reinforces the message about its efforts to ensure customer safety and the quality of its background checks when it charges UberX, UberPool, and UberXL customers a $1.00 "Safe Rides Fee," which is depicted on the rider's receipt.

**CLASS ACTION COMPLAINT**

24.     The "Safe Rides Fee" appears next to a question mark, which links to a webpage with an explanation of the fee. Through October, 2014, the hyperlink connected to a webpage which stated that the Safe Rides Fee was used to support, among other things, "an industry-leading background check process."

25.     In October of 2014, Uber changed the words "industry-leading" to "a Federal, state, and local background check process." As of December 15, 2014, the page continued to state that the fee "supports continued efforts to ensure the safest possible platform for Uber riders and drivers..."

26.     The aforementioned representations made by Uber are untrue or misleading in violation of California law. Alone and in conjunction, the representations are likely to mislead consumers into the belief that Uber takes exhaustive safety precautions, when the background check process Uber describes as "industry-leading" and "more rigorous than what is required to become a taxi driver" does not even take steps to ensure that applicants are who they represent themselves to be.

27.     Unlike many background checks, Uber's process does not utilize fingerprints or even require the applicant to appear in person. Uber simply asks its drivers to submit information such as name, address, driver's license number, and social security number through a webpage, Uber then provides this information to Hirease, Inc., the company that performs its background checks. As no unique identifying information, such as a fingerprint, is required, Hirease includes a sample report on its website that states "Final verification of an individual's identity and proper use of report contents are the user's responsibility."

28.     In contrast, many taxi regulators, such as those in Uber's hometown of San Francisco, employ a fingerprint identification technology known as "Live Scan." This process is essential in preventing fraud and abuse of the most basic sort in background checks: applicants who could not otherwise pass a background check borrowing or stealing the identity of another person in order to pass.

**CLASS ACTION COMPLAINT**

29.     Hirease, Uber's own background check provider, touts the superiority of fingerprint-based background checks. "Fingerprinting helps uncover criminal history not discovered through traditional methods, offers extra protection to aid in meeting industry guidelines, and helps prevent fraud."

30.     Uber's representations concerning the nature and quality of its background checks are untrue and/or misleading. Despite representing that it employs "background checks you can trust" that "lead the industry" and are "often more rigorous than what is required to become a taxi driver," Uber's background check process falls well short of the standard used in most large cities, including its own hometown.

31.     Uber has consistently resisted subjecting its drivers to the same types of background checks undergone by other commercial providers of transportation. A New York Times article has described Uber's "aggressive" efforts to fight background check legislation "in statehouses across the country." (http://www.nytimes.com/2014/12/10/technology/ubers-system-for-screening-drivers-comes-under-scrutiny.html?ref=technology).

32.     Uber's other "safety" measures also fall well short of established industry standards. Instead of performing actual inspections of drivers' vehicles, Uber allows drivers to simply transmit photographs of the vehicles to the company. Uber's efforts at driver training are similarly substandard, as UberX applicants receive little to no training on safe driving and are never observed actually driving before they are allowed to transport Uber's paying passengers. Additionally, the separate "Uber" smartphone that drivers are required to use may distract drivers from safe operation of their vehicle.

33.     Uber has repeatedly and publically parroted its misleading statements about its background checks in response to a series of unfortunate incidents involving its drivers.

34.     On February 12, 2014, it was reported that Uber was expanding its background checks after a series of well publicized incidents, including an UberX driver with a previous reckless driving conviction allegedly hitting and killing a six year old girl

**CLASS ACTION COMPLAINT**

and another driver with a felony record allegedly assaulting a passenger. (http://blog.sfgate.com/techchron/2014/02/12/uber-to-vet-drivers-more-thoroughly/).   Uber issued a statement on its blog in which it expressed its commitment "to improving the **already best in class safety and accountability of the Uber platform**." (emphasis added). These "expanded" background checks remained below industry standards, despite Uber's statements to the contrary.

35.     An investigation by NBC's Detroit affiliate reported that a woman on probation for burglary and assault was hired by UberX after filling out Uber's online application. A number of local UberX drivers researched by the station had a litany of red flags on their driving records, including suspended licenses, speeding tickets, citations for no proof of insurance, and driving vehicles registered to other people. In response, an Uber spokesperson issued a statement claiming that "We work every day to c*onnect riders with **the safest rides on the road** and **go above and beyond local requirements** in every city we operate. Uber only partners with drivers who pass **an industry-leading screening** that includes a criminal background check at the county, federal and multi-state level going back as far as the law allows. ... For more information on what makes Uber the safest rides on the road, please see our website: https://www.uber.com/safety." (emphasis added). (*http://www.clickondetroit.com/news/local-4-defenders-is-uberx-safe/26944252*).*

36.     In an April 29, 2014 article describing UberX drivers with criminal backgrounds, including one on probation for nearly beating a woman to death, and another with a 2012 DUI conviction who had been accused of sexually assaulting a passenger, Lane Kasselman is quoted as telling the author by e-mail "Uber's **industry-leading background checks** help connect consumers with the **safest ride on the road**…Our driver partner **background checks are more thorough than those of taxi in most cities** … We continue to improve and are always working hard to tighten our policies and processes to ensure that **Uber remains the safest transportation option available**." (emphasis added). (http://mashable.com/2014/04/29/uberx-passengers-risk/).

**CLASS ACTION COMPLAINT**

*Uber's Download and Registration Process Obscures*

*its Unconscionable Terms & Conditions*

37.     Plaintiff Philliben downloaded the app and created an Uber account in approximately August, 2014.  Plaintiff McKnight downloaded the app and created an Uber account in approximately late 2013 or early 2014.

38.     Plaintiffs followed the registration process for creating an account. This process is conducted within the app itself, on the screen of the smartphone.

39.     During the registration process, an electronic keyboard obscures the lower portion of the screen as information is inputted into the required fields for registration: e-mail address, mobile telephone number, password, name, and credit card payment information.

40.     Throughout the registration process, the lower half of the screen remains obscured by the electronic keyboard.

41.     At the last step of the process, the app displays a screen on which a hyperlink to Uber's "Terms & Conditions and Privacy Policy" appears at the bottom.

42.     At no step during the registration process were the "Terms & Conditions" and/or "Privacy Policy" displayed to Plaintiffs.

43.     Uber's registration process never required Plaintiffs to access the "Terms & Conditions" hyperlink, read the "Terms & Conditions," or affirmatively assent to them.

44.     Each new Uber user must register and create an Uber account using the same steps and viewing the same screens as Plaintiffs.

45.     Uber's undisplayed and inconspicuously linked "Terms & Conditions" are unconscionably one-sided and purport to contract away all possible legal obligations from Uber to its riders, including any obligation to provide a safe vehicle, or a safe driver, all while retaining its right to payment regardless of whether a given ride is even completed.

46.     Uber's "Terms & Conditions" contain a complete disclaimer of warranties, which disavows substantially every basis upon which a reasonable user would rely in using

**CLASS ACTION COMPLAINT**

the app and Uber's service:

> The company makes no representation, warranty, or guaranty
> on the reliability, timeliness, quality, suitability, availability,
> accuracy, or completeness of the service or application…
>
> The service and application is provided to you strictly on an
> "as is" basis. All conditions, representations and warranties,
> whether express, implied, statutory or otherwise, including,
> without limitation, any implied warranty of merchantability,
> fitness for a particular purpose, or non-infringement of third
> party rights, are disclaimed to the maximum extent permitted
> by applicable law…
>
> You acknowledge and agree that the entire risk arising out of
> your use of the application and service, and any third party
> services or products remains solely with you, to the maximum
> extent permitted by law.

47.     Uber's "Terms & Conditions" contain a "no refund" policy, which applies to "[a]ny fees that the Company may charge you…" This "no refund policy shall apply at all times regardless of your decision to terminate your usage, our decision to terminate your usage, disruption caused to our Application or Service either planned, accidental or intentional, or any reason whatsoever.

48.     Uber's "Terms & Conditions" contain a complete Liability Disclaimer, wherein Uber purports to absolve itself of any and all liability that may arise out of the use of its app or service.

49.     Despite Uber's representations about safety, Uber disclaims "any and all liability… in any way related to the third party transportation provider…"

50.     Despite its representations about its background check process, Uber disclaims any responsibility to "assess the suitability, legality or ability of any" of

**CLASS ACTION COMPLAINT**

1    its drivers.

2    51.    Uber disavows any responsibility for the rider's safety. "You

3 understand, therefore, that by using the application and the service, you may be

4 exposed to transportation that is potentially dangerous, offensive, harmful to minors,

5 unsafe or otherwise objectionable, and that you use the application and the service at

6 your own risk."

7    52.    One of Uber's more controversial practices is to charge "surge

8 pricing," wherein fees for transportation rise significantly during times of higher

9 demand. In contrast to its inconspicuous link to its "Terms & Conditions", Uber

10 goes out of its way to ensure that it has the customer's informed consent before

11 charging such prices. Uber discloses the amount of the surcharge, and requires the

12 customer to type the surcharge into a separate field, ensuring that the customer is

13 expressly consenting to the fee.

14    53.    Uber's purpose for this process is to ensure that the terms of its surge

15 pricing are "clear and straightforward" such that its customers "won't be surprised"

16 by the terms of the contract.

17                    ***Plaintiffs' Transportation***

18    54.    On October 11, 2014, Plaintiff Philliben used the Uber app to obtain

19 UberX transportation; as reflected on his electronic receipt, Plaintiff Philliben paid

20 $18.52 for the trip, including the $1.00 Safe Rides Fee.

21    55.    On May 20, 2014, Plaintiff McKnight used the Uber app to obtain

22 UberX transportation; as reflected on his electronic receipt, Plaintiff McKnight paid

23 $10.56 for the trip, including the $1.00 Safe Rides Fee.  On May 20, 2014, Plaintiff

24 McKnight used the Uber app to obtain UberX transportation; as reflected on his

25 electronic receipt, Plaintiff McKnight paid $10.56 for the trip, including the $1.00

26 Safe Rides Fee.  On September 30, 2014, Plaintiff McKnight used the Uber app to

27 obtain UberX transportation; as reflected on his electronic receipt, Plaintiff

28

**CLASS ACTION COMPLAINT**

1    McKnight paid $13.14 for the trip, including the $1.00 Safe Rides Fee.  On October

2    1, 2014, Plaintiff McKnight used the Uber app to obtain UberX transportation; as

3    reflected on his electronic receipt, Plaintiff McKnight paid $14.17 for the trip,

4    including the $1.00 Safe Rides Fee.

5                              **V.    Class Allegations**

6         56.    All UberX, UberXL and UberPool rides are subject to the Safe Rides Fee.

7         57.    Upon information and belief, at least hundreds of thousands of Safe Rides

8    Fees have been charged to at least tens of thousands of riders, making joinder of all class

9    members impracticable. The exact size of the proposed class and the identity of all class

10   members can be readily ascertained from Defendant's records.

11        58.    There are questions of law and fact common to the class, which questions

12   predominate over any questions affecting only individual class members. The principal

13   common issues include:

14        a.     Whether Uber represented on its website and other marketing materials that it

15             conducts "industry leading" background checks on its drivers;

16        b.     Whether Uber represented that its service is "safer than a taxi";

17        c.     Whether Uber's background checks are or were "industry leading";

18        d.     Whether Uber is or was "safer than a taxi";

19        e.     Whether Uber's conduct is unfair, unlawful, and/or fraudulent in violation of

20             the Unfair Competition Law, California Business and Professions Code § 17200, *et*

21             *seq*.;

22        f.     Whether Uber's conduct constitutes untrue or misleading statements within

23             the meaning of California Business and Professions Code 17500;

24        g.     The relief to which Plaintiffs and the class are entitled.

25        59.    A class action is superior to any other available means for the fair and

26   efficient adjudication of this controversy. The claims of Plaintiffs and individual class

27   members are small compared to the burden and expense that would required to separately

28

**CLASS ACTION COMPLAINT**

litigate their claims against Defendant, and it would be impracticable for class members to seek redress individually. Litigating claims individually would also be wasteful to the resources of the parties and the judicial system and create the possibility of inconsistent or contradictory judgments. Class treatment provides manageable judicial treatment which will bring an orderly and efficient conclusion to all claims arising from Defendant's misconduct. Class certification is therefore appropriate under Rule 23(b)(3).

60.     Class certification is also appropriate under Rule 23(b)(1), as the prosecution of separate actions by individual members of the class would create the risk of adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication and/or substantially impair their ability to protect those interests.

61.     Class certification is also appropriate under Rule 23(b)(2), as Defendant has acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate for the class.

## COUNT I- Business & Professions Code § 17500, *et seq.* (Untrue or Misleading Statements)

62.     Plaintiffs restate and incorporate all allegations set forth in this complaint as though fully set forth herein.

63.     Beginning at an exact date unknown to Plaintiffs, but in any event within three years of the filing of this complaint, and continuing to the present, Defendants, with the intent to perform services, or to induce members of the public to enter into obligations relating thereto, made or disseminated or caused to be made or disseminated before Plaintiffs and the putative class statements concerning such services, or matters of fact connected with the performance thereof, which were untrue or misleading, and which defendants knew or reasonably should have known were untrue or misleading, in violation of Business and Professions Code section 17500 *et seq.* Such statements include but are not limited to all of the representations set forth and discussed in paragraphs 1-53 of this

**CLASS ACTION COMPLAINT**

1   complaint.

2   **COUNT II- Business & Professions Code § 17200,** *et seq.* **(Unfair**

3   **Competition and Unlawful Business Practices)**

4   64.  Plaintiffs restate and incorporates all allegations set forth in this complaint as

5   though fully set forth herein.

6   65.  Plaintiffs have standing to pursue this cause of action as Plaintiffs have

7   suffered injury in fact and have lost money or property as a result of Defendants' actions as

8   delineated herein.

9   66.  Beginning at an exact date unknown to Plaintiffs, but in any event within

10  four years of the filing of this complaint, and continuing to the present, Defendants

11  engaged and continue to engage in acts of unfair competition and in unfair, deceptive or

12  unlawful business practices within the meaning of Business and Professions Code section

13  17200 *et seq.*, including but not limited to the following:

14  A.  Defendants made untrue or misleading statements in violation of Business

15  and Professions Code section 17500, as set forth and discussed in

16  paragraphs 1-53 and in the first count of this complaint.

17  B.  Defendants' business practices, as alleged herein, violate the "fraudulent"

18  prong of California Business & Professions Code section 17200, *et seq.*

19  because Plaintiffs and members of the class are likely to be deceived by

20  Defendants' failure to disclose facts about its "Safe Rides Fee."

21  C.  Defendants undertook the following unfair methods of competition or

22  unfair or deceptive acts or practices in transactions intended to result or

23  which did result in the sale of services to consumers, in violation of Civil

24  Code section 1770(a):

25  (1) Defendants, by use of the untrue or misleading statements set forth

26  and discussed in paragraphs 1-53, above, represented that services

27  have characteristics or benefits which they do not have, in violation of

28

**CLASS ACTION COMPLAINT**

Civil Code section 1770(a)(5);

(2) Defendants, by use of the untrue or misleading statements set forth and discussed in 1 through 53 above, represented that services are of a particular standard of quality when they are of another, in violation of Civil Code section 1770(a)(7); and

(3) Defendants, by use of the untrue or misleading statements set forth and discussed in paragraphs 1-53 disparaged the services or business of another by false or misleading representation of fact, in violation of Civil Code 1770(a)(8).

D. Defendants committed fraud within the meaning of Civil Code section 1572 by charging customers who used the UberX service a $1.00 "Safe Rides Fee" purportedly to cover the cost of background checks that Uber falsely advertised as "industry-leading."

E. Plaintiffs reserve the right to allege other violations of law which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this day.

67.     Pursuant to California Business and Professions Code section 17203, Plaintiffs and the class seek an order of this court enjoining Defendants from continuing to engage in unlawful, unfair, or deceptive business practices and any other act prohibited by law, including those acts set forth in the complaint.  Plaintiffs and the class also seek an order requiring Defendants to make full restitution of all monies it wrongfully obtained from Plaintiffs and the Class.

## VI.  Request For Relief

WHEREFORE, Plaintiffs, on behalf of themselves and the class of similarly situated individuals, requests the Court to:

**CLASS ACTION COMPLAINT**

(a) Certify the case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designate Plaintiffs as representatives of the class and designate counsel of record as class counsel;

(b) Order Defendants to provide restitution to Plaintiffs and class members and/or order Defendant to disgorge profits it realized as a result of its unlawful conduct;

(c) Declare Defendants' conduct unlawful and enter an order enjoining Defendants from continuing to engage in the conduct alleged herein;

(d) For both pre and post-judgment interest at the maximum allowable rate on any amounts awarded;

(e) For costs of the proceedings herein;

(f) For reasonable attorneys' fees as allowed by statute; and

(g) Award such other relief as the Court deems appropriate under the circumstances.

## Jury Demand

Plaintiffs demand a trial by jury on all claims so triable.

Dated: December 23, 2014      **ARIAS OZZELLO & GIGNAC LLP**

By: *_/s/Mike Arias_____*
        Mike Arias
        Alfredo Torrijos

**LIDDLE & DUBIN, P.C.**
Steven D. Liddle (Pro Hac Vice to be submitted)
Nicholas A. Coulson (Pro Hac Vice to be submitted)

*Counsel for Plaintiffs and the Proposed Classes*

**CLASS ACTION COMPLAINT**