IRELL & MANELLA LLP
Andra Barmash Greene (123931)
agreene@irell.com
A. Matthew Ashley (198235)
mashley@irell.com
Justin N. Owens (254733)
jowens@irell.com
840 Newport Center Drive, Suite 400
Newport Beach, California 92660-6324
Telephone:   (949) 760-0991
Facsimile:   (949) 760-5200

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO

| | |
|---|---|
| MATTHEW PHILLIBEN, individually and on behalf of all others similarly situated; and BYRON McKNIGHT, individually and on behalf of all others similarly situated,<br><br>                                  *Plaintiffs*,<br><br>          vs.<br><br>UBER TECHNOLOGIES, INC. a Delaware Corporation; and RASIER, LLC, a Delaware Limited Liability Company,<br><br>                                  *Defendants*. | Case No. 4:14-cv-05615-JST<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO STAY PROCEEDINGS PENDING ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Filed Concurrently with: Declarations of Michael Colman, R. Michael Cianfrani, Abhay Vardhan, and Paul Holden; [Proposed] Order]<br><br>Date:   May 21, 2015<br>Time:   2:00 p.m.<br>Judge:  Hon. Jon S. Tigar<br>Place   San Francisco Courthouse<br>          Courtroom 9, 19th Floor<br>          450 Golden Gate Ave.<br>          San Francisco, CA 94102 |

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

I.      INTRODUCTION ..................................................................................... 1

II.     BACKGROUND ........................................................................................ 2

        A.      The Uber Registration Process ................................................. 2

        B.      The Arbitration Agreement ....................................................... 5

III.    LEGAL STANDARD ............................................................................... 6

IV.     PLAINTIFFS AGREED TO ARBITRATE THEIR CLAIMS ON
        AN  INDIVIDUAL BASIS ....................................................................... 7

        A.      The Agreement is Governed By The FAA ................................ 7

        B.      The Arbitrator Should Decide Any Questions Of
                Arbitrability ............................................................................... 8

        C.      Plaintiffs Assented To The Arbitration Agreement ................. 10

        D.      The Arbitration Agreement Encompasses Plaintiffs' Claims ... 15

        E.      The Arbitration Agreement Is Not Unconscionable ................. 16

        F.      Arbitration Of McKnight's Claims Is Further Mandated By
                The Arbitration Clause In His Transportation Provider
                Agreement ................................................................................ 18

V.      CONCLUSION ....................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*5381 Partners LLC v. Shareasale.com, Inc.,*
    No. 12cv426, 2013 WL 5328324 (E.D.N.Y. Sept 23, 2013) ............................................ 12

*Allied-Bruce Terminix Cos., Inc. v. Dobson,*
    513 U.S. 265 (1995) ........................................................................................................ 8

*AT&T Techs., Inc. v. Commc'ns Workers of Am.,*
    475 U.S. 643 (1986) ................................................................................................... 7, 15

*Bernal v. Southwestern & Pac. Specialty Fin., Inc.,*
    No. C-12-05797, 2014 U.S. Dist. LEXIS 63338 (N.D. Cal. May 7, 2014) ...................... 9

*Binder v. Aetna Life Ins. Co.,*
    75 Cal. App. 4th 832 (1999) .......................................................................................... 10

*Bosinger v. Belden CDT, Inc.,*
    358 Fed. Appx. 812 (9th Cir. Cal. 2009) ....................................................................... 16

*Buckeye Check Cashing,*
    546 U.S. 440 (2006) ........................................................................................................ 7

*Cairo, Inc. v. Crossmedia Servs., Inc.,*
    No. 04-04825, 2005 WL 756610 (N.D. Cal. Apr. 1, 2005) ............................................ 12

*Carnival Cruise Lines, Inc. v. Shute,*
    499 U.S. 585 (1991) ...................................................................................................... 10

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.,*
    207 F.3d 1126 (9th Cir. 2000) ....................................................................................... 10

*Concepcion,*
    131 S. Ct. at 1745 ...................................................................................................... 6, 17

*Crawford v. Beachbody, LLC,*
    No. 14CV1583, 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014) ........................................ 12

*Cronus Invs., Inc. v. Concierge Servs.,*
    35 Cal. 4th 376 (2005) .................................................................................................... 7

*Crook v. Wyndham Vacation Ownership, Inc.,*
    No. 13-CV-03669, 2013 WL 6039399 (N.D. Cal. Nov. 8, 2013) ......................... 9, 15, 17

*Dream Theater, Inc. v. Dream Theater,*
    124 Cal. App. 4th 547 (2004) ..................................................................................... 9, 16

*Fteja v. Facebook, Inc.,*
    841 F. Supp. 2d 829 (S.D.N.Y. 2012) ...................................................................... 13, 14

*Garcia v. Enter. Holdings, Inc.,*
    Case No. 14-00596, 2015 U.S. Dist. LEXIS 8799 (N.D. Cal. Jan. 23, 2015) ................ 10

1

**Page(s)**

2

3

*Grant-Fletcher v. Collecto, Inc.*,
No. 13-3505, 2014 WL 1877410 (D. Md. May 9, 2014) ................................. 15

4

5

*Green Tree Fin. Corp. v. Randolph*,
531 U.S. 79 (2000) ................................................................................................ 7

6

*Howsam v. Dean Witter Reynolds, Inc.*,
537 U.S. 79 (2002) ................................................................................................ 8

7

8

*Hubbert v. Dell Corp.*,
835 N.E.2d 113 (Ill. App. Ct. 2005) ................................................................. 13

9

*iLOR, LLC v. Google, Inc.*,
631 F.3d 1372 (Fed. Cir. 2011) ........................................................................... 4

10

11

*Johnmohammadi v. Bloomingdale's, Inc.*,
755 F.3d 1072 (9th Cir. 2014) ........................................................................... 20

12

13

*Kuehner v. Dickinson & Co.*,
84 F.3d 316 (9th Cir. 1996) ................................................................................. 7

14

*Leong v. Myspace, Inc*,
No. CV 10-8366, 2011 WL 7808208 (C.D. Cal. March 11, 2011) ................... 14

15

16

*Major v. McCallister*,
302 S.W.3d 227 (Mo. Ct. App. 2009) ............................................................... 13

17

*Mortensen v. Bresnan Commc'n., LLC*,
722 F.3d 1151 (9th Cir. 2013) ................................................................. 6, 7, 17

18

19

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ....................................................................................... 6, 15, 20

20

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) .................................................................... passim

21

22

*Nicosia v. Amazon.com, Inc.*,
No. 14-CV4513, 2015 WL 500180 (E.D.N.Y. Feb. 4, 2015) .......................... 12

23

*Oracle Am., Inc. v. Myriad Grp. A.G.*,
724 F.3d 1069 (9th Cir. 2013) ............................................................................. 9

24

*Pinnacle Museum Towers Ass'n v. Pinnacle Market Dev., LLC*,
55 Cal. 4th 223 (2012) ................................................................................. 16, 17

25

26

*Prograph Int'l Inc. v. Barhydt*,
928 F. Supp. 983 (N.D. Cal. 1996) ................................................................... 16

27

*Rent-A-Center West, Inc. v. Jackson*,
561 U.S. 63 (2010) ........................................................................... 8, 16, 19

28

**Page(s)**

*Ross v. Am. Exp. Co.*,
    547 F.3d 137 (2d Cir. 2008) ........................................................................... 16

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*,
    198 F.3d 88 (2d Cir. 1999) ............................................................................. 16

*Swift v. Zynga Game Network, Inc.*,
    805 F. Supp. 2d 904 (N.D. Cal. 2011) ...................................................... 12, 14

*Tompkins v. 23andMe, Inc.*,
    No. 5:13-CV-05682, 2014 WL 2903752 (N.D. Cal. June 25, 2014) ................................. 9

*Ulbrich v. Overstock.com, Inc.*,
    887 F. Supp. 2d 924 (N.D. Cal. 2012) ............................................................. 17

*Universal Protection Service, L.P., v. Super. Court of San Diego Co.*,
    Case No. D066919, 2015 WL 851090 (Cal. Ct. App. 2015) ............................................ 9

*Washington Mut. Bank, FA v. Superior Court*,
    24 Cal. 4th 906 (2001) .................................................................................. 10

*Windsor Mills, Inc. v. Collins & Aikman Corp.*,
    25 Cal. App. 3d 987 (1972) .............................................................................. 10

**Statutes**

9 U.S.C. § 4 ................................................................................................. 10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

PLEASE TAKE NOTICE THAT on Thursday, May 21, 2015, at 2:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 9, 19th Floor 450 Golden Gate Avenue, San Francisco, CA, 94102, before the Honorable Jon S. Tigar, Defendants Uber Technologies, Inc. and Rasier LLC (collectively, "Uber") will and hereby do move the Court for an order staying these proceedings pending arbitration of the claims pursued by Plaintiffs Matthew Philliben and Byron McKnight ("Plaintiffs").  Defendants' motion is based upon this Notice of Motion, the Memorandum of Points and Authorities offered in support thereof, the supporting Declarations of Michael Colman, R. Michael Cianfrani, Paul Holden, and Abhay Vardhan, and all exhibits thereto, all documents in the Court's file, any matters of which this Court may take judicial notice, and any evidence or argument presented on this matter.

Pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, Defendants seek the following relief:  an order staying this litigation in favor of arbitration.[1]

Dated:  March 20, 2015

IRELL & MANELLA LLP
Andra B. Greene
A. Matthew Ashley
Justin N. Owens


By:  /s/  A. Matthew Ashley
   A. Matthew Ashley
   Attorney for Defendants

---

[1] Uber reserves the right to file a motion to dismiss under Federal Rule of Civil Procedure 12(b) should the Court deny its motion to stay pending arbitration.  *See Aetna Life Ins. Co. v. Alla Med. Servs., Inc.*, 855 F.2d 1470, 1475 (9th Cir. 1988) (because a motion to stay is not a Rule 12(b) motion, its filing does not bar a subsequent motion to dismiss); *see also Conrad v. Phone Directories Co.,* 585 F.3d 1376, 1383 (10th Cir. 2009) ("If a party files a motion under FAA §§ 3 or 4 [and] that motion is denied . . . nothing prevents that party from then filing a Rule 12 motion to dismiss.").

### MEMORANDUM OF POINTS AND AUTHORITIES

Uber Technologies, Inc. and Rasier, LLC (collectively "Uber") respectfully submit this memorandum in support of their motion to stay this action in favor of arbitration.

## I.  INTRODUCTION

By Plaintiffs' own admissions, Plaintiffs agreed to be bound by Uber's Terms and Conditions.  Those Terms and Conditions include a clear and conspicuous agreement to arbitrate (the "Arbitration Agreement"), which mandates staying this action in favor of arbitration.

Plaintiffs admit that they registered for Uber *by creating an account*.  Complaint ¶¶ 37-38. In doing so, they were directed to Uber's Terms and Conditions, including the Arbitration Agreement, via a clickable button.  Under binding Ninth Circuit authority, supported by precedent throughout the country, this constitutes assent to the Arbitration Agreement.  This is particularly true where, as here, Plaintiffs have asserted reliance on alleged misrepresentations by Uber that are not visible until a user has clicked on a hyperlink to the relevant text.  *See, e.g.,* Complaint ¶ 24 (alleging that "[t]he 'Safe Rides Fee' appears next to a question mark, which links to a webpage with an explanation of the fee.").

Having assented to the Arbitration Agreement, Plaintiffs are bound by its terms, which are fair and indeed generous to the user (as demonstrated below).  This includes the requirement that "any dispute, claim or controversy arising out of or relating to" the use of Uber's services (language that undoubtedly encompasses the assertions in this litigation) be resolved either by binding arbitration or in small claims court.  Plaintiffs' allegations are based entirely on their use of Uber's services to arrange and pay for third-party transportation, and thus fall squarely within the scope of the Arbitration Agreement.

For all of these reasons and those discussed further below, this action should be stayed in favor of arbitration.

- 1 -

## II.     BACKGROUND

### A.     <u>The Uber Registration Process</u>

Uber is a technology company that enables riders to request transportation services from third-party transportation providers.  Holden Decl. ¶ 2.  Rasier, LLC is a wholly-owned subsidiary of Uber Technologies, Inc.  *Id.*

Using Uber's technology platform, riders can request transportation services from their smartphones (such as iPhones) via the Uber App, and these requests are then transmitted to independent transportation providers in the area who are available to receive transportation requests.  Holden Decl. ¶ 3.  But before riders can request transportation services via the Uber App, they must first register by creating an Uber account.  *Id.*; *see* Complaint ¶¶ 37-38, 44. Riders can register with Uber by creating an account either through the company's website, at https://get.uber.com/sign-up/, or within the Uber App itself.  Holden Decl. ¶ 3.  Plaintiff McKnight alleges that he used the Uber App to create an account in "late 2013 or early 2014."  Complaint ¶¶ 37-38.  Plaintiff Philliben alleges that he registered through the Uber App, *id*. at ¶¶ 37-38, although Uber's records confirm that he in fact registered on the company's website (either on a computer or tablet, or in a web browser on his smartphone).  Vardhan Decl. ¶ 5.

To create an Uber account through the company's website on September 7, 2014, when Plaintiff Philliben registered for Uber, prospective riders were required to complete the following fields contained on a single webpage: name, mobile phone number (and country), email address, password, language, credit card information, postal code, and – if applicable – promotional code. Vardhan Decl. ¶ 7.  In order to create an account after completing these fields, the registrant was required to click the blue sign-up button at the bottom of the webpage.  *Id*.  The  following notice was visibly displayed directly above or below the blue sign-up button: "By clicking 'Submit' below, you are agreeing to Uber's Terms and Conditions and Privacy Policy."  *Id*. ¶ 8.  The words "Uber Terms and Conditions" and "Privacy Policy" are hyperlinks.  *Id*.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18



19   Vardhan Decl. Exs. A, B.

20           Registration on the Uber App is similarly simple and straightforward.  During the period

21   from late 2013 to early 2014, when Plaintiff McKnight alleges he registered for Uber, this process

22   involved three basic steps, each of which was confined to a single screen on the user's smartphone

23   with no scrolling required:  (1) Create an Account; (2) Create a Profile; and (3) Link Payment.

24   Holden Decl. ¶ 5.  In the Create an Account step/screen, prospective registrants entered their email

25   address, mobile phone number, and a chosen password.  The prospective registrant then hit the

26   "next" button at the top right of the screen to move to the next step.  *Id.* ¶ 5(a).  In the Create a

27   Profile step/screen, prospective registrants entered their first and last names (their user profile).

28

1   Once again, the prospective registrant had to hit the "next" button at the top right of the screen to

2   move to the next step.  *Id.* ¶ 5(b).

3          In the Link Payment step/screen, which is the final step in the Uber App registration

4   process, prospective registrants entered their credit card information.  Holden Decl. ¶ 5(c).  In

5   addition, they were informed on the same screen that:  "By creating an Uber account you agree to

6   the Terms of Service and Privacy Policy," with the words "Terms of Service and Privacy Policy"

7   distinguished in bolded text and a rectangular box that was a clickable button similar to a

8   hyperlink.  *Id.*  When the button was clicked, the rider was taken to a screen that contained

9   clickable buttons, one of which was entitled "Terms & Conditions," and another entitled "Privacy

10  Policy."  *Id.*; *see iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1374 (Fed. Cir. 2011) (a hyperlink is

11  a "string of text or a computer graphic that a user can 'click' with the mouse pointer" to open a

12  new browser page).  To complete the Uber App registration process and create an Uber account,

13  the registrant then clicked the "DONE" button at the top right of the screen:



27  *Id.*, Exs. A – E (screen shots of each of the three steps/screens in the registration process).  The

28  Uber App registration process cannot be completed without clicking the "DONE" button on the

- 4 -

1    final screen.  As the Court can see, the Uber App registration process – like that of the company's

2    website – is short and simple, and the screens are easy to read and understand.

3    **B.      The Arbitration Agreement**

4    Uber's Terms and Conditions contain seven sections.  The first section provides that the

5    Terms and Conditions create a contractual relationship between the registrant and Uber.  Cianfrani

6    Decl., Ex. A at 1.

7    Another section, entitled "Dispute Resolution," (Cianfrani Decl., Ex. A at 7-8), states that:

8    You and Company agree that any dispute, claim or controversy arising out of or
     relating to this Agreement or the breach, termination, enforcement, interpretation or
9    validity thereof or the use of the Service or Application (collectively, "Disputes")[2]
     will be settled by binding arbitration, except that each party retains the right to
10   bring an individual action in small claims court and the right to seek injunctive or
     other equitable relief in a court of competent jurisdiction to prevent the actual or
11   threatened infringement, misappropriation or violation of a party's copyrights,
     trademarks, trade secrets, patents or other intellectual property rights. **You**
12   **acknowledge and agree that you and Company are each waiving the right to a**
     **trial by jury or to participate as a plaintiff or class User in any purported class**
13   **action or representative proceeding.**  Further, unless both you and Company
     otherwise agree in writing, the arbitrator may not consolidate more than one
14   person's claims, and may not otherwise preside over any form of any class or
     representative proceeding . . . .

15   The Terms and Conditions also specify which private arbitration company will oversee

16   any dispute, and the particular arbitration rules that will govern:

17   Arbitration Rules and Governing Law. The arbitration will be administered by the
18   American Arbitration Association ("AAA") in accordance with the Commercial
     Arbitration Rules and the Supplementary Procedures for Consumer Related
19   Disputes (the "AAA Rules") then in effect, except as modified by this "Dispute
     Resolution" section. (The AAA Rules are available at www.adr.org/arb_med
20   (/web/20140905032202/http://www.adr.org/arb_med) or by calling the AAA at
     18007787879.)  The Federal Arbitration Act will govern the interpretation and
21   enforcement of this Section . . . .

22   *Id.*, Ex. A at 8.

23

24

---

25   **[2]** The terms "Service" and "Application" are defined in the Terms and Conditions as
     follows: "By using or receiving any services supplied to you by the Company (collectively, the
26   "Service"), and downloading, installing or using any associated application supplied by the
     Company which purpose is to enable you to use the Service (collectively, the "Application"), you
27   hereby expressly acknowledge and agree to be bound by the terms and conditions of the
     Agreement, and any future amendments and additions to this Agreement as published from time to
28   time at https://www.uber.com/terms (/web/20140905032202/https://www.uber.com/terms) or
     through the Service."  *Id.*, Ex. A at 1.

The terms of the arbitration provision heavily favor the user; it permits the user to arbitrate the dispute in the county where he or she resides, and allows for recovery of attorneys' fees only by the user, not Uber:

> Arbitration Location and Procedure. Unless you and Company otherwise agree, the arbitration will be conducted in the county where you reside . . . .  If you prevail in arbitration you will be entitled to an award of attorneys' fees and expenses, to the extent provided under applicable law.  Company will not seek, and hereby waives all rights it may have under applicable law to recover, attorneys' fees and expenses if it prevails in arbitration.

*Id.*, Ex. A at 8.

Further safeguarding riders' access to the arbitral forum is Uber's agreement to bear the burden of filing, administrative and arbitrator fees for non-frivolous claims:

> Fees.  Your responsibility to pay any AAA filing, administrative and arbitrator fees will be solely as set forth in the AAA Rules.  However, if your claim for damages does not exceed $75,000, Company will pay all such fees unless the arbitrator finds that either the substance of your claim or the relief sought in your Demand for Arbitration was frivolous or was brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)).

*Id.*, Ex. A at 7-8.

Thus, the Arbitration Agreement contains a detailed delineation of the waivers of the parties, including the waiver of any jury trial right, as well as the numerous protections afforded the user.

## III.   LEGAL STANDARD

In enacting the Federal Arbitration Act (the "FAA"), Congress's "clear intent" was "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22-25 (1983) (the FAA embodies "a liberal federal policy favoring arbitration agreements").  The Ninth Circuit recognizes that "the FAA's purpose is to give preference (instead of mere equality) to arbitration provisions." *Mortensen v. Bresnan Commc'n., LLC*, 722 F.3d 1151, 1160 (9th Cir. 2013) (*citing AT&T Mobility v. Concepcion*, 131 S. Ct. 1740, 1745 (2011)).

Accordingly, "[an] order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an

- 6 -

1  interpretation that covers the asserted dispute." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*,

2  475 U.S. 643, 650 (1986); *see also Kuehner v. Dickinson & Co.*, 84 F.3d 316, 319 (9th Cir. 1996)

3  (holding that the FAA "created a rule of contract construction favoring arbitration.").  "As

4  arbitration is favored, those parties challenging the enforceability of an arbitration agreement bear

5  the burden of proving that the provision is unenforceable." *Mortensen*, 722 F.3d at 1157 (citing

6  *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 91 (2000)).

7  **IV.    PLAINTIFFS AGREED TO ARBITRATE THEIR CLAIMS ON AN  INDIVIDUAL**

8  **BASIS**

9      Plaintiffs admit they went through the entire Uber registration process and admit that they

10  knowingly and intentionally created (and used) their Uber accounts.  Complaint ¶¶ 12, 37-38

11  ("Plaintiff Philliben downloaded the app and created an Uber account in approximately August

12  2014.  Plaintiff McKnight downloaded the app and created an Uber account in approximately late

13  2013 or early 2014.  Plaintiffs followed the registration process for creating an account.").

14  Plaintiffs are thus bound by the Terms and Conditions that they were expressly informed would

15  apply to their Uber accounts.  *See* Section IV(C), *infra*.  As discussed below, because the

16  Arbitration Agreement is governed by the FAA, and because Plaintiffs' claims fall within the

17  scope of the Arbitration Agreement, Plaintiffs are now bound by the Agreement's relevant

18  provisions including: the resolution of disputes by binding arbitration or in small claims court

19  (Section IV(D), *infra*); delegation of threshold arbitrability issues to the arbitrator (Section IV(B),

20  *infra*); and a waiver of any representative or class-wide proceedings (Section IV(E), *infra*).

21      **A.    The Agreement is Governed By The FAA**

22      Both the express terms of the Arbitration Agreement and the nature of the relationship

23  between Uber and Plaintiffs confirm that the FAA governs.  First, the Arbitration Agreement's

24  statement that "[t]he Federal Arbitration Act will govern the interpretation and enforcement" of

25  the agreement is a sufficient basis for application of the FAA.  *See Buckeye Check Cashing*, 546

26  U.S. 440, 442-43 (2006) (FAA found to preempt state law where arbitration agreement expressly

27  provided that the FAA would govern); *see also Cronus Invs., Inc. v. Concierge Servs.*, 35 Cal. 4th

28  376, 394 (2005) ("[P]arties to an arbitration agreement [may] expressly designate that any

- 7 -

1  arbitration proceeding should move forward under the FAA's procedural provisions rather than

2  under state procedural law.").  In addition, the FAA applies upon a finding that the transactions at

3  issue affect interstate commerce.  *See Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265,

4  274-277 (1995) (interpreting the FAA's "involving commerce" provision as broadly as the words

5  "affecting commerce," and confirming that the FAA should be applied coincident with the full

6  reach of Congress's powers under the Commerce Clause).  Where, as here, the transactions

7  involve the use of internet technologies to transmit user requests across a network of independent

8  drivers in over 100 cities across the United States, the "affecting commerce" requirement has been

9  met.  *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (applying the FAA

10  to a dispute involving internet commerce).

11          **B.**        <u>**The Arbitrator Should Decide Any Questions Of Arbitrability**</u>

12        The Court should stay this action and honor the parties' agreement to permit the arbitrator

13  to decide the threshold question of arbitrability.  "[P]arties can agree to arbitrate 'gateway'

14  questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their

15  agreement covers a particular controversy."  *Rent-A-Center West, Inc. v. Jackson*, 561 U.S. 63, 63

16  (2010); *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83-84 (2002) (questions of

17  arbitrability may be submitted to the arbitrator if the parties clearly and unmistakably agree).

18  Indeed, "[a]n agreement to arbitrate a gateway issue is simply an additional antecedent agreement

19  the party seeking arbitration asks the federal court to enforce," and the FAA operates on this

20  agreement just as it does any other.  *Rent-A-Center West, Inc.,* 561 U.S. at 70.

21        The Arbitration Agreement in this case delegates gateway questions of arbitrability to the

22  arbitrator by incorporation of the AAA Commercial Arbitration Rules.  Cianfrani Decl., Ex. A at

23  8.  Specifically, Rule 7(a) of the AAA Rules provides:  "The arbitrator shall have the power to rule

24  on his or her own jurisdiction, including any objections with respect to the existence, scope, or

25  validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  AAA

26  COMMERCIAL ARBITRATION RULES AND MEDIATION PROCEDURES at R-7(a)

27  (https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_004103) (effective October 1,

28  2013; last accessed March 20, 2015).  Courts in this District addressing the effect of incorporation

of the AAA Rules into contracts – including consumer contracts – have found that such incorporation mandates delegation of the gateway question of arbitrability to the arbitrator.  *See, e.g.*, *Crook v. Wyndham Vacation Ownership, Inc.*, No. 13-CV-03669, 2013 WL 6039399, at *6 (N.D. Cal. Nov. 8, 2013) (Orrick, J.) (granting motion to compel arbitration of putative class plaintiffs' claims and delegating questions of arbitrability to arbitrator); *see also Bernal v. Southwestern & Pac. Specialty Fin., Inc.,* No. C-12-05797, 2014 U.S. Dist. LEXIS 63338, at *13-17 (N.D. Cal. May 7, 2014) (Armstrong, J.) (same); *but see Tompkins v. 23andMe, Inc.,* No. 5:13-CV-05682, 2014 WL 2903752, at *13 (N.D. Cal. June 25, 2014) (Koh, J.) (declining to delegate questions of arbitrability to arbitrator ).[3]

Applying the incorporation doctrine to delegate issues of arbitrability in a putative consumer class action, the court in *Crook v. Wyndham Vacation Ownership, Inc.* noted that, "[v]irtually every circuit to have considered the issue has determined that incorporation of the American Arbitration Association's (AAA) arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."  *Crook*, 2013 WL 6039399, at *6 (citing *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013)); *see also Universal Protection Service, L.P. v. Super. Court of San Diego County*, Case No. D066919, 2015 WL 851090 at *5-9 (Cal. Ct. App. 2015) (holding that the parties' "agreement to resolve their arbitration under the AAA rules constitutes clear and unmistakable evidence of their intent that the arbitrator, not the court" decide threshold issues); *see also Dream Theater, Inc. v. Dream Theater*, 124 Cal. App. 4th 547, 557 (2004) (parties' agreement incorporating AAA Commercial Arbitration Rules provided "clear and unmistakable evidence of the intent that the arbitrator will decide whether a contested claim is arbitrable.").  Other courts in this District have reached the same conclusion.  *Bernal*, 2014 U.S. Dist. LEXIS 63338, at *14-15 ("Indeed, when an arbitration agreement explicitly incorporates the AAA Rules, numerous courts have held that the parties

---

[3] The Ninth Circuit has "express[ed] no view as to the effect of incorporating arbitration rules into consumer contracts."  *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1075 n.2 (9th Cir. 2013).

1   clearly and unmistakably agreed that the issue of arbitrability would be submitted to arbitration for

2   resolution.").

3          Consequently, this Court should stay this action and let the arbitrator decide the question of

4   arbitrability.

5          **C.     Plaintiffs Assented To The Arbitration Agreement**

6          As demonstrated above, the incorporation of the AAA Rules into the Arbitration

7   Agreement counsels that issues of arbitrability be delegated to the arbitrator.  However, if this

8   Court rules on issues of arbitrability, the Court's role under the FAA is "limited to determining

9   (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement

10  encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.,* 207 F.3d 1126,

11  1130 (9th Cir. 2000) (citing 9 U.S.C. § 4).  "If the response is affirmative on both counts, then the

12  Act requires the court to enforce the arbitration agreement in accordance with its terms." *Id.*

13         Mutual assent to contract "may be manifested by written or spoken words, or by conduct,"

14  *Binder v. Aetna Life Ins. Co.,* 75 Cal. App. 4th 832, 850 (1999), and acceptance of contract terms

15  may be implied through action or inaction. *See Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585,

16  593-95 (1991).[4]  Thus, "an offeree, knowing that an offer has been made to him but not knowing

17  all of its terms, may be held to have accepted, by his conduct, whatever terms the offer contains."

18  *Windsor Mills, Inc. v. Collins & Aikman Corp.,* 25 Cal. App. 3d 987, 992 (1972).  In the context of

19  online transactions, "the terms of the agreement are binding, even if the user did not actually

20  review the agreement, provided that the user had actual knowledge of the agreement or the website

21  put a 'reasonably prudent user on notice of the terms of the contract.'" *Garcia v. Enter. Holdings,*

22  *Inc.,* Case No. 14-00596, 2015 U.S. Dist. LEXIS 8799 at *21-22 (N.D. Cal. Jan. 23, 2015) (citing

23  *Nguyen,* 763 F.3d at 1176).

24

25

26        [4] Where, as here, the plaintiff alleges subject matter jurisdiction based on diversity of

27  citizenship, federal courts look to the choice of law principles of the forum state. *Nguyen,* 763
    F.3d at 1175.  The default choice of law presumption in California is that California law applies.

28  *See Washington Mut. Bank, FA v. Superior Court,* 24 Cal. 4th 906, 919 (2001) ("[T]he forum will
    apply its own rule of decision unless a party litigant timely invokes the law of a foreign state.").

1    In a recent decision, the Ninth Circuit noted that:  "While new commerce on the Internet

2    has exposed courts to many new situations, it has not fundamentally changed the principles of

3    contract.  One such principle is the requirement that mutual manifestation of assent, whether by

4    written or spoken word or by conduct, is the touchstone of contract."  *Nguyen*, 763 F.3d at 1175

5    (internal citations omitted).  The key question is whether the user had inquiry notice of the terms

6    and conditions.  *Id.* at 1176-77.  "[W]here the website contains an explicit textual notice that

7    continued use will act as a manifestation of the user's intent to be bound," courts have enforced

8    the agreements.  *Id.* at 1177.  The Ninth Circuit also noted that "the conspicuousness and

9    placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and

10   the website's general design all contribute to whether a reasonably prudent user would have

11   inquiry notice" of the terms and conditions.  *Id* at 1177.

12   In this case, there was undoubtedly inquiry notice.  Whether accomplished via the website

13   or the Uber App, the Uber registration process is clear, simple and unequivocal.  The website

14   registration process utilized by Plaintiff Philliben consists of a single webpage with a limited

15   number of fields for the prospective registrant to complete.  Vardhan Decl. ¶ 7.  Directly above the

16   sign-up button that completes the process is a textual notice stating: "By clicking 'Submit' below,

17   you are agreeing to the Uber Terms and Conditions and Privacy Policy."  The phrases "Uber

18   Terms and Conditions" and "Privacy Policy" are hyperlinks.  *Id.* ¶ 8.

19   Likewise, the entire three step registration process on the Uber App requires the

20   completion of just six data fields, and involves a total of three express notifications from Uber.

21   Namely, on the first step/screen, the potential registrant is told:  "We use your email and mobile

22   number to send you ride confirmations and receipts."  Holden Decl. ¶ 5(a).  The second screen

23   states: "Your name and photo helps your driver identify you at pickup."  *Id.* at ¶ 5(b).  And on the

24   last step/screen, the potential registrant is told:  "By creating an Uber account, you agree to the

25   Terms of Service and Privacy Policy," with the "Terms of Service and Privacy Policy" appearing

26   in bolded text and surrounded by a rectangular box to indicate a clickable box.  *Id.* at ¶ 5(c).  This

27   simple registration process then ends with a push of the "DONE" button at the top right hand

28   corner of the screen, which finishes the creation of the Uber account.  *Id.*  The Uber App

- 11 -

1   registration process, like that of the website, thus provides the required "explicit textual notice that

2   [creating an Uber account] will act as manifestation of the user's intent to be bound," satisfying

3   the *Nguyen* standard.  *Nguyen,* 763 F.3d at 1177.[5]

4        In situations like the one here – as *Ngyuen* recognizes – courts in this District and

5   throughout the nation (federal and state) have repeatedly held users to terms and conditions when

6   they were on notice that such terms would bind them if they proceeded.  *See, e.g., Swift v. Zynga*

7   *Game Network, Inc.*, 805 F. Supp. 2d 904, 908, 911 (N.D. Cal. 2011) (Mag. J. Laporte)

8   (videogame user bound by Zynga's online terms and conditions because she was told that, "By

9   using YoVille, you also agree to the YoVille [hyperlink] Terms of Service" and the user

10  proceeded) (compelling arbitration); *Cairo, Inc. v. Crossmedia Servs., Inc.*, No. 04-04825, 2005

11  WL 756610, at *4-5 (N.D. Cal. Apr. 1, 2005) (J. Ware) (enforcing forum selection clause in

12  website's terms of use where website expressly stated: "By continuing past this page and/or using

13  this site, you agree to abide by the Terms of Use for this site…") (granting motion to dismiss for

14  improper venue); *see also Nicosia v. Amazon.com, Inc.*, No. 14-CV4513, 2015 WL 500180, at *5

15  (E.D.N.Y. Feb. 4, 2015) (online Amazon customer who placed order was bound by contract terms

16  when website stated that, "By placing your order, you agree to Amazon.com's privacy, notice and

17  conditions of use," which were reachable by a hyperlink on the same webpage) (compelling

18  arbitration); *Crawford v. Beachbody, LLC*, No. 14CV1583, 2014 WL 6606563, at *3 (S.D. Cal.

19  Nov. 5, 2014) (online customer who placed order was bound by contract terms when website

20  stated that "By clicking Place Order below, you are agreeing that you have read and understand

21  the Beachbody Purchase Terms and Conditions," which were at a hyperlink on the same webpage)

22  (granting motion to transfer venue); *5381 Partners LLC v. Shareasale.com, Inc.*, No. 12cv426,

23  2013 WL 5328324, *4 (E.D.N.Y. Sept 23, 2013) (online purchaser who activated account was

24

25        [5] In *Nguyen,* the court found that there was no such "explicit textual notice" in that case, because the only notice to the user that the terms and conditions would bind them was in the terms
26  and conditions themselves – which the users were never prompted to review or told would be binding.  *See Nguyen,* 763 F.3d at 1174 (noting that the requisite warning – "[b]y visiting [the
27  site] . . . creating an account, [or] making a purchase . . . a User is deemed to have accepted the Terms of Use" – was not visible unless and until the user clicked to view the terms).  The opposite
28  is true in this case, where the user is expressly told during the account creation process that creating the account will subject the user to the terms and conditions.

bound by contract when website stated that "by clicking and making a request to Activate, you agree to the terms and conditions in the Merchant Agreement," and a hyperlink to the terms and conditions was available on the same page) (granting motion to transfer venue); *Fteja v. Facebook, Inc.,* 841 F. Supp. 2d 829, 837-38 (S.D.N.Y. 2012) (Facebook account holder was bound by contract when holder was expressly informed during the internet sign up process that registering would manifest agreement to the terms of use) (granting motion to transfer venue); *Major v. McCallister,* 302 S.W.3d 227, 229 (Mo. Ct. App. 2009) (binding online customer to contract when: "There were spaces for Appellant to enter her contact information, followed by a 'Submit for Matching Pros' button.  Next to the button was a blue hyperlink to the website terms and this notice:  'By submitting you agree to the Terms of Use.'") (affirming dismissal for improper venue); *Hubbert v. Dell Corp.*, 835 N.E.2d 113, 122 (Ill. App. Ct. 2005) ("The statement that the sales were subject to the defendant's 'Terms and Conditions of Sale' . . . accessible online by blue hyperlinks, was sufficient notice to the plaintiffs that purchasing computers online would make the 'Terms and Conditions of Sale' binding on them.") (compelling arbitration).  Having admitted that they completed the Uber registration process, and that they knowingly created and used their Uber accounts, Plaintiffs must now abide by the Terms and Conditions that they were informed would govern their Uber accounts.

In an attempt to avoid the Terms and Conditions, Plaintiffs offer several confusing and contradictory allegations.  First, Plaintiffs contend that the lower halves of the screens of their smart phones were obscured "[t]hroughout the registration process."  Complaint ¶ 40.  Of course, these assertions regarding the functionality of the Uber App are irrelevant in the case of Plaintiff Philliben, who registered for Uber using the company's website.  Vardhan Decl. ¶ 5.  Plaintiffs' "obscuring" defense fares no better with regard to Plaintiff McKnight: as stated in the attached declaration of Uber employee Paul Holden, with supporting screenshots, during the time when McKnight claims to have registered for Uber, the Terms of Service and associated notice "remained visible to the user during the registration process, even when the pop-up keyboard was

displayed."[6]  Holden Decl. ¶ 6; *see also* Holden Decl. at Exs. A-E.  Ultimately it is the screen shot, not Plaintiffs' mischaracterization of it, that governs, and the screen shot undeniably shows that Plaintiffs were on notice that, if they created an Uber account (which they admit they did), they were bound by Uber's Terms and Conditions.  *See, e.g., Swift*, 805 F. Supp. 2d at 911 (granting motion to stay in favor of arbitration, and rejecting "Plaintiff's description" of defendant's website upon finding that the description was "belied by the color screen shot image provided by [defendant] which makes the reference to terms of service and hyperlink much more visible.").

Plaintiffs next argue that:  "At no step during the registration process were the 'Terms & Conditions' and/or 'Privacy Policy' displayed to Plaintiffs," and that "Uber's registration process never required Plaintiffs to access the 'Terms & Conditions' hyperlink, read the 'Terms & Conditions,' or affirmatively assent to them."  Complaint ¶¶ 42-43.  However, this assertion is both irrelevant and wrong.  It is irrelevant because Plaintiffs do not dispute that the Terms and Conditions and Privacy Policy were available *via a clickable button* which was contained in the very sentence informing them that by creating an Uber account, they were agreeing to the connected terms and conditions.  Holden Decl. ¶ 5(c).  That Plaintiffs chose not to view those terms and conditions, or were not "required" to view them, makes no difference under the law. *See, e.g., Leong v. Myspace, Inc.*, No. CV 10-8366, 2011 WL 7808208, at *5 (C.D. Cal. March 11, 2011) (plaintiff on notice where "[t]he text of the Agreement was only a mouse-click away, but [plaintiff] apparently chose not to read its contents"); *see also Fteja,* 841 F. Supp. 2d at 839 (holding that hyperlinked terms provided adequate notice because courts have long upheld contracts where "the consumer is prompted to examine terms of sale that are located somewhere else.").

---

[6] Plaintiffs themselves admit that "[a]t the last step of the process, the app displays a screen on which a hyperlink to Uber's 'Terms & Conditions and Privacy Policy' appears at the bottom." Complaint ¶ 41.  Plaintiffs conveniently omit the fact that the hyperlink is part of a sentence that reads:  "By creating an Uber account, you agree to the Terms & Conditions and Privacy Policy." Holden Decl. ¶ 5(c).  Further, as reflected in the screenshots, the final screen was presented to the registrant without the keyboard; the keyboard did not appear until the user clicked into a field to enter text.  *Id.* ¶ 7.  At that point, the language  "By creating an Uber account, you agree to the Terms of Service and Privacy Policy (including the clickable 'Terms of Service and Privacy Policy' button) moved up above the keyboard, and was never obscured."  *Id.*

1    Notably, Plaintiffs' *own complaint* hinges on alleged misrepresentations that are not visible

2    until a user has clicked on a hyperlink. *See, e.g.,* Complaint ¶ 24 ("The 'Safe Rides Fee' appears

3    next to a question mark, which links to a webpage with an explanation of the fee."). Plaintiffs

4    cannot have it both ways. They cannot claim reliance on safety-related statements accessible via

5    hyperlink, yet claim that they had no inquiry notice of Terms and Conditions made accessible to

6    them in the same manner (indeed to which they were affirmatively directed). *See Grant-Fletcher*

7    *v. Collecto, Inc.*, No. 13-3505, 2014 WL 1877410, at *7 (D. Md. May 9, 2014) (Plaintiff's reliance

8    on terms and conditions in her complaint "undercut[] any argument that the Arbitration Agreement

9    was not available to her").

10   In summary, Plaintiffs at the very least were on inquiry notice that by creating their Uber

11   accounts they were agreeing to Uber's Terms and Conditions, which include the Arbitration

12   Agreement. That is all the law requires to stay this action in favor of arbitration.

13   **D.      The Arbitration Agreement Encompasses Plaintiffs' Claims**

14   As demonstrated above, it is the arbitrator who should decide the scope of the Arbitration

15   Agreement and whether it encompasses Plaintiffs claims. *See, supra,* Section IV(B); *Crook*, 2013

16   WL 6039399, at *6 (holding that incorporation of AAA Rules in consumer contract required that

17   "plaintiffs' objections to the scope of the dispute resolution clause must be decided by the

18   arbitrator."). However, to the extent this Court decides the issue, under the FAA a court must

19   compel arbitration "unless it may be said with positive assurance that the arbitration clause is not

20   susceptible of an interpretation that covers the asserted dispute." *AT&T Techs., Inc.*, 475 U.S. at

21   650. Moreover, "any doubts concerning the scope of arbitrable issues should be resolved in favor

22   of arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25.

23   The Arbitration Agreement provides that "any dispute, claim or controversy arising out of

24   or relating to this Agreement…or the use of the Service or Application (collectively, 'Disputes')

25   will be settled by binding arbitration [or] in small claims court." *See* Cianfrani Decl., Ex. A at 8.

26   The Court need look no further than the Complaint's description of the "Nature of the Case" to see

27   that this case arises out of and relates to Uber's services and application. *See, e.g.,* Complaint § I

28   "Nature of the Case": ¶ 1 ("Uber provides a smartphone application that . . ."); ¶ 2 ("Uber offers

- 15 -

1   multiple levels of service . . ."); ¶ 3 ("Uber's background check procedures and safety measures

2   are woefully inadequate . . ."). Indeed, all of Plaintiffs' allegations in one way or another "aris[e]

3   out of or relat[e]" to Uber's services. *See Dream Theater, Inc. v. Dream Theater*, 124 Cal. App.

4   4th 547, 553 n.1 (2004) ("An arbitration clause that covers *any claim arising out of or relating to

5   the contract or the breach thereof is very broad.*") (emphasis in original) (internal quotation marks

6   omitted). Consequently, the Arbitration Agreement encompasses Plaintiffs' claims in this case.[7]

7        **E.        The Arbitration Agreement Is Not Unconscionable**

8        On the question of unconscionability, the Court's analysis is limited to the issue of whether

9   the arbitration provision, by itself, is unconscionable. *See Rent-A-Center v. Jackson*, 561 U.S. 63,

10  70-71 (2010) ("[A] party's challenge to another provision of the contract, or to the contract as a

11  whole, does not prevent a court from enforcing a specific agreement to arbitrate."). Consequently,

12  Plaintiffs' allegations of supposedly unconscionable terms relating to warranty disclaimers, refund

13  policies, liability disclaimers, safety disclaimers, and surge pricing – in addition to being

14  unfounded – are simply irrelevant to the issue at hand. *See Complaint ¶¶ 45-53.* Indeed, the

15  Complaint does not contain *any* allegation that any aspect of the *arbitration provision* is

16  unconscionable. That alone ends the unconscionability inquiry.

17       In any event, "[u]nder California law, a contract provision is unenforceable due to

18  unconscionability only if it is *both* procedurally *and* substantively unconscionable." *Bosinger v.

19  Belden CDT, Inc.*, 358 Fed. Appx. 812, 814 (9th Cir. Cal. 2009). Moreover, "the party opposing

20  arbitration bears the burden of proving any defense, such as unconscionability." *Pinnacle

21  Museum Towers Ass'n v. Pinnacle Market Dev., LLC*, 55 Cal. 4th 223, 236 (2012). That means

22

---

23  [7] The Arbitration Agreement also covers Rasier LLC. First, Plaintiffs have sued Rasier
    LLC in its capacity as a "subsidiary" of Uber Technologies, Inc., *see* Complaint, ¶ 11, and

24  "[a]gency principles" permit "nonsignatory corporations to compel arbitration under arbitration
    clauses signed by their corporate parents," *see Prograph Int'l Inc. v. Barhydt*, 928 F. Supp. 983,

25  990 (N.D. Cal. 1996); *see also Ross v. Am. Exp. Co.*, 547 F.3d 137, 144 (2d Cir. 2008) (a non-
    signatory may compel arbitration where the non-signatory has a "corporate relationship to a

26  signatory party") (emphasis in original). In addition, the complaint treats Rasier LLC and Uber
    Technologies as if they were interchangeable and seeks to hold them liable for the same conduct.

27  *See Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 97
    (2d Cir. 1999) (non-signatory can compel arbitration where plaintiffs treated "related companies

28  as though they were interchangeable"). Accordingly, like Uber Technologies, Inc., Rasier LLC is
    also entitled to a stay pending arbitration of Plaintiffs' claims against it.

3329392

1    Plaintiffs must show that the arbitration clause is "so one-sided as to shock the conscience."

2    *Pinnacle,* 55 Cal. 4th at 246 (internal quotations omitted).  Plaintiffs cannot come close to meeting

3    their burden.

4         Far from being "unjustifiably one-sided," the Arbitration Agreement is bilateral and replete

5    with user safeguards.  For example, the Arbitration Agreement provides that if a user's claim for

6    damages does not exceed $75,000, Uber will pay *all* of the user's "filing, administrative and

7    arbitrator fees" for non-frivolous claims.  Cianfrani Decl., Ex. A at 8.  Moreover, the Arbitration

8    Agreement recognizes the right of riders to collect attorneys' fees and expenses if they prevail in

9    arbitration, even though Uber itself waives rights it may have to collect attorneys' fees and

10   expenses.  *Id.*  The Arbitration Agreement further ensures the user's ability to pursue a remedy by

11   providing that arbitration proceedings "will be conducted in the county" where the user resides,

12   thus eliminating the threat of prohibitive travel expenses.  *Id.*  These provisions comprehensively

13   safeguard the user's access to the arbitral forum on an individual basis, and go well beyond what

14   is required to survive a challenge based on alleged unconscionability.  *See Ulbrich v.*

15   *Overstock.com, Inc*., 887 F. Supp. 2d 924, 933-34 (N.D. Cal. 2012) (rejecting unconscionability

16   challenge even where arbitration provision required employees to share in costs of arbitration and

17   to attend the arbitration at an out-of-state location, and lacked complete mutuality in the remedies

18   available to the parties); see also *Crook*, 2013 WL 6039399, at *5 (enforcing arbitration agreement

19   despite plaintiffs' argument that agreement was unconscionable because it (i) contemplated that

20   the parties would share some of the fees and costs of arbitration, (ii) incorporated the AAA Rules,

21   and (iii) required travel to an arbitration forum outside plaintiffs' home county).

22        And to the extent Plaintiffs contend that the class waiver is unconscionable, any such

23   contention is precluded by Supreme Court and Ninth Circuit precedent.  *Concepcion*, 131 S. Ct. at

24   1748 (A state rule barring class action waivers "interferes with fundamental attributes of

25   arbitration and thus creates a scheme inconsistent with the FAA"); *Mortensen*, 722 F.3d at 1160

26   ("In our view, *Concepcion* crystalized the directive… that the FAA's purpose is to give preference

27   (instead of mere equality) to arbitration provisions.").

28        The Arbitration Agreement thus is not unconscionable and should be enforced.

**F.**     **Arbitration Of McKnight's Claims Is Further Mandated By The Arbitration Clause In His Transportation Provider Agreement**

Although this Court need not reach the issue, there is an alternative and independent basis for compelling arbitration of McKnight's claims.  McKnight was a transportation service provider who used the Uber app to receive requests for transportation services and, in doing so, he expressly agreed to be bound by a Software License and Online Services Agreement ("Licensing Agreement").  Under that agreement, like the Arbitration Agreement in Uber's Terms and Conditions, McKnight agreed to arbitrate his claims (including the gateway issue of arbitrability; Colman Decl. Ex. A at § 14.3(i)), and waived any right to participate in class proceedings against Uber (*id.*).

In order to obtain access to Uber's software platform to receive requests for livery services from riders, McKnight registered with Uber in 2012 as a third-party transportation provider. Colman Decl. ¶ 6.  In June 2014 – six months before filing this action – McKnight agreed to an updated version of the Licensing Agreement, which included an arbitration provision.  *Id.* ¶ 7. The effect of the arbitration provision was plainly and conspicuously stated multiple times in the amended agreement.  Colman Decl., Ex. A at pp.1-2, § 14.3.  McKnight was then presented with the arbitration agreement when he accessed Uber's software, in which he was expressly informed that:  "To go online, you must agree to all the contracts below."  On the same page, McKnight was presented with hyperlinks to the Licensing Agreement and two other documents and notified that: "**By clicking below, you acknowledge that you agree to all the contracts above**."  Colman Decl. ¶ 8.

- 18 -

(Colman Decl., Ex. B)

Uber's records confirm that McKnight in fact clicked the button titled, "Yes, I agree," and also clicked a second button confirming that he had "reviewed all the documents and agree[d] to all the new contracts."  Colman Decl. ¶ 10.  Uber's records also confirm that McKnight did not exercise his contractual right to opt out of the arbitration agreement.  *Id.* ¶ 11.  Under Ninth Circuit precedent and case law throughout the nation, McKnight assented to the arbitration agreement.  *See, e.g., Nguyen,* 763 F.3d at 1177; *see also* Section IV(C), *supra.*

The Licensing Agreement's arbitration clause expressly provides that the arbitrator is to decide threshold issues of arbitrability, which include both assent and scope.  Colman Decl. Ex. A at § 14.3(i) (providing for arbitration of issues "including the enforceability, revocability, or validity of the Arbitration Provision.");  *Rent-A-Center West, Inc.,* 561 U.S. at 63.  However, in the event this Court does decide arbitrability, the arbitration provision is broad in scope, covering any "disputes arising out of or related to this Agreement *and disputes arising out of or related to Your*

- 19 -

1  *relationship with Uber*."  Colman Decl., Ex. A at § 14.3(i) (emphasis added).  It further provides

2  for "arbitration of every claim or dispute that lawfully can be arbitrated," with the exception of

3  specifically identified exclusions not pertinent here.  *Id.*  Consequently, the arbitration clause

4  encompasses McKnight's claims, which at the very least "arise out of or relate to [his] relationship

5  with Uber," and which are not expressly excluded from arbitration in the contract.  *See Moses H.*

6  *Cone Mem'l Hosp.*, 460 U.S. at 24-25 ("[A]ny doubts concerning the scope of arbitrable issues

7  should be resolved in favor of arbitration."); *see also* Section IV(D), *supra*.[8]

8      Finally, the unconscionability arguments set forth above (Section IV(E), *supra*) also apply

9  to the Licensing Agreement, given that it, too, is bilateral and provides important safeguards (such

10  as sharing of fees, location of arbitration, and ability to recover fees when appropriate); in

11  addition, it contains an express right to opt out.  Colman Decl., Ex. A at § 14.3(viii); *see*

12  *Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1074 (9th Cir. 2014) (finding no

13  unconscionability where contracting party was provided meaningful opportunity to opt out).

14      In summary, the Licensing Agreement provides an independent and alternative basis to

15  stay McKnight's claims in favor of arbitration.

16  **V.    CONCLUSION**

17      The named Plaintiffs themselves allege that they created an Uber account, registered to use

18  the Uber App, and in fact used the Uber App to arrange transportation services.  There is no

19  dispute that, at the time the Plaintiffs created their Uber accounts, Uber's Terms and Conditions

20  contained an Arbitration Agreement that (i) required the parties to resolve disputes either by

21  binding arbitration or in small claims court, and (ii) included a class action waiver.  The only

22  disputed issue here is whether the Arbitration Agreement is valid and enforceable; for all the

23  reasons discussed herein, it is.  Consistent with the "liberal federal policy favoring arbitration

24  agreements," Uber respectfully requests that the Court stay this litigation in favor of the arbitration

25  proceedings to which the parties agreed.

26

27  [8] Like the Arbitration Agreement in the Terms and Conditions, the Licensing Agreement
expressly states that the FAA governs.  Colman Decl., Ex. A at § 14.3(i) ("This Arbitration

28  Provision is governed by the Federal Arbitration Act").  It also undoubtedly meets the broad test
of "affecting" interstate commerce.  *See* Section IV(A), *supra*.

Dated:  March 20, 2015

IRELL & MANELLA LLP
Andra B. Greene
A. Matthew Ashley
Justin N. Owens


By:  /s/  A. Matthew Ashley
        A. Matthew Ashley
        Attorney for Defendants

DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING ARBITRATION
CASE No. 4:14-cv-05615-JST

3329392

1

## <u>ECF ATTESTATION</u>

2          I, Justin N. Owens, am the ECF user whose ID and password are being used to file

3  **DEFENDANTS' NOTICE OF MOTION AND MOTION TO STAY PROCEEDINGS**

4  **PENDING ARBITRATION**.  I hereby attest that I have on file all holographic signatures

5  corresponding to any signatures indicated by a conformed signature (/s/) within this e-filed

6  document.

7                                          By:     /s/  Justin N. Owens

8                                                  Justin N. Owens

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3329392