1  ROBERT AHDOOT, SBN 172098
   rahdoot@ahdootwolfson.com
2  TINA WOLFSON, SBN 174806
   twolfson@ahdootwolfson.com
3  MEREDITH S. LIERZ, SBN 296650
   mlierz@ahdootwolfson.com
4  **AHDOOT & WOLFSON, P.C.**
   1016 Palm Ave.
5  West Hollywood, California 90069
   Tel: 310-474-9111; Fax: 310-474-8585
6
   *Attorneys for Plaintiffs,*
7  Julian Mena, Todd Schreiber, Nate Coolidge,
   and Ernesto Mejia
8
   MIKE ARIAS, SBN 115385              STEVEN D. LIDDLE (admitted *pro hac vice*)
9  mike@asstlawyers.com                sliddle@ldclassaction.com
   ALFREDO TORRIJOS, SBN 222458        NICHOLAS A. COULSON (admitted *pro hac vice*)
10 alfredo@asstlawyers.com             ncoulson@ldclassaction.com
   **ARIAS, SANGUINETTI, STAHLE &**    **LIDDLE & DUBIN, P.C.**
11 **TORRIJOS, LLP**                   975 E. Jefferson Avenue
   6701 Center Drive West, Suite 1400  Detroit, Michigan 48207
12 Los Angeles, California 90045-7504  Tel: 313-392-0015; Fax: 313-392-0025
   Tel: 310-844-9696; Fax: 310-861-0168
13
   *Attorneys for Plaintiffs,*
14 Matthew Philliben and Byron McKnight
15
                   **UNITED STATES DISTRICT COURT**
16
                  **NORTHERN DISTRICT OF CALIFORNIA**
17
18
19 MATTHEW PHILLIBEN, JULIAN MENA,        Case No. 3:14-cv-05615-JST
   TODD SCHREIBER, NATE COOLIDGE,
20 ERNESTO MEJIA, and BYRON MCKNIGHT,
   individually and on behalf of all others similarly  **CONSOLIDATED CLASS ACTION**
21 situated,                              **COMPLAINT**
22              Plaintiffs,               Honorable Jon S. Tigar, Presiding
23        v.
24
   UBER TECHNOLOGIES, INC., a Delaware
25 Corporation, and RASIER, LLC, a Delaware  **JURY TRIAL DEMANDED**
   Limited Liability Company,
26
27              Defendants.
28

---

Plaintiffs Matthew Philliben, Julian Mena, Todd Schreiber, Nate Coolidge, Ernesto Mejia, and Byron McKnight ("Plaintiffs"), by and through their counsel, file this Consolidated Class Action Complaint against Uber Technologies, Inc. and Rasier, LLC (collectively "Defendants" or "Uber"), on behalf of themselves and on behalf of a class of similarly situated individuals, and allege, upon personal knowledge as to their own actions, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      Defendants operate a "ride sharing" service, commonly known as "Uber," which provides transportation services to consumers in cities throughout the United States.  Uber operates its ride sharing service through a smartphone application (the "Uber App") that permits consumers to summon, arrange and pay for transportation services electronically via their smartphone.

2.      Plaintiffs bring this action on behalf of themselves and a class of similarly situated individuals who were subjected to certain of Uber's misstatements, misrepresentations, and/or misrepresentative advertising to consumers regarding its "Safe Rides Fee" and the nature and character of the background checks and safety measures conducted in association therewith.

3.      Uber offers a variety of rideshare options that are differentiated by the size and type of the vehicle and /or the number of riders; the options are or have been referred to as UberPool, UberX, UberXL, UberSelect, UberBlack, UberSUV, *etc.*  Uber charges different fares depending on the type of option a consumer orders.  For all of these options, Uber represents that all of its drivers are "thoroughly screened through a rigorous process we've developed using industry leading standards."  Any person with a qualifying vehicle (usually later model vehicles) can apply and become a driver who provides transportation under a number of these options.

4.      When creating an account with Uber, consumers place a credit card, debit card or PayPal account on file with Uber, which eliminates the need for cash payments. When a consumer orders and/or completes an Uber ride, Uber obtains payment from that consumer's credit card, debit card or PayPal account, retains a portion for itself and pays the balance to the driver.

5.      For a number of these Uber ride options, Uber adds a charge, in the amount of at least one dollar, to every ride.  Uber represents that this charge supports its "industry leading" background check process and other alleged safety measures.  However, Uber's background check procedures and purported safety measures are woefully inadequate and fall well short of what is required of other commercial providers of transportation.

6.      Specifically, in April 2014, Uber began to charge all consumers who used certain Uber ride options, including their UberX or UberXL, an undisclosed, mandatory "Safe Rides Fee" ostensibly to "support continued efforts to ensure the safest possible platform for Uber riders and drivers, including an *industry-leading* background check process, regular motor vehicle checks, driver safety education [and] development of safety features in the app. . . ."

7.      Uber originally set the amount of the Safe Rides Fee at $1.00.  On or about October 2015, Uber raised the price of the Safe Rides Fee.  The fee now apparently varies by city.  For example, in San Francisco the Safe Rides Fee is now approximately $1.35, in Los Angeles it is approximately $1.65, in Detroit it is approximately $2.30, and in Boston it is approximately $1.15.

8.      Despite its statements, Uber does not and has never provided an "industry-leading background check process."  To the contrary, the background check process used by Uber does not use fingerprint identification and therefore cannot ensure that the information obtained from a background check actually pertains to the driver that submitted the information.  By contrast, taxi regulators in the most populous parts of the United States require drivers to undergo criminal background checks using fingerprint identification, usually employing a technology called "Live Scan."  Requiring fingerprints for background checks ensures that the person whose criminal history has been run is, in fact, the applicant – and is the industry leading background check process.

9.      Furthermore, revenue generated from the Safe Rides Fee is not used to provide "regular motor vehicle checks" for all vehicles operating on platforms that charge a Safe Rides Fee.  In some cases, Uber drivers pay for the annual inspection of their own vehicles.

10.     Revenue generated from the Safe Rides Fee is also not used to provide sufficient "driver safety education" for all Uber drivers.  Uber allegedly requires its drivers to participate in driver safety education, but this training, if any, is minimal.

11.     The safety features of the Uber App are also insufficient.  For example, in late December 2014, Uber made a single-page, pop-up "Safe Ride Checklist" available to consumers only in Chicago and Boston, and otherwise ignored the remainder of the United States.

12.     The revenue from the Safe Rides Fee exceeds the amount that Uber spends on "efforts to ensure the safest possible platform for Uber riders and drivers," if any, by a significant amount.  As a consequence, by assessing and charging consumers the Safe Rides Fee, Plaintiffs have been, and will continue to be, damaged.

13.     Uber's assessment of the Safe Rides Fee for services that it fails to provide, or that are funded by Uber drivers and not through the Safe Rides Fee, constitutes an unlawful and unfair business practice and breach of implied contract. Uber's assessment of an undisclosed fee likewise constitutes, among other things, an unlawful and unfair business practice.

14.     Uber's uniform conduct is equally applicable to the class.  Plaintiffs bring this class action against Uber for: (1) breach of implied contract; (2) violations of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.; (3) violations of the unlawful prong California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. (the "UCL");  (4) violations of the unfair prong of the UCL; (5) violations of California's False Advertising Law Cal. Bus. & Prof. Code § 17500, *et seq*. (the "FAL"); and (6) violations of the Illinois Consumer Fraud Act, 815 ILCS 502/2, *et seq*.  Plaintiffs seek an order requiring Uber to, among other things: (1) cease the false or misleading misstatements, misrepresentative advertising, or representations; (2) cease the unlawful assessment and collection of the Safe Rides Fee; (3) conduct a corrective advertising campaign; and (4) pay damages and restitution to Plaintiffs and Class members.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).  The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are numerous class members who are citizens of states different from Defendants.  The number of members of the proposed class is in the aggregate greater than 100 and more than two-thirds of the class members reside in states other than the state in which Defendants are citizens.

16.     This Court has personal jurisdiction over Defendants because they are headquartered in San Francisco, California, they conduct business in California and a substantial portion of the acts complained of took place in San Francisco, California.

17.     Venue is proper in the Northern District of California (San Francisco Division) because Defendants are headquartered in this District, conduct business in this District and many of the acts complained of occurred in this District.

18.     Intra district Assignment: Pursuant to Civil Local Rules 3-2(c) a substantial part of the events or omissions giving rise to this action occurred in San Francisco County; therefore, it is appropriate to assign the action to the San Francisco Division.

19.     The wrongful practices alleged herein occurred or were conceived, reviewed, approved and otherwise controlled from Uber's headquarters in San Francisco, California.  The misrepresentations and omissions alleged herein were contained on and transmitted from Uber's website and smartphone application, which are maintained in California.  The transactions entered into by Plaintiffs and the class with Defendants utilized those platforms and their payments were processed by Defendants' California servers.

## **PARTIES**

20.     Plaintiff Matthew Philliben is an individual and a resident of Michigan.  Plaintiffs Byron McKnight and Julian Mena are individuals and residents of California.  Plaintiffs Todd Schreiber and Ernesto Mejia are individuals and residents of Illinois.  Plaintiff Nate Coolidge is an individual and a resident of Massachusetts.

21.     Defendant Uber Technologies, Inc. ("Uber") is a Delaware corporation with its principal place of business located in San Francisco, California.

22.     Defendant Rasier, LLC ("Rasier") is a Delaware Limited Liability Company and a subsidiary of Uber Technologies, Inc.

/ / /
/ / /
/ / /

# FACTUAL ALLEGATIONS

## *Background*

23.     Uber operates a "ride sharing" service, commonly known as "Uber," which provides transportation services to consumers in cities throughout the United States.  Defendants operate their ride sharing service through the Uber App.  The Uber App allows users to summon a vehicle to transport them much in the way a taxicab would.  Users download the Uber App, create an account, enter payment information, and are able to press a button to call for a ride.

24.     Payment for rides using the Uber App is automatic: the user must place a credit card, debit card or PayPal account on file through the Uber App before being allowed to obtain transportation.  At the end of the ride, Uber automatically charges the user's credit/debit card or PayPal account and the user is e-mailed a receipt for the transaction.  Uber retains a portion of every fare.

## *Uber's Safety Representations*

25.     Uber makes a number of representations in order to convey the message that Uber takes every measure possible to ensure the safety of its riders.

26.     Uber's "Safety" webpage (www.uber.com/safety) states: "Wherever you are around the world, Uber is committed to connecting you with the safest ride on the road."  "That means setting the strictest safety standards possible, then working hard to improve them every day.  The specifics vary, depending on what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security - and what we're doing in the US is an example of our standards around the world."

27.     The "Safety" webpage also describes Uber's background checks.  Until on or about October 2014, beneath a headline of "BACKGROUND CHECKS YOU CAN TRUST," Uber stated: "Every . . . driver is thoroughly screened through a rigorous process we've developed using industry-leading standards.  This includes a three-step criminal background screening for the U.S. - with county, federal and multi-state checks that go back as far as the law allows - and ongoing reviews of drivers' motor vehicle records throughout their time on Uber."

28.     On or about November 2014, the words "industry-leading" on Uber's "Safety" webpage were changed to "constantly improving."

29.     A link entitled "read more" beneath the section on background checks previously took users to a blog post dated April 25, 2014 (http://blog.uber.com/driverscreening) attributed to Lane Kasselman, Uber's Head of Communications for the Americas (the post has since been removed). Until at least December 2014, that page stated that "Uber ridesharing and livery partners must go through a rigorous background check that leads the industry."  Moreover, even though the phrase "leads the industry" was no longer present, at least as of December 2014, Uber still maintained that its background checks "are often more rigorous than what is required to become a taxi driver."

30.     In June 2014, Lane Kasselman was quoted in NBCBayArea.com news as stating: "We're confident that every ride on the Uber platform is safer than a taxi."  (http://www.nbcbayarea.com/investigations/SF-DA-Wants-Stricter-Rules-for-Rideshare-Companies-261754071.html).

31.     As of May 2015, the opening section of the Lane Kasselman blog post stated:  "All Uber ridesharing and livery partners must go through a rigorous background check.  The three-step screening we've developed across the United States, which includes county, federal and multi-state checks, has set a new standard.  These checks go back 7 years, the maximum allowable by the Fair Credit Reporting Act.  We apply this comprehensive and new industry standard consistently across all Uber products, including UberX.  Screening for safe drivers is just the beginning of our safety efforts.  Our process includes prospective and regular checks of drivers' motor vehicle records to ensure ongoing safe driving.  Unlike the taxi industry, our background checking process and standards are consistent across the United States and often more rigorous than what is required to become a taxi driver . . . .  Uber works hard to ensure that we are connecting riders with the safest rides on the road.  The current efforts we are undertaking to protect riders, drivers, and cities are just the beginning.  We'll continue innovating, refining, and working diligently to ensure we're doing everything we can to make Uber the safest experience on the road."  Uber also advertises that it "is committed to setting the bar for safety and continuing to raise it," that the ride sharing application leads to "Safe Rides, Safer Cities," and allows for "Safe Pickups . . . . No more waiting alone on a dark street hoping you can hail a taxi."

32.     Uber has also represented that it has "Background Checks that Exceed any Local or National Standard."

33.     Throughout all of its representations to its customers and would-be customers, Uber reinforces the message that Uber's platform does everything possible to ensure rider safety.  For example, Uber states under the heading of "RIDER SAFETY":

     a.     "From the moment you request a ride to the moment you arrive, the Uber experience has been designed from the ground up with your safety in mind;"

     b.     "We believe deeply that, alongside our driver partners, we have built the safest transportation option in 260 cities around the world;"

     c.     "From before the start of your trip until after it's finished, safety is built into every step of the Uber experience;" and

     d.     "Of course, no background check can predict future behavior and no technology can yet prevent bad actions.  But our responsibility is to leverage every smart tool at our disposal to set the highest standard in safety we can.  We will not shy away from this task."

34.     Such safety related representation and statements are false and/or misleading.

35.     Uber has also misrepresented the scope of its background check process.  For example, in a blog entitled "Details on Safety" ("Joe Sullivan Blog") Uber's Joe Sullivan falsely represents that:

     a.     Uber's background checks go back "the maximum allowable by the Fair Credit Reporting Act;"

     b.     Uber checks the National Sex Offender Registry and disqualifies applicants who appear on the Registry; and

     c.     "Verifying potential criminal records at the source - the courthouse records - helps ensure the records match the identity of the potential driver."

36.     The Joe Sullivan Blog also misstates that California law limits private background check companies to a "lookback" period of seven years, and that this period of time "strikes the right balance between protecting the public while also giving ex-offenders the chance to work and rehabilitate themselves."

37.     Uber does not check the National Sex Offender Registry, and therefore Uber's claims that it "prohibits drug or alcohol offenses, severe traffic violations, and sexual offenses" and that its background check process includes a "lifetime" disqualification for sex offenders are false or misleading.  Uber further misleads the public when it states that the Live Scan process flags innocent people and impacts minorities in particular.

38.     Uber has made numerous other false or misleading statements regarding its safety.  For example, Uber falsely claims that its safety measures "always exceed what is required of local taxi companies" and that its background check is better than the FBI fingerprint check and Live Scan.[1]

39.     Uber's representations and statements regarding the safety features of the Uber service impact consumers' decisions to use the Uber App and any of Uber ride options since Uber does not differentiate between different service options when making safety related representations such as Uber has the "safest rides on the road" or it employs "industry leading" background checks.

40.     Uber has consistently opposed and resisted the various state and local regulations regarding safety which are applied to other transportation services, such as taxis and other commercial car service companies.

### The Safe Rides Fee

41.     Uber reinforces the message about its efforts to ensure customer safety and the quality of its background checks when it charges customers on certain of its ride options, such as UberX, a "Safe Rides Fee," which is depicted on the rider's electronic receipt that is sent by Uber after the ride is completed.  Next to the phrase "Safe Rides Fee" is a link to a webpage with a purported explanation of the fee.  The link appears in the form of a small question mark.

---

[1]     Live Scan fingerprinting refers to both the technique and the technology used by law enforcement agencies and private facilities to capture fingerprints and palm prints electronically, without the need for the more traditional method of ink and paper.  In the United States, most law enforcement agencies use live Scan as their primary tool in the recognition of human individuals. Live Scan is commonly used for criminal booking, sexual offender registration, civil applicant and background check. Live Scan results can be verified and returned to the source within 72 hours of transmission.

42.     Through October, 2014, the "question mark" hyperlink connected to a webpage which stated that the Safe Rides Fee was used to support, among other things, "an industry-leading background check process."

43.     On or about October 2014, Uber changed the words "industry-leading" to "a Federal, state, and local background check process."  As of December 2014, however, the page continued to state that the fee "supports continued efforts to ensure the safest possible platform for Uber riders and drivers . . . ."

44.     On or about November 1, 2015, Uber changed the description on this webpage to read "The Safe Rides Fee supports the operation of the Uber platform, including a background check process, development of safety features in the app, incident response, and other operational costs."

45.     The aforementioned representations made by Uber are false and/or misleading.  These representations are likely to mislead consumers into the belief that Uber takes exhaustive safety precautions, when the background check process that Uber describes as "industry-leading" and "more rigorous than what is required to become a taxi driver" does not even take steps to ensure that applicants are who they represent themselves to be.

46.     Unlike many background checks, Uber's process does not utilize fingerprints or even require the applicant to appear in person.  Uber simply requires applicants to submit information such as name, address, driver's license number, and social security number through a webpage.  Uber then provides this information to third party companies such as Hirease, Inc. and/or Checkr, who actually perform the background checks.  Thus, because Uber does not obtain any unique identifying information, such as a fingerprint, companies such as Hirease provide a disclaimer with each back ground check stating that "[f]inal verification of an individual's identity and proper use of report contents are the user's responsibility."

47.     Thus, Uber never verifies the actual driver's true identity.

48.     In contrast, most commercial car services, such as taxis, require and employ a fingerprint identification technology such as Live Scan, which ensures that the person who is applying to be a driver is actually who he or she claims to be.  Indeed, Hirease, one of Uber's third party background check providers during the relevant period, touts the superiority of fingerprint-based

background checks, stating: "Fingerprinting helps uncover criminal history not discovered through traditional methods, offers extra protection to aid in meeting industry guidelines, and helps prevent fraud."

49.     Uber's statements and representations concerning its background checks are false and/or misleading.  For example, Uber's background checks do not lead the industry and are not more rigorous than what is required to become a taxi driver.

50.     While disseminating such false and misleading representations, Uber has steadfastly resisted any attempts by regulators to subject Uber drivers to the same types of background checks undergone by other commercial providers of transportation.  For example, the New York Times documented Uber's "aggressive" efforts to fight background check legislation "in statehouses across the country."  (http://www.nytimes.com/2014/12/10/technology/ubers-system-for-screening-driverscomes-under-scrutiny.html?ref=technology).

51.     Uber's other "safety" measures also fall well short of established industry standards.  For example, Uber does not verify the actual identity of the driver and instead of performing actual inspections of drivers' vehicles, Uber allows drivers to simply send photographs of the vehicles and the inspection form to the company.

52.     Uber's driver training is also substandard.  Uber drivers receive minimal – if any – training on safe driving and are never subjected to any review by Uber as to the standards of their driving.

53.     Uber has also disseminated misleading statements about its background checks in response to a series of incidents involving its drivers.[2]

---

[2]     On or about February 12, 2014, it was reported that Uber was expanding its background checks after a series of incidents, including where an Uber driver, with a previous reckless driving conviction, hit and killed a six-year-old girl, and another where an Uber driver with a felony record assaulted a passenger. (http://blog.sfgate.com/techchron/2014/02/12/uber-to-vet-drivers-more-thoroughly/).  Uber issued a statement on its blog in which it expressed its commitment "to improving the already best in class safety and accountability of the Uber platform."  These "expanded" background checks remained below industry standards, despite Uber's statements to the contrary.

       An investigation by NBC's Detroit affiliate reported that Uber hired a woman on probation for burglary and assault after she completed Uber's online application.  Also, a number of local Uber drivers had questionable driving records, including suspended licenses, speeding tickets, citations for

*Uber Charges A Safe Rides Fee Ostensibly To Provide "Industry-Leading Background Checks"*

*And Other Safety-Related Services For The Benefit Of Consumers*

54.     On or about April 2014, Uber began to charge consumers of some of its Uber service options, such as UberX, a mandatory "Safe Rides Fee." This fee was originally $1, and now varies by city, sometimes exceeding $2.

55.     Uber did not clearly and conspicuously disclose, if at all, the Safe Rides Fee to consumers. For example, the Safe Rides Fee is not disclosed when consumers obtain a "Fare Estimate."



---

no proof of insurance, and driving vehicles registered to other people. In response, an Uber spokesperson issued a statement claiming that Uber "work(s) every day to connect riders with the safest rides on the road and go above and beyond local requirements in every city we operate. Uber only partners with drivers who pass an industry-leading screening that includes a criminal background check at the county, federal and multi-state level going back as far as the law allows. . . . For more information on what makes Uber the safest rides on the road, please see our website: https://www.uber.com/safety." (http://www.clickondetroit.com/news/local-4-defenders-is-uberx-safe/26944252).

In an April 29, 2014 article describing Uber drivers with criminal backgrounds, including one on probation for nearly beating a woman to death, and another with a 2012 DUI conviction who had been accused of sexually assaulting a passenger, Lane Kasselman is quoted as telling the author by e-mail "Uber's industry-leading background checks help connect consumers with the safest ride on the road. . . . Our driver partner background checks are more thorough than those of taxi in most cities . . . We continue to improve and are always working hard to tighten our policies and processes to ensure that Uber remains the safest transportation option available." (http://mashable.com/2014/04/29/uberxpassengers-risk/).

11

1    56.    The Uber App's Fare Estimate feature expressly states that the estimate "does not

2    include discounts or promotions" but does not disclose or in any way refer to the Safe Rides Fee.

3    57.    Instead, before a consumer requests that an Uber driver pick the consumer up, the Safe

4    Rides Fee is only disclosed to a consumer on the Uber App if the consumer pushes the uberXL, uberX

5    or PLUS (*etc.*) symbols to trigger a pop-up screen that discloses the Safe Rides Fee as follows:

  

16   58.    After a ride has been completed, the Safe Rides Fee is separately itemized on an

17   electronic receipt sent to the customer via the Uber App and email.  Next to the words "Safe Rides

18   Fee" on the receipt is a question mark that hyperlinks to an explanation of the Safe Rides Fee (as

19   described above)**.**



CONSOLIDATED CLASS ACTION COMPLAINT (CASE NO. 4:14-CV-05615-JST)

59.     However, several Plaintiffs never saw or relied on the hyperlink that appears on the electronic receipts.  Because Plaintiffs and Class members receive and review Uber's electronic receipt on their mobile phones, the miniscule size of the font and light grey color used by Uber to itemize the Safe Rides Fee is so small that it is virtually illegible to many consumers without a magnifying glass, as is evident from the following screen shot which is equivalent in size to the screen of an iPhone 5s.

60.     In addition, charging the Safe Rides Fee as a separate line item is itself misleading because it bolsters consumers' expectations that they should be receiving the safest ride possible and that Uber does everything it can to ensure this.



61.     Beginning with Uber's April 2014 introduction of the Safe Rides Fee and continuing through October 2014, Uber explained that the Safe Rides Fee was assessed to "support continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, [and] development of safety features in the app . . . ."

62.     On or about April 24, 2014, Uber explained the Safe Rides Fee on its website as follows:[3]

## What Is The Safe Rides Fee?

From the beginning, we've always been committed to connecting you with the safest rides on the road. Our new Safe Rides Fee is a $1 fee added to uberX fares in United States cities with uberX ridesharing. This Safe Rides Fee supports our continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and insurance. For complete pricing transparency, you'll see this as a separate line item on every uberX receipt.

63.     On or about October 2014, Uber changed the words "industry-leading" to "a Federal, state, and local background check."  Uber also changed the words "and insurance" to "and more."  As of January 2015, Uber explained the Safe Rides Fee as follows:[4]

## What Is The Safe Rides Fee?

From the beginning, we've always been committed to connecting you with the safest rides on the road.   The Safe Rides Fee is a fee added to uberX fares on behalf of drivers (who may pay this fee to Uber) in cities with uberX ridesharing. This Safe Rides Fee supports continued efforts to ensure the safest possible platform for Uber riders and drivers, including a Federal, state, and local background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and more. For complete pricing transparency, you'll see this as a separate line item on every uberX receipt.

In the U.S., the Safe Rides Fee is always $1 USD. In Canada, it is $1 CAD.

---

[3]     *See* http://web.archive.org/web/20140424014638/http://support.uber.com/hc/en-us/articles/201950566-What-is-the-Safe-Rides-Fee- (last visited Jan. 6, 2015).

[4]     *See* https://support.uber.com/hc/en-us/articles/201950566-What-is-the-Safe-Rides-Fee- (last visited Jan. 6, 2015).

In addition, Uber advised consumers that "The Safe Rides Fee is a fee added to uberX fares on behalf of drivers (who may pay this fee to Uber) in cities with uberX ridesharing."[5]  However, Uber advises its drivers that Uber retains the Safe Rides Fee entirely: "Rider fees are fees charged to the rider by Uber directly.  They include the *safe rides fee*, airport tolls, and fare split fees, if applicable.  *Uber receives rider fees in full.*"[6]

64.     Uber continues to charge the Safe Rides Fee purportedly to support "continued efforts to ensure the safest possible platform for Uber riders and drivers, including a Federal, state, and local background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and more."[7]

### Uber Does Not Provide Or Pay For "Industry Leading" Background Checks

65.     Uber does not, and has never, provided consumers with an "industry-leading" background check process.

66.     To the contrary, Uber's background check process does not use fingerprint identification and therefore cannot ensure that the information obtained from a background check actually pertains to the Uber driver that submitted the information.

67.     Instead of using fingerprints, Uber's background check process relies upon drivers to submit personal identifiers (name, address, driver's license number and state, and social security number) through an online webpage.  Uber, in turn, provides this information to third parties, such as Hirease, Inc. and/or Checkr, to perform the background checks.

68.     This process cannot ensure that the information in the background check report is actually associated with the applicant since it does not use a unique biometric identifier such as a fingerprint.  In fact, the sample report Hirease posts on its website has a disclaimer stating, "Final verification of an individual's identity and proper use of report contents are the user's responsibility."[8]

---

[5]     *See id.*

[6]     *See* http://uberwest.weebly.com/payment-statements.html (last visited Jan. 6, 2015).

[7]     *See* Uber App, "What is the Safe Rides Fee?"; see also https://support.uber.com/hc/enus/articles/201950566-What-is-the-Safe-Rides-Fee- (last visited Jan. 6, 2015).

[8]     *See* http://cdn2.hubspot.net/hub/212230/file-417622326-pdf/docs/Sample_report.pdf?t=1408638373271 (last visited Jan. 6, 2015).

69.     Uber does not employ Live Scan, which is employed by many commercial car service regulators, such as taxis, to perform criminal background checks with scanned fingerprint identification.  Live Scan fingerprinting in California, for example, occurs at a facility designated by the California Department of Justice.  The fingerprints allow a biometric search of the California Department of Justice's criminal history databases and the option to obtain a search of the Federal Bureau of Investigation's database of multistate criminal history information.  The process of using a biometric identifier to search government databases is the gold or leading standard for a background check process.

70.     Because of the unique identifying characteristics of fingerprints, the Live Scan Process provides assurance that the person whose criminal history has been run is, in fact, the applicant.  This would ensure that a registered sex offender could not use his law-abiding brother's identification information to become an Uber driver.  It would also ensure that a convicted burglar could not borrow his cousin's identification information to become an Uber driver in order to case the empty homes of customers he takes to the airport.

71.     Uber's background check process does not provide the level of security provided by the fingerprint-based Live Scan Process employed for performing background checks on commercial and taxi drivers in the most populous cities of the United States.

72.     Notably, as reported by the New York Times, while touting its "industry leading" background checks and collecting the Safe Rides Fee from consumers, "in statehouses across the country, Uber has fought against legislation requiring background checks as strong as those demanded of traditional taxis."[9]  "In Colorado, the company helped persuade lawmakers to ease drivers' background checks in a bill that legalized ride-sharing companies.  In Illinois, after a lobbying push, Gov. Pat Quinn vetoed a bill that would have forced Uber to strengthen those checks.  And in California, Uber and other companies like it helped kill a law that would have required drivers to undergo a background check by the state's Justice Department, as is required of taxi drivers."[10]

---

[9]     *See* http://www.nytimes.com/2014/12/10/technology/ubers-system-for-screening-drivers-comesunder-scrutiny.html (last visited Jan. 6, 2015).

[10]    *Id.*

***Uber's Failure To Provide Industry Leading Background Allows Drivers With Criminal Records To Become Uber Drivers***

73.     In January 2014, in an article entitled "Uber driver accused of assault had done prison time for a felony, passed background check anyways," online news site PandoDaily.com reported that an Uber driver in San Francisco, who had been accused of verbally and physically assaulting a passenger, had passed Uber's background check even though he had a significant criminal history – including felony and misdemeanor charges, and at least one felony conviction involving prison time – that should have disqualified him from becoming an Uber driver.[11]  In June 2014, Forbes.com reported that the driver had been on probation for a battery conviction when Uber hired him in October 2013. Uber claimed that the driver "had a clean background check in October."

74.     On December 31, 2013, an Uber driver struck and killed a six-year-old girl while driving in San Francisco.[12]  The San Francisco Business Times subsequently reported that the driver had been convicted of reckless driving in Florida in September of 2004.[13]

75.     In February 2014, the Chicago Tribune reported that a 24-year-old Uber driver had a felony conviction for residential burglary in 2010, a misdemeanor conviction for criminal damage to property in 2009, and another misdemeanor conviction in 2008 for breaking into a car to steal a GPS and satellite radio receiver.[14]  The same Uber driver had received numerous speeding tickets and had his driving license suspended twice in 2008.  In response, Uber posted an apology on its website: "[W]e have already taken steps to prevent this from happening again, by expanding our background check process to set new industry-leading standards. . . . We are sincerely sorry for this error, and want to assure all riders that we are taking the necessary steps to fix it and build the safest option for

---

[11]     *See* http://pando.com/2014/01/06/exclusive-uber-driver-accused-of-assault-passed-zero-tolerancebackground-check-despite-criminal-history/ (last visited Jan. 6, 2015).

[12]     *See* http://www.latimes.com/local/lanow/la-me-ln-uber-driver-girl-dead-20141209-story.html (last visited Jan. 6, 2015).

[13]     *See* http://www.bizjournals.com/sanfrancisco/blog/2014/01/uber-uberx-sofia-liu.html?page=all (last visited Jan. 6, 2015).

[14]     *See* http://articles.chicagotribune.com/2014-02-14/news/ct-rideshare-background-checks-met-20140214_1_background-checks-ride-sharing-drivers (last visited Jan. 6, 2015).

consumers."

76.     Two months later, on April 24, 2014, an NBC television affiliate in Los Angeles aired an investigative report about Uber's driver background checks in which the station enlisted a woman to apply to become an Uber driver.[15]  She was on felony probation for making criminal threats (willfully threatening to commit a crime which will result in death or great bodily injury to another person), and during the broadcast described the conduct leading to her arrest: "I pulled a girl out of a car and almost beat her to death."  On March 3, 2014, Uber sent the woman an email notifying her that she passed her background check.  According to the NBC report, Uber would not respond to the station's request for comment about this case.  Instead, Uber spokesperson Lane Kasselman sent an email explaining Uber's background screening policy.  The email ended with, "We're confident that every ride on Uber is safer than a taxi."

77.     On November 17, 2014, as reported by the Chicago Sun Times, an Uber driver allegedly drove an inebriated passenger to his apartment on Chicago's Northwest Side, raped her and then told her, "I made you happy."[16]

78.     On December 17, 2014, the Boston Globe reported that an Uber driver pleaded not guilty to charges of rape, assault to rape, kidnapping, and two counts of assault and battery following the Uber driver's violent assault against a young female Uber customer.[17]  Uber confirmed that the alleged rapist had passed Uber's background check.  In the same article, the Boston Globe reported that two additional women in the Boston area had reported indecent assaults by an Uber driver on a single day in December 2014.

/ / /

/ / /

/ / /

---

[15]     *See* http://www.nbclosangeles.com/news/local/Risky-Ride-Uber-Investigation-256604571.html (last visited Jan. 6, 2015).

[16]     *See* http://chicago.suntimes.com/news-chicago/7/71/247604/will-ubering-anybody-judge-saysdriver-charged-raping-woman (last visited Jan 6, 2015).

[17]     *See* http://www.bostonglobe.com/metro/2014/12/17/uber-driver-accused-rape-kidnappingcustomer/KYnOQczKFqggfbnri2FpGL/story.html (last visited Jan 6, 2015).

*Uber Does Not Pay For The Other Safety-Related Services*

*It Claims Are Supported By The Safe Rides Fee*

79.     Upon information and belief, Uber does not use enough of the revenue it generates from the Safe Rides Fee to provide for "regular motor vehicle checks" and "driver safety education."

80.     Uber does not use enough of the Safe Rides Fee for "regular motor vehicle checks" of Uber drivers' vehicles.  Many Uber drivers pay for the annual inspection of their own vehicles.  By way of example, the list of potential inspection locations available to Uber drivers in California includes numerous repair shops that offer inspections for a fee that averages approximately $20.[18] Because many Uber drivers had difficulty scheduling an inspection in 2014, Uber partnered "with YourMechanic.com" to provide Uber drivers with the opportunity to have a mechanic "come to you (usually your home address) at a time of your choosing . . . [to] . . . complete an on-site Uber vehicle inspection AND oil change for $50."[19]  Some Uber drivers are offered free inspections provided they spend a set amount in repairs.

81.     Uber does not use enough of the Safe Rides Fee to provide Uber drivers with "driver safety education."  Uber only requires Uber drivers to participate in minimal mandatory driver safety education.  Uber also advises Uber drivers that if they want to learn how to be good drivers, they can pay anywhere from $40 to $65 for a class that will provide "detailed reviews" of a particular city's "neighborhoods and key routes, as well as driver professionalism tips and basic safety concepts for commercial drivers."

/ / /

/ / /

/ / /

---

[18]     *See* http://uberwest.weebly.com/vehicle-inspection.html (last visited Jan 6, 2015); see also http://www.weebly.com/uploads/2/8/4/2/28420371/ca_inspection_locations_september_2014.pdf (last visited Jan. 6, 2015).
[19]     *See* http://uberwest.weebly.com/vehicle-inspection.html (last visited Jan. 6, 2015).

82.     For example, in Washington, D.C., Uber drivers are offered the following "training class."[20]

## WASHINGTON DC DRIVER TRAINING CLASS

The Driver Training Class given by 7x7 Executive Transportation introduces beginning and experienced Uber partners to lessons and techniques designed to improve their driving and customer service skills. Lecture topics include detailed reviews of Washington DC neighborhoods and key routes, as well as driver professionalism tips and basic safety concepts for commercial drivers. Class discussion on each of these topics is encouraged, and another module includes discussion of common customer service issues and how to address them. A major focus of the class is how drivers can improve their ratings from Uber users. The class lectures are supplemented by video clips, map displays, white board drawings, written course materials as well as a final exam.

**All classes are held at the University of Phoenix. University of Phoenix is a trade name and registered trademark of the Apollo Education Group, Inc. Any use by 7x7 Executive Transportation to identify the event location is not intended to imply affiliation with, sponsorship or endorsement of the event by The University of Phoenix, Inc. or Apollo Education Group, Inc.**

**The address for the class is 25 Massachusetts Ave NW, Washington, DC 20001. The nearest Metro station is Union Station. Free parking is available by validation if you park in the garage in the basement of 25 Massachusetts Ave NW. (Validation is availabe ONLY from the Instructor and is not available for any other parking location.) Go to the elevator lobby and you will be directed to the University of Phoenix lobby area and from there information on the classroom number will be available. PLEASE DO NOT GO TO THE UNIVERSITY OF PHOENIX EXCEPT ON THE DAY OF YOUR CLASS. THERE WILL BE NO ONE THERE FROM 7X7 TO HELP YOU. IF YOU NEED TO CONTACT US, PLEASE USE THE CONTACT INFORMATION AT THE BOTTOM OF THIS WEB PAGE.**

The class will start on time. Please arrive 15 minutes early to allow time for registration. If you are more than 10 minutes late for the class you will not be able to come in and will need to sign up for another class. You must pay for the class online using a major credit card. We will accept Visa, Master Card, American Express, and Discover. Please follow the prompt after signing up to pay now. Please dress professionally as if you are working and bring your personal phone (NOT Uber phone) with you.

## CLICK ON A DATE IN THE CALENDAR BELOW:

| Choose Appointment | Your Info | Confirmation |
| --- | --- | --- |

Returning? Log in

| 7x7 Washington DC Driver Training Class |
| --- |
| 4 hours @ $65.00 |

83.     In an October 10, 2014 article entitled "Uber Skimps On Driver Training, Then Charges Drivers $65 For Basic Driver Skills Course," Forbes reported that new Uber drivers are not required to engage in any safety training whatsoever:

> When Michael Coe, 38, signed up to be an Uber driver in Washington, D.C. a few weeks ago, he was shocked to find that once his driver's license and identity paperwork had cleared, he was asked to come in to pick up a phone — then put on the road with no training except a 13- minute video on how to use the Uber app. "When I got to one of the onboarding sessions at a local hotel, it was like, 'Here's your papers, go to the other room, get your phone, and great — get on the road and drive,'" Coe told Forbes. No one from Uber had more than a passing conversation with him before he was set to give what the company calls "the world's safest, most reliable ride." Uber never looked at his car either, though he did have to provide proof of a recent Virginia state car inspection."[21]

---

[20]    *See* https://dctraining.7x7executive.com/ (last visited Jan. 6, 2015).

[21]    *See* http://www.forbes.com/sites/ellenhuet/2014/10/08/uber-skimps-on-driver-training-then-chargesdrivers-65-for-basic-driver-skills-course (last visited Jan. 6, 2015).

84.   Upon information and belief, Uber has not used enough of the revenue generated by the Safe Rides Fee for the "development of safety features in the app."

85.   Since the April 2014 introduction of the Safe Rides Fee, Uber has not introduced *any* city-specific safety features for the Uber App in most locations where it operates.

86.   In late December 2014, Uber made a "Safe Ride Checklist" available only to Uber App users in Chicago and Boston in response to high-profile sexual assault accusations against Uber drivers in those two cities.  An Uber driver in each city was charged in December 2014 with raping a female customer.[22]

87.   The Safe Ride Checklist available in Chicago and Boston is a relatively straightforward, single page that recommends that passengers confirm they're getting in the right car and that the in-app driver photo matches up:



---

[22]   *See* http://chicago.suntimes.com/news-chicago/7/71/251756/uber-adds-safety-checklist-app-driverscharged-sex-assault (last visited Jan. 6, 2015).

CONSOLIDATED CLASS ACTION COMPLAINT (CASE NO. 4:14-CV-05615-JST)

88.     Although Uber charged and collected the Safe Rides Fee from consumers throughout the United States, it has not made the "safe ride checklist" – such as it is – available to Uber App users throughout the United States.[23]  Consumers in cities other than Chicago and Boston have, thus, received no benefit whatsoever from Uber's development of this Uber App so-called safety feature.

***The Safe Rides Fee Is A Profit Center For Uber, Not A Genuine Fee Used To Obtain Background Checks And Fund Other Programs That Benefit Consumer Safety***

89.     Upon information and belief, Uber generates far more revenue from the assessment and collection of the Safe Rides Fee than it spends on effective efforts to provide safe rides for the consumers that pay the Safe Rides Fee.  To the extent Uber believes that its spends money collected from Safe Rides Fees on valid expenditures, such expenditures are not adequately disclosed or appropriate.

90.     As of 2013, Uber was estimated to provide 800,000 completed rides per week.[24]  Of that amount, approximately 528,000 of the completed rides are UberX rides.  Thus, for a one-year period Uber provided approximately 27,456,000 completed rides.  Given that Defendants charge the Safe Rides Fee for each of those 27,456,000 completed rides, Uber's imposition of the Safe Rides Fee generated $27,456,000 in annual revenue (at $1 per Safe Rides Fee).  Since 2013, Uber has experienced rapid growth and the number of rides and Safe Rides Fees generated have increased dramatically.

91.     Upon information and belief, Defendants spend significantly less on background checks than they collect in Safe Rides Fees.

***Uber's Download and Registration Process Obscures its Unconscionable Terms & Conditions***

92.     Plaintiff Philliben downloaded the Uber App and created an Uber account in approximately August 2014.  Plaintiff McKnight downloaded the Uber App and created an Uber account in approximately late 2013 or early 2014.  Plaintiff Julian Mena downloaded the Uber App

---

[23]     *See* http://www.vocativ.com/money/business/ubers-rape-chicago/ (last visited Jan. 6, 2015).
[24] *See* Leaked: Uber's Internal Revenue and Ride Request Numbers, available at http://valleywag.gawker.com/leaked-ubers-internal-revenue-and-ride-request-number-1475924182 (last visited Jan. 6, 2015).

and created an Uber account in approximately October 2013.  Plaintiff Todd Schreiber downloaded the Uber App and created an Uber account in approximately May 2014.  Plaintiff Nate Coolidge downloaded the Uber App and created an Uber account in approximately February 2014.  Plaintiff Ernesto Mejia downloaded the Uber App and created an Uber account in approximately October 2014.

93.     Plaintiffs followed the registration process for creating an account.  This process is conducted within the app itself, on the screen of the smartphone.

94.     During the registration process, an electronic keyboard obscures the lower portion of the screen as information is inputted into the required fields for registration: email address, mobile telephone number, password, name, and credit card payment information.

95.     Throughout the registration process, the lower half of the screen remains obscured by the electronic keyboard.

96.     At the last step of the process, the app displays a screen on which a hyperlink to Uber's "Terms & Conditions and Privacy Policy" appears at the bottom.

97.     At no step during the registration process were the "Terms & Conditions" or "Privacy Policy" displayed to Plaintiffs.

98.     Uber's registration process never required Plaintiffs to access the "Terms & Conditions" hyperlink, read the "Terms & Conditions," or affirmatively assent to them.

99.     Each new Uber user must register and create an Uber account using the same steps and viewing the same screens as Plaintiffs.

100.    Uber's un-displayed and inconspicuously linked "Terms & Conditions" are unconscionably one-sided and purport to contract away all possible legal obligations from Uber to its riders, including any obligation to provide a safe vehicle, or a safe driver, all while retaining its right to payment regardless of whether a given ride is even completed.

101.    Uber's "Terms & Conditions" contain a complete disclaimer of warranties, which disavows substantially every basis upon which a reasonable user would rely in using the app and Uber's service:

> The company makes no representation, warranty, or guaranty on the reliability, timeliness, quality, suitability, availability, accuracy, or completeness of the service or          application… The service and

application is provided to you strictly on an "as is" basis.  All conditions, representations and warranties, whether express, implied, statutory or otherwise, including, without limitation, any implied warranty of merchantability, fitness for a particular purpose, or non-infringement of third party rights, are disclaimed to the maximum extent permitted by applicable law . . . .
You acknowledge and agree that the entire risk arising out of your use of the application and service, and any third party services or products remains solely with you, to the maximum extent permitted by law.

102.    Uber's "Terms & Conditions" contain a "no refund" policy, which applies to "[a]ny fees that the Company may charge you . . . ."  This "no refund policy shall apply at all times regardless of your decision to terminate your usage, our decision to terminate your usage, disruption caused to our Application or Service either planned, accidental or intentional, or any reason whatsoever."

103.    Uber's "Terms & Conditions" contain a complete Liability Disclaimer, wherein Uber purports to absolve itself of any and all liability that may arise out of the use of its app or service.

104.    Despite Uber's representations about safety, Uber disclaims "any and all liability . . . in any way related to the third party transportation provider . . ."

105.    Despite its representations about its background check process, Uber disclaims any responsibility to "assess the suitability, legality or ability of any" of its drivers.

106.    Uber disavows any responsibility for the rider's safety.  "You understand, therefore, that by using the application and the service, you may be exposed to transportation that is potentially dangerous, offensive, harmful to minors, unsafe or otherwise objectionable, and that you use the application and the service at your own risk."

107.    One of Uber's more controversial practices is to charge "surge pricing," wherein fees for transportation rise significantly during times of higher demand.  In contrast to its inconspicuous link to its "Terms & Conditions", Uber goes out of its way to ensure that it has the customer's informed consent before charging such prices.  In contrast to the Safe Rides Fee, Uber conspicuously discloses the amount of the surcharge, and requires the customer to type the surcharge into a separate field, ensuring that the customer is expressly consenting to the fee.

108.    Uber's purpose for this process is to ensure that the terms of its surge pricing are "clear and straightforward" such that its customers "won't be surprised" by the terms of the contract.

*Plaintiffs' Transportation*

109.     On or about October 11, 2014, Plaintiff Philliben used the Uber App to obtain UberX transportation; as reflected on his electronic receipt, Plaintiff Philliben paid $18.52 for the trip, including the $1.00 Safe Rides Fee.  Plaintiff Philliben has subsequently used other Uber ride options.

110.     On or about May 20, 2014, Plaintiff McKnight used the Uber App to obtain UberX transportation; as reflected on his electronic receipt, Plaintiff McKnight paid $10.56 for the trip, including the $1.00 Safe Rides Fee.  On May 20, 2014, Plaintiff McKnight used the Uber App to obtain UberX transportation; as reflected on his electronic receipt, Plaintiff McKnight paid $10.56 for the trip, including the $1.00 Safe Rides Fee.  On September 30, 2014, Plaintiff McKnight used the Uber App to obtain UberX transportation; as reflected on his electronic receipt, Plaintiff McKnight paid $13.14 for the trip, including the $1.00 Safe Rides Fee.  On October 1, 2014, Plaintiff McKnight used the Uber App to obtain UberX transportation; as reflected on his electronic receipt, Plaintiff McKnight paid $14.17 for the trip, including the $1.00 Safe Rides Fee.  Plaintiff McKnight has subsequently used other Uber ride options.

111.     Uber did not disclose the Safe Rides Fee to Plaintiffs Philliben and McKnight before they paid for their rides and they were not aware of the Safe Rides Fee.

112.     Uber did not clearly and conspicuously disclose the Safe Rides Fee to Plaintiffs Philliben and McKnight before they paid for their rides.

113.     Plaintiffs Philliben and McKnight did not notice the Safe Rides Fee hyperlink that appears on the electronic receipts they received following each UberX ride.

114.     On or about October 13, 2013, Plaintiff Mena used his iPhone 4 to download the Uber App.  Plaintiff Mena used the Uber App on his iPhone 4 to obtain an Uber account. Plaintiff Mena did not see Uber's Terms and Conditions at the time that he obtained his account.

115.     After he had used the Uber App to obtain an Uber Account, Plaintiff Mena received an email from Uber with the subject line "Welcome to Uber!" (the "Welcome Email.")  The Welcome Email included several representations, including the following:

•        Just request a pickup, and in minutes a car will be curbside and ready to take you
         wherever you need to go.

25

- Order a Car: Use the iPhone or Android app, or visit m.uber.com to request a ride.

- Your Driver Comes to You: Sit back and relax. We'll text you when your Uber arrives.

- Hop in & Hop out: After arriving at your destination, we'll charge your credit card on file and email you a receipt.

116. The Welcome Email also represented that Plaintiff Mena could obtain a "fare estimate" as follows: "You can get a fare estimate for your trip right in the app by following the instructions at t.uber.com/fare estimate."

117. The Welcome Email did not disclose that Uber would charge Plaintiff Mena's credit card for any fees, including the Safe Rides Fee.

118. Plaintiff Mena relied on the representations and omissions in the Welcome Email.

119. Plaintiff Mena used the Uber App to obtain UberX transportation on numerous occasions before and after the Safe Rides Fee was implemented.

120. For example, on May 6, 2014, Plaintiff Mena used the Uber App to obtain UberX transportation. Defendants did not disclose the Safe Rides Fee to Plaintiff Mena before he paid for the ride and Plaintiff Mena was not aware of the Safe Rides Fee.  As reflected on his electronic receipt, however, Plaintiff Mena paid $7.63 for the trip, which included the $1.00 Safe Rides Fee.  Plaintiff Mena has subsequently used other Uber ride options.

121. Uber did not clearly and conspicuously disclose the Safe Rides Fee to Plaintiff Mena before he paid for the ride, and Plaintiff Mena was not aware of the Safe Rides Fee.

122. Plaintiff Mena did not notice the Safe Rides Fee hyperlink that appears on the electronic receipts he received following each UberX ride.

123. On or about May 11, 2014, Plaintiff Schreiber used his Samsung Galaxy S4 to download the Uber App.  Plaintiff Schreiber used the Uber App to obtain an Uber account.  Plaintiff Schreiber did not see Uber's Terms and Conditions at the time that he obtained his account.

124. Following Defendants' April 2014 introduction of the Safe Rides Fee, Plaintiff Schreiber used the Uber App to obtain UberX transportation on numerous occasions.

125. For example, on October 24, 2014, Plaintiff Schreiber used the Uber App to obtain UberX transportation.  Uber did not disclose the Safe Rides Fee to Plaintiff Schreiber before he paid

CONSOLIDATED CLASS ACTION COMPLAINT (CASE NO. 4:14-CV-05615-JST)

for the ride and Plaintiff Schreiber was not aware of the Safe Rides Fee.  As reflected on his electronic receipt, however, Plaintiff Schreiber paid the $4.79 cost for the trip, which included the $1.00 Safe Rides Fee.  Plaintiff Schreiber has subsequently used other Uber ride options.

126.    Uber did not clearly and conspicuously disclose the Safe Rides Fee to Plaintiff Schreiber before he paid for the ride, and Plaintiff Schreiber was not aware of the Safe Rides Fee.

127.    Plaintiff Schreiber did not notice the Safe Rides Fee hyperlink that appears on the electronic receipts he received following each UberX ride.

128.    On or about February 2014, Plaintiff Coolidge used his smartphone to download the Uber App.  Plaintiff Coolidge used the Uber App to obtain an Uber account.  Plaintiff Coolidge did not see Uber's Terms and Conditions at the time that he obtained his account.

129.    Following Uber's April 2014 introduction of the Safe Rides Fee, Plaintiff Coolidge used the Uber App to obtain UberX transportation on numerous occasions.

130.    For example, on April 30, 2014, Plaintiff Coolidge used the Uber App to obtain UberX transportation.  Defendants did not disclose the Safe Rides Fee to Plaintiff Coolidge before he paid for the ride and Plaintiff Coolidge was not aware of the Safe Rides Fee. As reflected on his electronic receipt, however, Plaintiff Coolidge paid $19.26 cost for the trip, which included the $1.00 Safe Rides Fee.  Plaintiff Coolidge has subsequently used other Uber ride options.

131.    Uber did not clearly and conspicuously disclose the Safe Rides Fee to Plaintiff Coolidge before he paid for the ride, and Plaintiff Coolidge was not aware of the Safe Rides Fee.

132.    Plaintiff Coolidge did not notice the Safe Rides Fee hyperlink that appears on the electronic receipts he received following each UberX ride.

133.    On or about October 24, 2014, Plaintiff Mejia used his iPhone 5 to download the Uber App.  Plaintiff Mejia used the Uber App on his iPhone 5 to obtain an Uber account.  Plaintiff Mejia did not see Uber's Terms and Conditions at the time that he obtained his account.

134.    Following Defendants' April 2014 introduction of the Safe Rides Fee, Plaintiff Mejia used the Uber App to obtain UberX transportation on numerous occasions.

135.    For example, on November 21, 2014, Plaintiff Mejia used the Uber App to obtain UberX transportation.  Defendants did not disclose the Safe Rides Fee to Plaintiff Mejia before he paid

for the ride and Plaintiff Mejia was not aware of the Safe Rides Fee.  As reflected on his electronic receipt, however, Plaintiff Mejia paid $25.00 for the trip, which included the $1.00 Safe Rides Fee. Plaintiff Mejia has subsequently used other Uber ride options.

136.    Defendants did not clearly and conspicuously disclose the Safe Rides Fee to Plaintiff Mejia before he paid for the ride, and Plaintiff Mejia was not aware of the Safe Rides Fee.

137.    Plaintiff Mejia did not notice the Safe Rides Fee hyperlink that appears on the electronic receipts he received following each UberX ride.

## **CLASS ALLEGATIONS**

138.    Plaintiffs bring this class action under Rule 23 and seek certification of the claims and issues in this action pursuant to the applicable provisions of Rule 23.  The proposed class is defined as:

All persons residing in the United States or its territories who, from January 1, 2013 until the date that notice of this class action is disseminated to the Class, have used the Uber smartphone application or website, in the United States or its territories, to obtain service from one of Uber's Rideshare Services.  Excluded from the Class are (a) all persons who are employees, directors, officers, and agents of Uber Technologies, Inc. and Raiser, LLC; (b) governmental entities; and (c) the Court, the Court's immediate family, and Court staff. Uber means the companies, incorporated in the State of Delaware as Uber Technologies, Inc. and Rasier, LLC, who operate the ride shares service commonly known as Uber.  Uber's Rideshare Services means all transportation services that are arranged through Uber's smartphone application or website, regardless of type of ride or service that is requested (such as UberX, UberSUV, UberBlack, UberPool, *etc.*).

139.    Plaintiffs reserve the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

140.    All rides on an Uber platform are subject to Uber's false or misleading statements about safety.

141.    Numerosity.  Fed. R. Civ. P. 23(a)(1).  Upon information and belief, there are millions of riders who have taken a ride on one or more Uber platforms, making joinder of all class members impracticable.  The exact size of the proposed class and the identity of all class members can be readily ascertained from Defendants' records.

142.    Commonality.  Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members.  The principal common issues include:

a.      Whether or the extent to which Uber represented on its website and other marketing materials that it conducts "industry leading" background checks on its drivers;

b.      Whether or the extent to which Uber represented that its service is "safer than a taxi";

c.      Whether or the extent to which Uber's background checks are or were "industry leading";

d.      Whether or the extent to which Uber is or was "safer than a taxi";

e.      Whether or the extent to which Uber's statements and representations about safety, background checks, and the Safe Rides Fee are or were false or misleading;

f.      Whether or the extent to which Uber uses revenue generated by the collection of the Safe Rides Fee to provide "regular motor vehicle inspections";

g.      Whether or the extent to which Uber uses revenue generated by the collection of the Safe Rides Fee to provide "driver safety education";

h.      Whether or the extent to which Uber uses revenue generated by the collection of the Safe Rides Fee to "develop safety features for the app";

i.      Whether or the extent to which Uber uses revenue generated by the collection of the Safe Rides Fee to support other efforts to ensure consumer safety;

j.      Whether Uber breached an implied contract with consumers;

k.      Whether Uber violated Illinois Consumer Fraud Act, 815 ILCS 502/2, *et seq.*;

l.      Whether Uber's conduct is unfair or unlawful in violation of the Unfair Competition Law, California Business and Professions Code § 17200, *et seq.*;

m.      Whether Uber's conduct constitutes untrue or misleading statements within the meaning of California Business and Professions Code § 17500, *et seq.*;

n.      The nature of the relief, including equitable relief, to which Plaintiffs and the class are entitled.

29

143.   Typicality.  Fed. R. Civ. P. 23(a)(3).  Plaintiffs' claims are typical of the claims of the Class they seek to represent.  Plaintiffs and all Class members were exposed to uniform practices and sustained injuries arising out of and caused by Uber's unlawful conduct.

144.   Adequacy of Representation.  Fed. R. Civ. P. 23(a)(4).  Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Further, Plaintiffs' counsel is competent and experienced in litigating class actions.

145.   Superiority.  Fed. R. Civ. P. 23(b)(3).  A class action is superior to any other available means for the fair and efficient adjudication of this controversy.  The claims of Plaintiffs and individual class members are small compared to the burden and expense that would be required to separately litigate their claims against Uber, and it would be impracticable for class members to seek redress individually.  Litigating claims individually would also be wasteful to the resources of the parties and the judicial system and create the possibility of inconsistent or contradictory judgments.  Class treatment provides manageable judicial treatment which will bring an orderly and efficient conclusion to all claims arising from Uber's misconduct.  Class certification is therefore appropriate under Rule 23(b)(3).

146.   Class certification is also appropriate under Rule 23(b)(1), as the prosecution of separate actions by individual members of the class would create the risk of adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication and substantially impair their ability to protect those interests.

147.   Class certification is also appropriate under Rule 23(b)(2), as Uber has acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate for the class.

## FIRST CAUSE OF ACTION

### Breach of Implied Contract

**(On behalf of Plaintiffs Mena and McKnight and the Nationwide Class, or, Alternatively, The California Class – under the law of the State of California)**

148.   Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

149.   An implied-in-fact contract was formed between Plaintiffs and Class members on the

one hand and Uber on the other with respect to the Safe Rides Fee and the safety features of Uber's service as represented by Uber (the "Safe Rides Fee Agreement").

150.   At all times relevant, Uber offered to enter into the Safe Rides Fee Agreement when it demanded payment of the Safe Rides Fee from Plaintiffs and other Class members to support its safety efforts.

151.   At all times relevant, Uber offered to enter into the Safe Rides Fee Agreement with consumers when it demanded payment of the Safe Rides Fee from Plaintiffs and other Class members.

152.   Plaintiffs and other Class members accepted Uber's offer by paying the Safe Rides Fee. Through their payment of the Safe Rides Fee, Plaintiffs and other Class members performed all conditions, covenants and promises required of Plaintiff and other Class members in accordance with the Safe Rides Fee Agreement.

153.   Uber breached the Safe Rides Fee Agreement in at least the following respects:

   a.   Uber did not use the Safe Rides Fee to provide an industry-leading background check process;

   b.    Uber did not use enough of the Safe Rides Fee to provide regular motor vehicle checks;

   c.   Uber did not use enough of the Safe Rides Fee to provide "driver safety education";

   d.   Uber has not used enough of the Safe Rides Fee to develop safety features on the Uber App for the vast majority of consumers in the United States; and

   e.   Upon information and belief, Uber has retained considerable portions of the revenue generated from the Safe Rides Fee for purposes unrelated to the provision of safe rides for consumers.

154.   No express contract exists between Plaintiffs and Class members on the one hand and Uber on the other with respect to the imposition and collection of the Safe Rides Fee.

155.   Uber's breaches were willful and not the result of mistake or inadvertence.

156.   As a result of Uber's breach of the Safe Rides Fee Agreement, Plaintiffs and other Class members have been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Breach of Implied Contract

**(On behalf of Plaintiffs Schreiber and Mejia and the Nationwide Class, or, Alternatively, The Illinois Class – under the law of the State of Illinois)**

157.    Plaintiffs Schreiber and Mejia incorporate all preceding factual allegations as if fully set forth herein.

158.    An implied-in-fact contract was formed between Plaintiffs Schreiber and Mejia and Class members on the one hand and Uber on the other with respect to the Safe Rides Fee (the "Safe Rides Fee Agreement").

159.    At all times relevant, Uber offered to enter into the Safe Rides Fee Agreement when it demanded payment of the Safe Rides Fee from Plaintiffs Schreiber and Mejia and other Class members to support its safety efforts.

160.    At all times relevant, Uber offered to enter into the Safe Rides Fee Agreement with consumers when it demanded payment of the Safe Rides Fee from Plaintiffs and other Class members.

161.    Plaintiffs Schreiber and Mejia and other Class members accepted Uber's offer by paying the Safe Rides Fee.  Through their payment of the Safe Rides Fee, Plaintiffs Schreiber and Mejia and other Class members performed all conditions, covenants and promises required of Plaintiffs and other Class members in accordance with the Safe Rides Fee Agreement.

162.    Uber breached the Safe Rides Fee Agreement in at least the following respects:

a.    Uber did not use the Safe Rides Fee to provide an industry-leading background check process.

b.    Uber did not use enough of the Safe Rides Fee to provide regular motor vehicle checks;

c.    Uber did not use enough of the Safe Rides Fee to provide "driver safety education";

d.    Uber has not used enough of the Safe Rides Fee to develop safety features on the Uber App for the vast majority of consumers in the United States; and

e.    Upon information and belief, Uber has retained considerable portions of the

revenue generated from the Safe Rides Fee for purposes unrelated to the provision of safe rides for consumers.

163.    No express contract exists between Plaintiffs Schreiber and Mejia and Class members on the one hand and Uber on the other with respect to the imposition and collection of the Safe Rides Fee.

164.    Uber's breaches were willful and not the result of mistake or inadvertence.

165.    As a result of Uber's breach of the Safe Rides Fee Agreement, Plaintiffs Schreiber and Mejia and other Class members have been damaged in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

**Breach of Implied Contract**

**(On behalf of Plaintiff Coolidge and the Nationwide Class, or, Alternatively, The Massachusetts Class – under the law of the State of Massachusetts)**

166.    Plaintiff Coolidge incorporates all preceding factual allegations as if fully set forth herein

167.    An implied-in-fact contract was formed between Plaintiff Coolidge and Class members on the one hand and Uber on the other with respect to the Safe Rides Fee (the "Safe Rides Fee Agreement").

168.    At all times relevant, Uber offered to enter into the Safe Rides Fee Agreement when it demanded payment of the Safe Rides Fee from Plaintiff and other Class members to support its safety efforts.

169.    At all time relevant, Uber offered to enter into the Safe Rides Fee Agreement with consumers when it demanded payment of the Safe Rides Fee from Plaintiff and other Class members.

170.    Plaintiff and other Class members accepted Uber's offer by paying the Safe Rides Fee. Through their payment of the Safe Rides Fee, Plaintiff and other Class members performed all conditions, covenants and promises required of Plaintiff and other Class members in accordance with the Safe Rides Fee Agreement.

171.    Uber breached the Safe Rides Fee Agreement in at least the following respects:

   a.    Uber did not use the Safe Rides Fee to provide an industry-leading background

check process;

b.     Uber did not use enough of the Safe Rides Fee to provide regular motor vehicle checks;

c.     Uber did not use enough of the Safe Rides Fee to provide "driver safety education";

d.     Uber has not used enough of the Safe Rides Fee to develop safety features on the Uber App for the vast majority of consumers in the United States; and

e.     Upon information and belief, Uber has retained considerable portions of the revenue generated from the Safe Rides Fee for purposes unrelated to the provision of safe rides for consumers.

172.    No express contract exists between Plaintiff and Class members on the one hand and Uber on the other with respect to the imposition and collection of the Safe Rides Fee.

173.    Uber's breaches were willful and not the result of mistake or inadvertence.

174.    As a result of Uber's breach of the Safe Rides Fee Agreement, Plaintiff and other Class members have been damaged in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**

**Violation of Consumers Legal Remedies Act – California Civil Code § 1750, *et seq.***

**(On behalf of Plaintiffs Mena and McKnight and the Nationwide Class and, alternatively, the California Class – under the law of California)**

175.    Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

176.    This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* (the "CLRA") because Uber's actions and conduct described herein constitute transactions that have resulted in the sale or lease of goods or services to consumers.

177.    Plaintiffs are consumers as defined by California Civil Code § 1761(d).

178.    The Products are services within the meaning of Civil Code § 1761(a).

179.    Uber violated the CLRA in at least the following respects:

a.     In violation of Cal. Civ. Code § 1770(a)(5), Uber, by use of the untrue or misleading statements set forth and alleged in this complaint, represented that services have

34

characteristics or benefits which they do not have;

      b.     In violation of Cal. Civ. Code § 1770(a)(7), Uber, by use of the untrue or misleading statements set forth and alleged in this complaint, represented that services are of a particular standard of quality when they are of another;

      c.     In violation of Cal. Civ. Code § 1770(a)(8), Uber, by use of the untrue or misleading statements set forth and alleged in this complaint, disparaged the services or business of another by false or misleading representation of fact;

      d.     In violation of Cal. Civ. Code § 1770(a)(9), Uber advertised its transportation services (as requiring an automatic payment only of the fare) with the intent not to sell them as advertised (because Uber intended to, and did, automatically charge both the fare and the Safe Rides Fee to the consumer's credit card, debit card or PayPal account on file with Uber).

      e.     In violation of Cal. Civ. Code § 1770(a)(14), Uber represented that a transaction involves obligations (by assessing and charging the Safe Rides Fee and itemizing it on each consumer's receipt), which it does not have or involve, or which are prohibited by law (because Uber charged the Safe Rides Fee to consumers without clearly and conspicuously disclosing the fee and without the consumers' express, informed consent to pay the fee).

      f.     In violation of Cal. Civ. Code § 1770(a)(16), Uber represented that the subject of a transaction has been supplied in accordance with a previous representation (that only the fare will be automatically charged to the consumer's credit card on file with Uber) when it was not (because Uber automatically charged both the fare and the Safe Rides Fee to the consumer's credit card, debit card or PayPal account on file with Uber).

180.    Uber knew, or should have known, that its representations and advertisements about the Safe Rides Fee, safety, background checks, and other topics were false or misleading.

181.    On April 10, 2015, Plaintiffs notified Uber in writing, by certified mail, of the violations alleged herein and demanded that Defendant remedy those violations.

182.    Uber's conduct is malicious, fraudulent, and wanton in that Defendant intentionally and knowingly provided misleading information to the public.

## FIFTH CAUSE OF ACTION

**Unlawful Business Practices In Violation of Cal. Bus. & Prof. Code § 17200, *et seq.***

**(On behalf of Plaintiffs and the Nationwide Class or, alternatively, The California Class – under the law of California)**

183.    Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

184.    Uber's conduct constitutes unlawful business acts or practices under California's Unfair Competition Law, California Business & Professions Code § 17200, *et seq.* (the "UCL").

185.    Uber's business practices are unlawful because, as detailed above, they constitute (1) a breach of the implied contract between Plaintiffs and Class members on the one hand and Uber on the other, (2) a violation of the CLRA, and (3) because Uber has been unjustly enriched.

186.    As a result of Uber's unlawful business acts and practices, Plaintiffs and other Class members have suffered injury in fact and lost money or property.

187.    Plaintiffs request that the Court issue sufficient equitable relief to restore Class members to the position they would have been in had Uber not engaged in unfair competition, including by ordering restitution of all funds that Uber may have acquired as a result of its unfair competition and an injunction prohibiting the charging of fees that are called the Safe Rides Fee.

## SIXTH CAUSE OF ACTION

**Unfair Business Practices In Violation of Cal. Bus. & Prof. Code § 17200, *et seq.***

**(On behalf of Plaintiffs and the Nationwide Class or, alternatively, The California Class – under the law of California)**

188.    Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

189.    The UCL proscribes unfair business acts or practices.

190.    A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.  A business act or practice is also "unfair" under the UCL if Uber's conduct practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.  A business act or practice is also "unfair" under the UCL where the consumer injury is substantial; the injury is not outweighed by any countervailing benefits to consumers or competition; and the injury is one that consumers

themselves could not reasonably have avoided.

191.   Uber's conduct as detailed herein constitutes unfair business acts and practices.

192.   Uber charged and collected a Safe Rides Fee for "industry leading background checks" but did not provide "industry leading background checks."

193.   Uber charged and collected a Safe Rides Fee "to support . . . driver safety education" but did not use enough of the revenue generated from the collection of the Safe Rides Fee to provide driver safety education for Uber drivers.  Instead, Uber offered Uber drivers an optional "driver training class" at a cost between $40 and $65, which would be paid by the Uber driver, and not by revenue generated from the Safe Rides Fee.

194.   Uber charged and collected a Safe Rides Fee "to support . . . regular motor vehicle inspections" but did not use enough of the revenue generated from the collection of the Safe Rides Fee to provide regular motor vehicle inspections for all Uber drivers.  The vast majority of Uber drivers pay the costs for their own motor vehicle inspection.  Other Uber drivers are offered free inspections provided they spend a set amount in repairs.

195.   Plaintiffs and other Class members had no way of reasonably knowing that Uber would not use the Safe Rides Fee for the purposes for which they paid that fee.  Nor did Plaintiffs and other Class members have a means to reasonably know that Uber was overcharging Plaintiffs and other Class members for the safety-related services that were not provided or not sufficiently provided.

196.   The consequences of Uber's conduct as detailed herein outweigh any justification, motive or reason for Uber's conduct.  Uber's conduct is and continues to be unlawful, immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiffs and members of the Class. Uber's conduct has caused substantial injury to Plaintiffs and other Class members (because it results in a windfall for Uber estimated to be in excess of $20,000,000), that injury is not outweighed by any countervailing benefits to consumers (because Uber does not use the Safe Rides Fee revenue for the purposes for which it was collected) and Plaintiffs and Class members could not have avoided such injury since the assessment and collection of the Safe Rides Fee was mandatory and automatic, and was not clearly and conspicuously disclosed.

197.   As a result of Uber's unfair business acts and practices, Plaintiffs and other Class

members have suffered injury in fact and lost money or property.  Plaintiffs request that the Court issue sufficient equitable relief to restore Class members to the position they would have been in had Uber not engaged in unfair competition, including by ordering restitution of all funds that Uber may have acquired as a result of its unfair competition and an injunction prohibiting the charging of the Safe Rides Fee, and by requiring Uber to correct its labeling and to engage in a corrective advertising campaign.

### SEVENTH CAUSE OF ACTION

**Violation of the Illinois Consumer Fraud Act, 815 ILCS 502/2, *et seq.***

**(On behalf of Plaintiffs Schreiber and Mejia and the Illinois Class – under the law of Illinois)**

198.    Plaintiffs Schreiber and Mejia incorporate all preceding factual allegations as if fully set forth herein.

199.    In Illinois, the "Consumer Fraud and Deceptive Business Practices Act" 815 Ill. Comp. Stat. 502/2, *et seq.*, prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce.

200.    In the course of conducting business, Uber committed unfair or deceptive acts and practices by concealing, suppressing, or omitting material facts, as set forth more fully herein.

201.    Uber intended that Plaintiffs Schreiber and Mejia and each of the other members of the Illinois Class would rely upon its conduct, and a reasonable person would in fact be misled by this conduct.

202.    In addition, Uber's conduct showed malice and recklessness such that an award of punitive damages is appropriate.

### EIGHTH CAUSE OF ACTION

**False Advertising In Violation of Cal. Bus. & Prof. Code § 17500, *et seq.***

**(On behalf of Plaintiffs and the Nationwide Class or, alternatively, The California Class – under the law of California)**

203.    Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

204.    Beginning at an exact date unknown to Plaintiffs, but in any event within three years of the filing of the first complaint in this case, and continuing to the present, Uber, with the intent to

perform services, or to induce members of the public to enter into obligations relating thereto, made or disseminated or caused to be made or disseminated before Plaintiffs and the putative class statements concerning such services, or matters of fact connected with the performance thereof, which were untrue or misleading, and which Uber knew or reasonably should have known were untrue or misleading, in violation of Business and Professions Code section 17500, *et seq.*  Such statements include but are not limited to all of the representations set forth and discussed in the previous paragraphs of this complaint, all of which are incorporated herein by this reference.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the class of similarly situated individuals, request the Court to:

(a)     Certify the case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designate Plaintiffs as representatives of the class and designate counsel of record as class counsel;

(b)     Order Uber to provide actual damages and equitable monetary relief (including restitution) to Plaintiffs and class members and/or order Uber to disgorge profits they realized as a result of their unlawful conduct;

(c)     Order Uber to pay punitive damages, as allowable by law, to Plaintiffs and class members;

(d)     Order Uber to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiffs and class members;

(e)     Declare Uber's conduct unlawful and enter an order enjoining Uber from continuing to engage in the conduct alleged herein;

(f)     For both pre and post-judgment interest at the maximum allowable rate on any amounts awarded;

(g)     For costs of the proceedings herein;

(h)     For reasonable attorneys' fees as allowed by statute; and

(i)     Award such other relief as the Court deems appropriate under the circumstances.

1  DATED:  January 7, 2015

Respectfully submitted,

2  **AHDOOT & WOLFSON, PC**

3  By:  /s/ Robert Ahdoot
4  Robert Ahdoot
   rahdoot@ahdootwolfson.com
5  Tina Wolfson
   twolfson@ahdootwolfson.com
6  Meredith S. Lierz
   mlierz@ahdootwolfson.com
7  1016 Palm Avenue
   West Hollywood, California 90069
8  Tel: 310-474-9111
9  Fax: 310-474-8585

10  *Attorneys for Plaintiffs*,
    Julian Mena, Todd Schreiber, Nate Coolidge, and
11  Ernesto Mejia

12

13  **ARIAS, SANGUINETTI, STAHLE &
    TORRIJOS, LLP**

14

15  By:  /s/ Mike Arias
          Mike Arias
16  mike@asstlawyers.com
    Alfredo Torrijos
17  alfredo@asstlawyers.com
    6701 Center Drive West, Suite 1400
18  Los Angeles, California 90045-7504
    Tel: 310-844-9696; Fax: 310-861-0168
19

20  **LIDDLE & DUBIN, P.C.**

21

22

23  By:  /s/ Steven D. Liddle
          Steven D. Liddle (admitted *pro hac vice*)
    sliddle@ldclassaction.com
24  Nicholas A. Coulson (admitted *pro hac vice*)
    ncoulson@ldclassaction.com
25  975 E. Jefferson Avenue
    Detroit, Michigan 48207
26  Tel: 313-392-0015; Fax: 313-392-0025

27  *Attorneys for Plaintiffs*,
    Matthew Philliben and Byron McKnight
28

CONSOLIDATED CLASS ACTION COMPLAINT (CASE NO. 4:14-CV-05615-JST)