1 Robert Ahdoot, SBN 172098
  rahdoot@ahdootwolfson.com
2 Tina Wolfson, SBN 174806
  twolfson@ahdootwolfson.com
3 Theodore Maya, SBN 223242
  tmaya@ahdootwolfson.com
4 **AHDOOT & WOLFSON, P.C.**
  1016 Palm Ave.
5 West Hollywood, California 90069
  Tel: 310-474-9111; Fax: 310-474-8585
6
  *Attorneys for Plaintiffs,*
7 Julian Mena, Todd Schreiber, Nate Coolidge,
  and Ernesto Mejia
8
  Mike Arias, SBN 115385
9 mike@asstlawyers.com
  Alfredo Torrijos, SBN 222458
10 alfredo@asstlawyers.com
  **ARIAS, SANGUINETTI, STAHLE &**
11 **TORRIJOS, LLP**
  6701 Center Drive West, Suite 1400
12 Los Angeles, California 90045-7504
  Tel: 310-844-9696; Fax: 310-861-0168
13
  *Attorneys for Plaintiffs,*
14 Matthew Philliben and Byron McKnight
15 *(Additional counsel on signature page)*
16
17                **UNITED STATES DISTRICT COURT**
18                **NORTHERN DISTRICT OF CALIFORNIA**
19 MATTHEW PHILLIBEN, JULIAN MENA,      | Case No. 3:14-cv-05615-JST
20 TODD SCHREIBER, NATE COOLIDGE,        |
   ERNESTO MEJIA, and BYRON MCKNIGHT,    | The Honorable Jon S. Tigar
21 individually and on behalf of all others similarly
   situated,
22          Plaintiffs,                  | **PLAINTIFFS' NOTICE OF MOTION AND**
                                         | **MOTION FOR PRELIMINARY APPROVAL**
23      vs.                              | **OF CLASS ACTION SETTLEMENT;**
                                         | **MEMORANDUM OF POINTS AND**
24 UBER TECHNOLOGIES, INC., a Delaware   | **AUTHORITIES IN SUPPORT THEREOF**
   Corporation, and RASIER, LLC, a Delaware
25 Limited Liability Company,            |
26          Defendants.                  | Date: August 25, 2016
                                         | Time: 2:00 p.m.
27                                       | Place: Courtroom 9 – 19th Floor
28

---

**MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT (NO. 3:14-CV-05615-JST)**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 25, 2016 at 2:00 p.m., in Courtroom 9 of the above-captioned Court before the Honorable Jon S. Tigar, Plaintiffs Matthew Philliben, Julian Mena, Todd Schreiber, Nate Coolidge, Ernesto Mejia, and Byron McKnight (collectively, "Plaintiffs") will and hereby do move for an Order Granting Preliminary Approval of Class Action Settlement, pursuant to the Stipulation of Settlement filed concurrently.

More specifically, Plaintiffs move for an Order: (1) granting preliminary approval of the proposed Settlement; (2) certifying a Class for settlement purposes; (3) approving the parties' proposed Notice Program and forms of notice; (4) directing that notice of the proposed Settlement be disseminated to the Class; (5) approving the procedures for Class Members to exclude themselves from the Settlement or object to the Settlement; (6) appointing Matthew Philliben, Julian Mena, Todd Schreiber, Nate Coolidge, Ernesto Mejia, and Byron McKnight as Class Representatives for the Class; (7) appointing Tina Wolfson and Robert Ahdoot of Ahdoot & Wolfson, PC; Mike Arias and Alfredo Torrijos of Arias, Sanguinetti, Stahle & Torrijos, LLP; and Nicholas Coulson of Liddle & Dubin, PC as Class Counsel; (8) appointing Epiq Systems, Inc. as the Settlement Administrator specified in the Settlement; and (9) setting the following schedule on further proceedings to determine whether the proposed Settlement is fair, reasonable and adequate and whether an order awarding attorneys' fees, reimbursement of expenses and service awards should be approved (this schedule assumes the Court issues an order preliminarily approving the Settlement on August 25, 2016):

| Event | Date |
|---|---|
| Initial Date For Publishing Notice | **September 12, 2016**<br>(18 days after preliminary approval) |
| Deadline For Completing Notice Program | **October 9, 2016**<br>(45 days after preliminary approval) |
| Deadline For Plaintiffs' Counsel To File Any Motion For Award Of Attorneys' Fees And Service Awards | **November 9, 2016**<br>(14 days before objection/exclusion deadline) |

| Event | Date |
|---|---|
| Deadline For Class Members To Submit Objections To The Proposed Settlement Or Requests For Exclusion | **November 23, 2016** (90 days after preliminary approval) |
| Deadline To Submit Payment Election Forms | **November 23, 2016** (90 days after preliminary approval) |
| Deadline For Plaintiffs' Counsel To File Motion For Final Approval Of Class Action Settlement And Report Verifying Dissemination Of Notice | **December 15, 2016** (7 days before final approval hearing) |
| Final Approval Hearing | **December 22, 2016** |

This motion is made pursuant to Fed. R. Civ. P. 23 and is based upon: this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the Stipulation of Settlement; the declarations of Plaintiffs' proposed Class Counsel (Robert Ahdoot,  Mike Arias, and Nicholas Coulson); the declaration of Richard Dubois, on behalf of the proposed *cy pres* recipient (the National Consumer Law Center); and such evidence and argument as the Court may consider at the hearing on this motion.

Dated: July 14, 2016                    Respectfully Submitted,


**AHDOOT & WOLFSON, PC**

/s/ Robert Ahdoot
Tina Wolfson
Robert Ahdoot
Theodore W. Maya
Keith Custis
Meredith S. Lierz
1016 Palm Avenue
West Hollywood, California 90069
Tel: (310) 474-9111; Fax: (310) 474-8585

*Attorneys for Plaintiffs and the Proposed Class*

ii

1

**ARIAS, SANGUINETTI, STAHLE & TORRIJOS, LLP**

2

/s/ Alfredo Torrijos
Mike Arias

3

Alfredo Torrijos
6701 Center Drive West, Suite 1400

4

Los Angeles, California 90045-7504
Tel: (310) 844-9696; (Fax) 310-861-0168

5

6

*Attorneys for Plaintiffs and the Proposed Class*

7

**LIDDLE & DUBIN, PC**

8

/s/ Nicholas Coulson
Nicholas Coulson (admitted *pro hac vice*)

9

975 E. Jefferson Avenue
Detroit, Michigan 48207

10

Tel: 313-392-0015; Fax: 313-392-0025

11

*Attorneys for Plaintiffs and the Proposed Class*

12

13

14

15

16

17

18

19

20

**ATTORNEY ATTESTATION**

21

Pursuant to Civil Local Rule 5-1(i), I, Robert Ahdoot, hereby attest that concurrence in the filing

22

of this document has been obtained from the other signatories on this document.

23

DATED: July 14, 2016

24

25

By:   */s/ Robert Ahdoot*_____

26

Robert Ahdoot

27

28

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     SUMMARY OF LITIGATION, INVESTIGATION, AND SETTLEMENT.......................... 1

   A.   The Original Complaints and Relation of the Cases................................................. 1

   B.   The Arbitration Motions ............................................................................................ 2

   C.   The Consolidated Class Action Complaint................................................................ 3

   D.   Settlement Negotiations ............................................................................................ 3

   E.   Plaintiffs' Counsel's Investigation ........................................................................... 4

III.    THE PROPOSED SETTLEMENT.................................................................................. 5

   A.   The Class To Be Certified for Settlement Purposes ................................................. 5

   B.   Monetary Relief ........................................................................................................ 5

        1.   Distribution of the Settlement Fund................................................................. 6

        2.   Class Members' Estimated Individual Recovery ............................................. 6

   C.   Injunctive Relief........................................................................................................ 7

   D.   Dissemination of Notice to the Class ....................................................................... 8

   E.   Service Awards to Class Representatives ................................................................. 9

   F.   Attorneys' Fees and Expenses ................................................................................. 9

   G.   Release Provisions .................................................................................................. 10

   H.   Opt-Out Procedure and Opportunity to Object ...................................................... 10

IV.     CLASS ACTION TREATMENT IS APPROPRIATE ...................................................... 10

   A.   This Action Satisfies the Requirements of Rule 23(a)............................................ 10

        1.   The Class Is Numerous .................................................................................. 11

        2.   The Action Presents Common Questions ....................................................... 11

        3.   Plaintiffs' Claims Are Typical ....................................................................... 11

        4.   Plaintiffs and Their Counsel Will Fairly and Adequately Protect
             the Interests of the Class................................................................................. 11

   B.   The Predominance and Superiority Requirements of Rule 23(b)(3) are Satisfied .............. 12

1.      Common Questions of Law and Fact Predominate .......................................................... 12

2.      A Class Action Is Superior .......................................................................................... 13

C.      Plaintiffs' Counsel Should Be Appointed Class Counsel Under Rule 23(g)...................... 14

V.      THE SETTLEMENT MEETS THE STANDARD FOR PRELIMINARY APPROVAL ........................................................................................................... 14

A.      The Settlement Is the Product of Serious, Informed, Non-Collusive Negotiations............. 15

B.      The Settlement Presents No Deficiencies ................................................................... 15

C.      The Settlement Does Not Grant Preferential Treatment to Class Representatives and Provides for a Fair Allocation of Relief to All Class Members........................................... 17

D.      The Settlement Falls Within the Range of Possible Approval ....................................... 17

1.      The Strength of Plaintiffs' Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation ..................................................................................... 18

a.    Plaintiffs Would have to Overcome Defendants' Forced Arbitration Provisions .................. 19

b.    Fact Intensive Inquiries Are Pervasive ......................................................... 19

c.    Continued Litigation Would Present Risks Establishing Liability and Damages .................. 21

2.      Defendants' Payment of $28.5 Million Is Significant Compared to the Maximum Potential Recovery Available...................................................................................... 23

3.      Class Counsel Performed Sufficient Research and Analysis to Adequately Assess the Settlement and the Strengths and Weaknesses of the Class' Claims ........... 24

4.      The Recommendations of Experienced Class Counsel Favor Approval ........................ 24

VI.      THE PROPOSED FORM AND METHOD OF NOTICE IS THE BEST NOTICE PRACTICABLE AND SHOULD BE APPROVED ........................................................... 24

VII.      THE COURT SHOULD SET A SCHEDULE FOR FINAL APPROVAL ....................... 25

VIII.      CONCLUSION................................................................................................... 25

ii

# TABLE OF AUTHORITIES

**CASES**

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S.Ct. 1184 (2013)............................................ 12

*Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245 (N.D. Cal. 2015) ............................................. 18, 24

*Ching v. Siemens Indus., Inc.*, No. 11-cv-04838-MEJ, 2014 WL 2926210 (N.D. Cal. June 27, 2014) ...... 21

*Chow v. Neutrogena Corp.*, No. CV 12-04624 R JCX, 2013 WL 5629777 (C.D. Cal. Jan. 22, 2013) ...... 17

*Chun–Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848 (N.D. Cal. 2010) ...................................... 15, 18

*Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004)...................................... 18, 22

*Class Plaintiffs v. Seattle*, 995 F.2d 1268 (9th Cir. 1992) ...................................................... 14, 15

*Custom LED, LLC v. eBay, Inc*, No. 12-CV-00350-JST, 2013 WL 6114379

(N.D. Cal. Nov. 20, 2013)................................................................................. 17

*Custom LED, LLC v. eBay, Inc*, No. 12-CV-00350-JST, 2014 WL 2916871 (N.D. Cal.

June 24, 2014)...................................................................................... 18, 23

*Dennis v Kellogg*, 697 F.3d 858 (9th Cir. 2012)....................................................................... 6

*Dyer v. Wells Fargo Bank, N.A.*, No. 13-cv-02858-JST, 2014 WL 1900682 (N.D. Cal. May 12, 2014) ... 14

*Fraley v. Batman*, No. 13-16819, 2016 WL 145984 (9th Cir. Jan. 6, 2016)............................................. 16

*Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939 (N.D. Cal. 2013)................................................. 16

*Garner v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) .................. 18, 24

*Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068 MMC, 2007 WL 221862 (N.D. Cal. Jan. 26, 2007) ......... 23

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ............................................ 11, 12, 18

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992)........................................................ 11

*In re Apple & AT&TM Antitrust Litig.*, 596 F. Supp. 2d 1288 (N.D. Cal. 2008) ................................ 13

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011)............................................ 9, 15

*In re Ferrero Litig.*, 583 F. App'x 665 (9th Cir. 2014) ................................................................ 15

*In re Google Buzz Privacy Litig.*, No. 10-00672, 2011 WL 7460099 (N.D. Cal. June 2, 2011)................. 16

*In re Google Referrer Header Privacy Litig.*, No. 10-04809, 2015 WL 1520475 (N.D. Cal.

Mar. 31, 2015)................................................................................................ 16

1   *In re Heritage Bond Litig.*, No. 02–ML–1475–DT, 2005 WL 1594389 (C.D. Cal. June 10, 2005) .......... 23

2   *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139 (E.D.N.Y. 2000) ............................... 15

3   *In re LDK Solar Secs. Litig.*, No. 07-5182 WHA, 2010 U.S. Dist. LEXIS 87168 (N.D. Cal.

4       July 29, 2010)............................................................................................................ 23

5   *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002)...................................... 15

6   *In re Mego Financial Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000)...................................... 21, 23

7   *In re Netflix Privacy Litig.*, No. 11-00379, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ...................... 16

8   *In re Omnivision*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008) ...................................................... 21, 23

9   *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 962 F. Supp. 450 (D.N.J. 1997)........................... 14

10  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078 (N.D. Cal. 2007)....................................... 1, 14, 17

11  *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840 (D. Md. 2013)............................................. 22

12  *In re Tobacco II Cases*, 46 Cal. 4th 298 (2009)................................................................. 13, 16

13  *In re TracFone Unlimited Serv. Plan Litig.*, No. C-13-3440 EMC, 2015 WL 4051882 (N.D. Cal.

14      July 2, 2015)............................................................................................................ 16

15  *In Re Uber FCRA Litigation*, No. C-14-5200 EMC (N.D. Cal.), Nos. 15-17533, 16-15035 (9th Cir.) ...... 19

16  *In re Wells Fargo Loan Processor Overtime Pay Litig.*, No. MDL C-07-1841 EMC, 2011 WL

17      3352460 (N.D. Cal. Aug. 2, 2011)............................................................................. 19

18  *In re Wireless Facilities, Inc. Sec. Litig. II*, 253 F.R.D. 607 (S.D. Cal. 2008) ........................................ 10

19  *In re: TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2012 WL 12369590 (N.D. Cal.

20      Oct. 15, 2012) ..................................................................................................... 14, 17

21  *Keirsey v. eBay, Inc.*, No. 12-CV-01200-JST, 2013 WL 5755047 (N.D. Cal. Oct. 23, 2013)............ 10

22  *Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012) ................................................................ 6

23  *Larsen v. Trader Joe's Co.*, No. 11-cv-05188-WHO, 2014 WL 3404531 (N.D. Cal. July 11, 2014) ........ 24

24  *Lilly v. Jamba Juice Co.*, No. 13-CV-02998-JST, 2015 WL 2062858 (N.D. Cal. May 4, 2015) .............. 19

25  *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234 (9th Cir. 1998) ...................................... 14

26  *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas*, 244 F.3d 1152 (9th Cir. 2001) .... 13

27  *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718 (9th Cir. 2007) ............................................. 22

28  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) ...................................................... 22

iv

*Moore v. Verizon Comms. Inc.*, No. C 09–1823 SBA, 2013 WL 4610764 (N.D. Cal. Aug. 28, 2013) ...... 18

*Mullane v. Central Hanover Trust,* 339 U.S. 306 (1950) ................................................................. 24

*Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004)................................ 24

*Negrete v. Allianz Life Ins. Co. of N. Am.,* 238 F.R.D. 482 (C.D. Cal. 2006) ............................... 13

*Officers for Justice v. Civil Service Com'n of City and County of San Francisco*, 688 F.2d 615
  (9th Cir. 1982)................................................................................................................ 18

*Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) ................................................................... 11

*Phillips Petroleum Co. v. Shutts,* 472 U.S. 797 (1985) ............................................................. 13

*Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009)................................................ 14, 18, 21

*Satchell v. Fed. Express Corp.*, No. C 03-2659 SI, 2007 WL 1114010 (N.D. Cal. Apr. 13, 2007)............ 15

*Smith v. Am. Greetings Corp.*, No. 14-cv-02577-JST, 2015 WL 4498571 (N.D. Cal. July 23, 2015)........ 14

*Tchoboian v. Parking Concepts, Inc*., No. SACV 09-422, 2009 WL 2169883 (C.D. Cal. Jul. 16,
  2009) ................................................................................................................... 13

*United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union,*
  *AFL-CIO v. ConocoPhillips Co.*, 593 F.3d 802 (9th Cir. 2010)......................................... 10

*Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943 (9th Cir. 1976) ................................................ 14

*Villegas v. J.P. Morgan Chase & Co*., No. CV 09–00261 SBA (EMC), 2012 WL 5878390 (N.D.
  Cal. Nov. 21, 2012)................................................................................................ 17

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ..................................................... 11

*Westways World Travel, Inc. v. AMC Corp.,* 218 F.R.D. 223 (C.D. Cal. 2003) ........................... 13

*Williams v. Gerber Products Co*., 552 F.3d 934 (9th Cir. 2008)............................................. 12

*Wolin v. Jaguar Land Rover N. Am., LLC,* 617 F.3d 1168 (9th Cir. 2010)................................ 13

*Yokoyama v. Midland Nat. Life Ins. Co*., 594 F.3d 1087 (9th Cir. 2010)................................ 12

### STATUTES

28 U.S.C. §1715.................................................................................................... 9

815 ILCS 502/2.................................................................................................... 2

Cal. Bus. & Prof. Code §17200 ............................................................................. 2

v

Cal. Bus. & Prof. Code §17500 ........................................................................................ 2

Cal. Civ. Code §1750 ...................................................................................................... 2

**OTHER AUTHORITIES**

Federal Judicial Center, Judges' Class Action Notice And Claims Process Checklist And

    Plain Language Guide (2010) ................................................................................... 8

Manual for Complex Litigation (2d ed. 1985) .............................................................. 14

**RULES**

Fed. R. Civ. P. 23(b) .............................................................................................. 12, 13

Fed. R. Civ. P. 23(c) .................................................................................................... 25

Rule 23(a) ............................................................................................................. 10, 11

1  **I.      INTRODUCTION**

2        Plaintiffs and Defendants Uber Technologies, Inc. and Rasier, LLC (collectively, "Defendants"

3  or "Uber") have reached a settlement that, if approved, will resolve claims arising out of Defendants'

4  representations and omissions regarding the safety of Defendants' Rideshare Service, Defendants' so-

5  called "Safe Rides Fee," and their drivers' background checks. The Stipulation of Settlement filed on

6  February 11, 2016 as ECF Docket No. 74 ("Settlement" or "Stip."),[1] would require Defendants to

7  establish a non-reversionary cash Settlement Fund in the amount of $28.5 million, and to distribute that

8  Fund to Class Members, using Uber's infrastructure, which is an additional benefit that has the

9  estimated value of $1,875,000. (Stip. Ex. I at ¶ 38.) The Settlement also provides significant injunctive

10  relief to Class Members by precluding Defendants from naming any fee associated with their service a

11  "Safe Rides Fee" and from using certain terms in Commercial Advertising regarding safety and

12  background checks, among other relief.

13        The Settlement is the product of extensive and complex arms' length negotiations between

14  experienced and informed counsel, including multiple mediation sessions with the Hon. Carl West, a

15  retired complex litigation judge with substantial experience in class action litigation and settlement, as

16  well as numerous in-person meetings and telephonic conferences between counsel. It is fair, reasonable,

17  and adequate given the claims, the alleged harm, and the Parties' respective litigation risks, and is well

18  within the "range of reasonableness" standard applicable at the preliminary approval stage. *In re*

19  *Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007).

20        The Settlement also provides for an effective notice program, featuring direct notice to potential

21  Class Members as well as internet advertising and publication, all of which are well-tailored to

22  disseminate the best notice practicable. Accordingly, Plaintiffs ask this Court to grant preliminary

23  approval of the Settlement and issue the concurrently filed [Proposed] Preliminary Approval Order.

24  **II.     SUMMARY OF LITIGATION, INVESTIGATION, AND SETTLEMENT**

25        **A.      The Original Complaints and Relation of the Cases**

26        On December 23, 2014, plaintiffs Philliben and McKnight filed a nationwide class action, No.

27

28  ――――――――――――――
[1]        Unless otherwise stated, capitalized terms have the same meaning as in the Settlement.

3:14-cv-05615 ("*Philliben*"), which asserted causes of action for alleged violations of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §17500 *et seq.*, and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200 *et seq.*, and which alleged, *inter alia*, misrepresentations and omissions regarding Defendants' "Safe Rides Fee," their safety measures, alleged expenditures, and the nature of the driver background checks. (*Philliben* Dkt. 1.)

On January 6, 2015, Andrea Pappey filed a nationwide (or in the alternative California, Illinois, and Massachusetts) class action, No. 3:15-cv-00064 ("*Mena*"). This complaint was later amended and Plaintiffs Mena, Schreiber, Coolidge, and Mejia joined as class representatives, while Andrea Pappey withdrew.  *Mena* alleged breach of implied contract; violations of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §1750 *et seq.*; and violations of the UCL, FAL, and the Illinois Consumer Fraud Act, 815 ILCS 502/2, *et seq.* ("ICFA") in connection with alleged misrepresentations and omissions regarding Defendants' Safe Rides Fee, their safety measures, alleged expenditures, and the nature and character of the driver background checks. (*Mena* Dkt. 28.)

The Court granted a joint stipulation to relate these cases on February 18, 2015. (*Philliben* Dkt. 23; *Mena* Dkt. 19.) Plaintiffs' Counsel then cooperated in organizing a leadership structure to effectively and efficiently prosecute the claims on behalf of Plaintiffs and the proposed Class. (Declaration of Robert R. Ahdoot filed concurrently herewith ("Ahdoot Decl.")[2] ¶ 5; *see also id.* at ¶¶ 9-14 (providing additional background).)

**B.    The Arbitration Motions**

On March 20, 2015, Defendants filed a Motion to Stay Proceedings Pending Arbitration in *Philliben*. (*Philliben* Dkt. 25-29, 38-40), which the *Philliben* plaintiffs opposed (*id.* Dkt. 37). On May 4, 2015, Defendants filed a similar motion in *Mena* (*Mena* Dkt. 31-36, 39-41), which the *Mena* plaintiffs opposed (*id.* Dkt. 37-38). The *Mena* plaintiffs also filed an Objection to and Motion to Strike Reply Evidence (*id.* Dkt. 42), and the Court granted the *Mena* plaintiffs leave to file a Sur-reply, which was

---

[2]     A redacted version of the Ahdoot Decl. was previously filed as ECF Docket No. 75-5. Pursuant to the Court's July 7, 2016 Order Granting Motion To Seal And Granting Motion For Modification Of Order on Motion To Seal (Dkt. No. 94), the Ahdoot Decl. is filed concurrently herewith with revised redactions.

1  filed on June 9, 2015. (*Id.* Dkt. 45.) On June 10, 2015, the *Mena* plaintiffs filed a Statement of Recent

2  Decision in connection with the arbitration motion. (*Id.* Dkt. 46.)

3  **C.      The Consolidated Class Action Complaint**

4  On January 7, 2016, plaintiffs filed a Consolidated Amended Complaint asserting claims for

5  breach of implied contract and violations of the CLRA, UCL, FAL, and ICFA. (*Philliben* Dkt. 67

6  (hereinafter, the "CAC").) The CAC alleges, *inter alia*, that Uber charges a Safe Rides Fee without

7  properly disclosing it prior to the ride (CAC ¶¶ 41, 54-58, 61, 64), and that Uber makes a number of

8  representations and/or omissions regarding its safety efforts, expenditures, and background checks. (*Id.*

9  ¶¶ 25, 26-27, 29-40, 65). Plaintiffs also assert that Uber does not use the Safe Rides Fee to pay for the

10  alleged safety-related services, and thus the term is itself a misrepresentation. (*Id.* ¶¶ 79, 89.) Defendants

11  dispute the allegations and deny any and all liability.

12  **D.      Settlement Negotiations**

13  More than six months ago, and after the arbitration motions were fully briefed, the parties began

14  discussing possible settlement, which resulted in a long series of arms' length negotiations, including

15  three full days of mediation and numerous face-to-face and telephonic meetings between counsel and

16  with the mediator. (Ahdoot Decl. ¶ 15.)

17  The Honorable Carl West (Ret.) of JAMS served as the mediator. Judge West is a highly

18  respected and experienced class action mediator, who joined JAMS following eighteen years on the

19  bench, spending the most recent ten years as a judge with the Los Angeles County Superior Court's

20  complex litigation panel. (*Id.* ¶ 17.)

21  In connection with the mediation, Plaintiffs requested substantial information from Defendants,

22  and, to ensure that this information could be timely provided, the Parties filed a Stipulation With

23  Proposed Order For A Second Temporary Stay Pending Mediation on July 29, 2015 (*Mena* Dkt. 52;

24  *Philliben* Dkt. 51) as well as a Stipulation and Protective Order (*Mena* Dkt. 49; *Philliben* Dkt. 50),

25  which was entered by the Court on August 3, 2015 (*Mena* Dkt. 51; *Philliben* Dkt. 52). The parties

26  participated in three full days of in-person mediation on August 24, 2015, October 2, 2015, and on

27  October 30, 2015, and numerous additional meetings and telephone calls, between counsel. (Ahdoot

28  Decl. ¶¶ 16, 19.) The parties finally reached a settlement in principle in December 2015. (*Id.* ¶ 21.)

1   The parties then began memorializing the full Settlement, which generated numerous additional

2   rounds of comprehensive and often spirited negotiations. The parties extensively negotiated each aspect

3   of the Settlement, including each of its nine exhibits. For example, counsel negotiated and meticulously

4   refined the notice program and each document comprising the notice (the Long Form Notice, Summary

5   Notice, and Banner Ads), with the assistance of a class action notice expert, to ensure that the

6   information disseminated to Class Members is clear and concise. (*Id.* ¶ 23.)

7           **E.      Plaintiffs' Counsel's Investigation**

8           Before initiating these Actions, Plaintiffs' Counsel investigated the underlying facts and

9   analyzed the veracity of the claims. They researched Defendants' representations, marketing, business

10  practices and promotional efforts, interviewed users of Uber's Rideshare Service and a number of Uber

11  drivers, and investigated facts and applicable law and standards relating to background checks and

12  commercial transportation service safety. Furthermore, Plaintiffs' Counsel researched and analyzed the

13  merits of the potential causes of action, and defenses, under state statutory and common law. (*Id.* ¶ 6.)

14          Plaintiffs' counsel continued these efforts after filing the Actions and before entering into the

15  Settlement, and conducted a thorough examination, investigation, and evaluation of the relevant law and

16  facts to assess the merits of the claims and defenses. (*Id.* ¶ 7.)

17          Plaintiffs submitted comprehensive requests for information regarding their allegations and

18  Defendants' anticipated defenses, and Defendants provided thousands of pages of responsive documents

19  and sworn responses. Plaintiffs' Counsel thoroughly analyzed and evaluated all information provided,

20  including documents bearing on Defendants' background checks, alleged safety expenditures, the Safe

21  Rides Fee and resulting revenues, and Defendants' representations, advertising, and marketing regarding

22  safety. (*Id.* ¶ 27.) Plaintiffs' investigation also included a detailed inspection and testing of Defendants'

23  ride share App across various operating system platforms, consultations with experts, interviews of

24  witnesses, drivers, and putative class members, the evaluation of documents and information related to

25  other litigation against Defendants, as well as extensive factual and legal research regarding arbitration,

26  the sufficiency of the claims, and the appropriateness of class certification. (*Id.* ¶ 28.)

27          Plaintiffs' Counsel conducted ten extensive interviews of key witnesses over the course of three

28  days at Uber's offices and other locations in San Francisco. Counsel interviewed current and former

1    high level Uber employees with direct knowledge of the facts at issue in the Actions, including safety

2    representations, safety measures, alleged safety expenditures, details regarding the Safe Rides Fee, user

3    databases, and other relevant areas of Uber's operations. (*Id.* ¶ 29.)

4    **III.    THE PROPOSED SETTLEMENT**

5         **A.    The Class To Be Certified for Settlement Purposes**

6         Plaintiffs seek certification of the following Class for settlement purposes:

7         All persons who, from January 1, 2013 to January 31, 2016, used the Uber smartphone
          application ("App") or website to obtain service from one of Uber's Rideshare Services
8         in the United States or its territories and who have a U.S. Payment Profile. "Uber's
          Rideshare Services" means all transportation services that are arranged through the App
9         or website, regardless of type of ride or service that is requested (such as UberX,
          UberSUV, UberBlack, UberPool, etc.). "U.S. Payment Profile" means that the payment
10        method associated with the person's most recent U.S. trip (as of January 31, 2016) is a
          credit card or debit card issued in the U.S., or any other payment method (Google Wallet,
11        PayPal, etc.). "Uber" means the companies, incorporated in the State of Delaware as
          Uber Technologies, Inc. and Rasier, LLC, who operate the ride share service commonly
12        known as Uber. Excluded from the Class are (a) all persons who are employees,
          directors, and officers of Uber Technologies, Inc. and Raiser, LLC; and (b) the Court and
13        Court staff.

14

15   (Stip. ¶ 3.)  Compared to the class alleged in the CAC, this Class has been refined to include only, and

16   define more precisely, U.S. riders. The time period of the Class has changed slightly, and now ends

17   January 31, 2016, instead of "the date that notice of this class action is disseminated." (CAC ¶ 138.)

18        **B.    Monetary Relief**

19        Defendants will pay $28.5 million in cash to create the Settlement Fund, which will be used for

20   payments to Class Members, the costs of notice and settlement administration (including transaction

21   costs for payments to Class Member's Uber Payment Accounts),[3] Court-approved Service Awards, and

22   Attorneys' Fees and Expenses. (Stip. ¶ 48.) The Settlement Fund cannot revert to Defendants. (*Id.* ¶ 45.)

23   Uber will distribute each Class Member's Settlement Share,[4] through its infrastructure, providing an

24   estimated additional $1,875,000 in settlement value, by reducing the administrative costs to the Class.

25   (Stip. ¶¶ 55-74 & Ex. I ¶ 38.)

26   _____

27   [3]    The Settlement Administrator estimates that administration costs will range between $300,000
     and $500,000, and has agreed that in no event will the costs exceed $800,000.  (Stip. Ex. I ¶ 37.)

28   [4]    "Settlement Share" is each Class Member's *per capita* share of the Settlement Fund. (Stip. ¶ 34.)

### 1. Distribution of the Settlement Fund

Class Members will automatically receive their Settlement Share. They may choose to (1) have it paid to their default payment method on file with Uber (credit card, PayPal, *etc.*) or (2) paid to their Uber Rider Account (meaning it will be paid towards their next Uber ride), by submitting the Payment Election Form (Stip. ¶¶ 55-74 & Ex. C) within sixty (60) days from the Notice Date.[5] In the event Class Members do not submit a Payment Election Form, the Settlement Share will be automatically paid to their Uber Rider Account.[6] If Class Members who receive the Settlement Share as a payment towards their next Uber ride do not use Uber's Rideshare Service within 365 days of the Effective Date, Defendants will pay the Settlement Share such Class Members' default payment method on file with Uber.[7] (Stip. ¶ 64.) Prior to payment of the Settlement Share to an Uber Payment Account, the Settlement Administrator will send emails to the respective Class Members reminding them to ensure that payment information is current. (*Id.* ¶ 83.)

While the Settlement makes every effort to confer the Settlement Shares to Class Members (*see e.g.* Stip. ¶¶ 55-74), in the event the entire amount of the Settlement Fund is not paid to Class Members,[8] any residual will be paid to the National Consumer Law Center ("NCLC"). (*Id.* ¶ 75.)[9]

### 2. Class Members' Estimated Individual Recovery

The Settlement Fund of $28.5 million presents an overall value of approximately $1.14 per Class

---

[5]     The Payment Election Form can be submitted online or by mail, and will be available upon request or by download on the Settlement website.

[6]     Defendants' data indicate that Class Members are extremely likely to re-use Uber and, thus, benefit from payment of their Settlement Share to their Uber Rider Account. (Ahdoot Decl. ¶¶ 32, 40.)

[7]      This refers to the "Uber Payment Account," meaning the default credit card, debit card, PayPal account, or other payment method linked to each Class Member's Uber Rider Account. (Stip. ¶ 38.) "Uber Rider Account" means the account each Class Member created when he or she electronically registered to use Uber's Rideshare Services. (Stip. ¶ 39.)

[8]     Given the transaction costs involved in each attempt to pay the default payment account of each Class Member, Uber will only attempt payment once. (Stip. ¶ 64.).

[9]     The Parties carefully selected NCLC in compliance with *Lane v. Facebook, Inc.*, 696 F.3d 811, 820 (9th Cir. 2012), and *Dennis v Kellogg*, 697 F.3d 858 (9th Cir. 2012). As set forth in the Declaration of Richard Dubois filed on February 11, 2016 as ECF Docket No. 76 ("Dubois Decl."), NCLC is a non-profit organization committed to protecting consumers and promoting fairness in the marketplace. It has committed to use any *cy pres* funds to support consumer education. (Dubois Decl. ¶ 12.)

1   Member, based on a Class size of 25 million Members.[10] Accounting for the costs of administration,

2   attorneys' fees, service awards, and transaction costs, each Class Member's Settlement Share will

3   amount to approximately $0.82. (Ahdoot Decl. ¶¶ 67-68.) However evaluated, the Settlement's value on

4   a per-Class-Member basis is significant compared to the average initial Safe Rides Fee of $1.12 paid by

5   Class Members prior to disclosure of that fee after their first Uber ride (*Id.* ¶ 41), and compared to the

6   maximum potential recovery, described in Section V.D.2, below, which amounts to $5.33 per Class

7   Member (and does not account for any costs or fees).

8       **C.     Injunctive Relief**

9           Uber has agreed to the following significant measures as part of the Settlement:

10          (a) Defendants will not describe or title any fee that they charge for their services,
11      including any charge for Uber's Rideshare Services, as the "Safe Rides Fee."

12          (b) In any Commercial Advertising,[11] Defendants will not make the following
13      representations regarding their background checks:

14              (i) Defendants shall not list any offense type that does not result in automatic
15          disqualification as a driver during the initial screening process without explaining
            the disqualification criteria; and

16              (ii) Defendants shall not represent that they screen against arrests for any
17          instances where Defendants actually screen only against convictions.

18          (c) In any Commercial Advertising regarding background checks, Defendants shall
19      identify the time period covered by the background check report Defendants use to screen
        potential drivers or, if shorter, any time period used for disqualification purposes.

20          (d) In any Commercial Advertising, Defendants shall not use the terms "best
21      available," "industry leading," "gold standard," "safest," or "best-in-class" in connection
        with their background checks.

22

23  [10]     The $28.5 million figure does not attribute any monetary value to the significant injunctive relief
    included in the Settlement.  Nor does this figure account for the added value attributable to Defendants'
24  agreement to make payments to those Class Members who elect to receive their Settlement Share via a
    payment to their Uber Payment Account, which is estimated at $1.875 million. (Stip. Ex. I ¶ 38.)

25  [11]     "Commercial Advertising" means any print advertisements, television or radio advertisements,
    online advertisements, in-app advertisements, or any mass e-mails or other written or electronic
26  communications from Defendants to consumers made for the purpose of influencing consumers to buy
    Defendants' services. To constitute Commercial Advertising, the advertisement must be disseminated
27  sufficiently to the relevant purchasing public to constitute advertising or promotion within Defendants'
    industry. Commercial Advertising includes advertorials but does not include statements to the news
28  media. (Stip. ¶7.)

1
2
3
4

(e) In any Commercial Advertising, Defendants shall not use the following phrases to describe Uber's Rideshare Services: "safest ride on the road," "strictest safety standards possible," "safest experience on the road," "best in class safety and accountability," "safest transportation option," "background checks that exceed any local or national standard," or "safest possible platform."

5   (Stip. ¶ 47.) The Settlement thus addresses substantially all of the objectionable conduct alleged in the

6   CAC, despite Defendants' denial of liability. As part of the Settlement, Defendants agree to no longer

7   charge any fee entitled "Safe Rides Fee." Defendants may charge a "booking fee," which they may

8   describe as "a separate flat fee added to every trip that helps support safety initiatives for riders and

9   drivers as well as other operational costs." (Stip. p. 6.)

10          The CAC alleges a number of additional representations regarding Uber's safety standards that

11  Plaintiffs contend are false or misleading (CAC ¶¶ 25-40) and, although Defendants disagree with such

12  contentions, they have agreed to clarify their alleged safety-related Commercial Advertising. Uber's

13  safety webpage (www.uber.com/safety) will include the following disclaimer so long as it remains in

14  use, specifically designed to remedy the alleged misstatements, most of which were disseminated

15  through that same webpage: "The screening process does not require fingerprints, Live Scan, or the

16  Department of Justice or FBI databases." (Stip. p. 6.)

17          **D.     Dissemination of Notice to the Class**

18          Class Members will directly receive the Summary Notice (Stip., Ex. G) to the email addresses

19  associated with their Uber Rider Accounts. (Stip. ¶ 80(d)(i) & Ex. I ¶¶ 17-18.) According to Defendants,

20  they do not collect or maintain Class Members' physical mailing addresses, but they do maintain email

21  addresses and, based on Uber's recent emails to its customers, approximately 95% of the email

22  addresses are likely to be valid. (Ahdoot Decl. ¶¶ 36-39.)

23          The notice program will also include Internet advertising, including sponsored search listings on

24  major search engines and banner ads appearing on a network of various websites. (Stip. ¶ 80(d)(ii) & Ex.

25  I ¶ 21-23.) The Long Form Notice (Stip. Ex. E) will be made available on a settlement website

26  (www.RideShareSettlement.com) and upon request through a toll-free number. (Stip. ¶¶ 80(d)(iii),

27  80(c).) A Publication Notice (Stip. Ex. H) also will be published in accordance with the CLRA (Cal.

28  Civ. Code § 1781(d)). (Stip. ¶¶ 80(d)(ii) & Ex. I ¶ 20.) The notice plan will reach no less than 80% of

1   Class Members, and likely over 90%.[12] (Stip. Ex. I ¶ 16.)

2       The Summary Notice will refer Class Members to the Settlement website, which will make

3   available the Long Form Notice, Payment Election Form, Stipulation, and other relevant Court

4   documents. (Stip. ¶ 80(b) & Ex. I ¶ 19.) The toll-free number will also provide Settlement-related

5   information. (*Id.* ¶ 80(c)& Ex. I ¶ 25.) Finally, Defendants will comply with the requirements of 28

6   U.S.C. §1715 ("CAFA") (Stip. ¶ 77), and Plaintiffs' Counsel will place links to the Settlement website

7   on the homepages of their websites.

8       **E.   Service Awards to Class Representatives**

9       The Settlement allows each Plaintiff to apply for a Service Award no later than 14 days prior to

10  the objection/exclusion deadline, to be paid out of the Settlement Fund. (*Id.* ¶ 119.) There is no

11  agreement between the parties as to the amount of this request nor is the Settlement conditioned on the

12  Service Awards. Plaintiffs' intention to seek no more than $500 for each Class Representative is

13  disclosed on the notice forms (*see, e.g.*, Stip., Ex. E). Should the Court award less than the amount

14  sought, the balance will remain in the Settlement Fund and be applied toward the calculation of the

15  Settlement Shares for Class Members. (*Id.* ¶ 33.)

16      **F.   Attorneys' Fees and Expenses**

17      Plaintiffs' Counsel will apply for an Attorneys' Fees and Expense Award to be paid from the

18  Settlement Fund. (*Id.* ¶¶ 85-88.) There is no agreement between Plaintiffs and Defendants regarding the

19  amount of Plaintiffs' attorneys' fees or expenses.[13] (*Id.*) Plaintiffs will apply for the award of fees and

20  expenses no later than 14 days prior to the objection/exclusion deadline, and will not seek fees in excess

21  of 25% of the Settlement Fund. *See, e.g. In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942

22  (9th Cir. 2011). This maximum amount is stated on the relevant notice forms. (*E.g.* Stip. Ex. E.) Should

23  the Court award less than the amount ultimately sought, the balance will remain in the Settlement Fund

24  and be applied toward the calculation of the Settlement Shares for Class Members. (*Id.* ¶ 33.)

25  _____

26  [12]    "It is reasonable to reach between 70–95% [of the class]." FEDERAL JUDICIAL CENTER, JUDGES'
    CLASS ACTION NOTICE AND CLAIMS PROCESS CHECKLIST AND PLAIN LANGUAGE GUIDE 3 (2010).

27  [13]    Moreover, the procedure for, and the allowance or disallowance of any attorneys' fees, costs,
28  expenses, or reimbursement is not part of the Settlement and is to be considered separately from the
    fairness, reasonableness, and adequacy of the Settlement. (Stip. ¶ 88.)

### G.      Release Provisions

If the Court grants final approval of the proposed Settlement, Class Members will be deemed to have released Defendants of all claims, known or unknown, that were asserted or could have been asserted in the litigation. (*Id.* ¶¶ 26, 89-90.) Claims for personal injury, however, are excluded. (*Id.* ¶ 26.) The Released Claims are tied to "the allegations in the Action," which are the claims alleged in the CAC. (*Id.*)

### H.      Opt-Out Procedure and Opportunity to Object

Any potential Class Member may request to be excluded from the Class by sending a written request to the Settlement Administrator postmarked on or before a date no later than 90 days after the the Court enters an order preliminarily approving the Settlement. (Stip. Exs. D-E.) Valid requests must include information described in the Notice, including a statement that the person sending the request wishes to be excluded from the Class. (*Id.* ¶ 116 & Ex. E.)

Any Class Member who does not request to be excluded may object to the Settlement, Class Counsel's fee application, and/or the requests for Service Awards. (*Id.* ¶ 114.) To be considered, an objection must either be mailed to the Class Action Clerk or filed with the Court, and must be in writing, personally signed by the objector, and include the information prescribed by the Notice. (*Id.* Exs. D-E.)

## IV.    CLASS ACTION TREATMENT IS APPROPRIATE

The Court should certify the Class because Rule 23(a) and 23(b)(3) are satisfied.[14]

### A.      This Action Satisfies the Requirements of Rule 23(a)

"The four requirements of Rule 23(a) are commonly referred to as 'numerosity,' 'commonality,' 'typicality,' and 'adequacy of representation' (or just 'adequacy'), respectively." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO v. ConocoPhillips Co.*, 593 F.3d 802, 806 (9th Cir. 2010).

---

[14]      A court may certify a class solely for settlement purposes. *Keirsey v. eBay, Inc.*, No. 12-CV-01200-JST, 2013 WL 5755047, at *2 (N.D. Cal. Oct. 23, 2013) (certifying class for settlement purposes); *In re Wireless Facilities, Inc. Sec. Litig. II*, 253 F.R.D. 607, 610 (S.D. Cal. 2008) ("Parties may settle a class action before class certification and stipulate that a defined class be conditionally certified for settlement purposes.").

1

### 1.    The Class Is Numerous

2      The Class includes almost 25 million members (Ahdoot Decl. ¶ 32), easily satisfying the

3  numerosity requirement of Rule 23(a)(1).

4

### 2.    The Action Presents Common Questions

5      Rule 23(a)(2) requires that "there [be] questions of law or fact common to the class,"[15] and also

6  is satisfied. Common questions include whether Defendants' representations and omissions regarding

7  the Safe Rides Fee and Defendants' safety practices were misleading, whether revenues were used for

8  the stated purpose, whether the statements created implied contracts with the Class Members, whether

9  such contracts were breached, and whether defendants' practices violated the law.

10

### 3.    Plaintiffs' Claims Are Typical

11      Rule 23(a)(3)'s requirement that "the claims or defenses of the representative parties are typical

12  of the claims or defenses of the class" also is satisfied because plaintiffs' claims are "reasonably co-

13  extensive with those of absent class members." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir.

14  1998).  The Plaintiffs' claims stem from the same common course of conduct as the claims of the Class.

15  The injuries suffered by Plaintiffs are the same as those of the Class and result from Defendants' safety-

16  related representations, omissions, and the imposition of and disclosures regarding the Safe Rides Fee.

17  Typicality is therefore satisfied. *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014).

18

### 4.    Plaintiffs and Their Counsel Will Fairly and Adequately Protect the

19

### Interests of the Class

20      Rule 23(a)(4) requires that the representative parties will fairly and adequately protect the

21  interests of the class. "Resolution of two questions determines legal adequacy: (1) do the named

22  plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the

23  named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150

24

25  ---

[15]     *See Hanlon v. Chrysler Corp*, 150 F.3d 1011, 1019 (9th Cir. 1998); *see also Wal-Mart Stores,*
26  *Inc. v. Dukes*, 131 S. Ct. 2541, 2556 (2011). "Commonality requires the plaintiff to demonstrate that the
class members have suffered the same injury." *Id. at* 2551. This means that the class members' claims
27  "must depend on a common contention . . . of such a nature that it is capable of class wide resolution—
which means that determination of its truth or falsity will resolve an issue that is central to the validity of
28  each one of the claims in one stroke." *Id.*

– 11 –

1   F.3d at 1020. There are no conflicts of interest here. Plaintiffs seek the same remedy as all Class

2   Members: relief to address claims arising from Defendants' safety-related representations and the

3   imposition of, and disclosures regarding, the Safe Rides Fee. Plaintiffs' interests are perfectly aligned

4   with the interests of the Class.

5          Further, proposed Class Counsel have extensive experience litigating and settling class actions,

6   including false advertising, breach of contract, and unlawful business practices claims on behalf of

7   consumers. They have demonstrated expertise in handling all aspects of complex litigation and class

8   actions, and are well qualified to represent the Class. (Ahdoot Decl. Ex. A; Arias Decl. ¶¶ 4-13, Dkt. 78;

9   Coulson Decl. ¶¶ 2-6, Dkt. 77). Plaintiffs and proposed Class Counsel remain fully committed to

10  advancing the interests of, and obtaining relief for, the Class Members, as evidenced by the terms of the

11  Settlement.

12         **B.     The Predominance and Superiority Requirements of Rule 23(b)(3) are Satisfied**

13         "In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class

14  certification must also show that the action is maintainable under Fed. R. Civ. P. 23(b)(1), (2) or (3)."

15  *Hanlon*, 150 F.3d at 1022. Here, Rule 23(b)(3) is satisfied because: (i) the questions of law and fact

16  common to members of the class predominate over any questions affecting only individuals; and (ii) the

17  class action mechanism is superior to any other available methods for the fair and efficient adjudication

18  of the controversy. Fed. R. Civ. P. 23(b)(3).

19         **1.     Common Questions of Law and Fact Predominate**

20         Rule 23(b)(3) does not require plaintiffs seeking class certification to prove that each element of

21  their claim is susceptible to class-wide proof. *See Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,

22  133 S.Ct. 1184, 1196 (2013). Plaintiffs need only show that "common questions 'predominate over any

23  questions affecting only individual [class] members.'" *Id.* (quoting Fed. Rule Civ. Proc. 23(b)(3)).

24         The claims in this case are based upon uniform conduct and uniform representations and

25  omissions regarding Uber's safety. There are no predominating individual issues because, under

26  Plaintiffs' legal theories, the objective reasonable consumer standard applies to determining liability, as

27  well as to the materiality of the alleged non-disclosures or alleged misrepresentations. *See Yokoyama v.*

28  *Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1089, 1092-93 (9th Cir. 2010) (predominance requirement

1  met where state's consumer protection statute is based upon the objective reasonable consumer

2  standard); *Williams v. Gerber Products Co*., 552 F.3d 934, 938-39 (9th Cir. 2008) (reasonable consumer

3  standard applies to California's consumer protection statutes); *see also In re Apple & AT&TM Antitrust*

4  *Litig*., 596 F. Supp. 2d 1288, 1310-11 (N.D. Cal. 2008) (materiality for purposes of duty to disclose

5  analysis determined by reasonable consumer standard); *In re Tobacco II Cases*, 46 Cal. 4th 298, 326-27

6  (2009) (no showing of injury or reliance by absent class members required).

7               **2.**      **A Class Action Is Superior**

8      A class action is superior to other available methods for the fair and efficient adjudication of this

9  controversy. To determine the issue of "superiority," Rule 23(b)(3) enumerates the following factors for

10  courts to consider: "(A) [T]he interest of members of the class in individually controlling the

11  prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the

12  controversy already commenced by . . . members of the class; (C) the desirability . . . of concentrating

13  the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the

14  management of a class action."

15      Each of these factors supports certifying the Class. First, there is little interest or incentive for

16  Class Members to individually control the prosecution of separate actions. The Class Members'

17  individual claims are too small to justify the potential litigation costs that would be incurred by

18  prosecuting these claims individually. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 809 (1985);

19  *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas*, 244 F.3d 1152, 1163 (9th Cir.

20  2001); *Wolin v. Jaguar Land Rover N. Am., LLC,* 617 F.3d 1168, 1175–76 (9th Cir. 2010). Although the

21  injury resulting from Defendants' alleged misrepresentations and omissions to the Class are real, the

22  cost of individually litigating such a case against Defendants would easily exceed the value of any relief

23  that could be obtained by any one purchaser. This factor alone warrants a finding that a class action is a

24  superior method of adjudication. *See Tchoboian v. Parking Concepts, Inc*., No. SACV 09-422, 2009 WL

25  2169883, at *7 (C.D. Cal. Jul. 16, 2009). The claims of each Class Member in this case are virtually

26  identical, thus no one member of the Class would have a materially greater interest in controlling the

27  litigation. *See Westways World Travel, Inc. v. AMC Corp.,* 218 F.R.D. 223, 240 (C.D. Cal. 2003).

28      Second, certification would be superior because concentrating this litigation in one forum would

1  not only prevent the risk of inconsistent outcomes but would also "reduce litigation costs and promote

2  greater efficiency." *Negrete v. Allianz Life Ins. Co. of N. Am.,* 238 F.R.D. 482, 493 (C.D. Cal. 2006).

3  This "factor emphasizes the desirability of the forum selected, not the desirability of claims

4  concentration generally." *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 962 F. Supp. 450, 524

5  (D.N.J. 1997). The Northern District is a compelling forum because Defendants are headquartered in

6  San Francisco.

7         **C.**      **Plaintiffs' Counsel Should Be Appointed Class Counsel Under Rule 23(g)**

8         Rule 23(g)(1) states that "a court that certifies a class must appoint class counsel." As discussed

9  above, Plaintiffs' counsel are well-qualified and should be appointed class counsel.

10  **V.**      **THE SETTLEMENT MEETS THE STANDARD FOR PRELIMINARY APPROVAL**

11         Rule 23(e) requires that any settlement of claims brought on a class basis be approved by the

12  Court. There is an "overriding public interest in settling and quieting litigation," *Van Bronkhorst v.*

13  *Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976), and the Ninth Circuit "has long deferred to the private

14  consensual decision of the parties" to settle, *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir.

15  2009), *vacated on other grounds* 688 F.3d 645. Settlements of complex class actions prior to trial are

16  strongly favored. *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1238 (9th Cir. 1998).

17         To grant preliminary approval of the proposed Settlement, the Court need only find that it falls

18  within "the range of reasonableness." *In re: TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI,

19  2012 WL 12369590, at *3 (N.D. Cal. Oct. 15, 2012) (quoting *In re Tableware Antitrust Litig.*, 484 F.

20  Supp. 2d 1078, 1079 (N.D. Cal. 2007)). A settlement falls within the range of reasonableness if: "[1] the

21  proposed settlement appears to be the product of serious, informed, non-collusive negotiations, [2] has

22  no obvious deficiencies, [3] does not improperly grant preferential treatment to class representatives or

23  segments of the class, and [4] falls within the range of possible approval." *In re Tableware Antitrust*

24  *Litig.*, 484 F. Supp. 2d at 1079 (quoting Manual for Complex Litigation § 30.44 (2d ed. 1985)); *see also*

25  *Smith v. Am. Greetings Corp.*, No. 14-cv-02577-JST, 2015 WL 4498571 (N.D. Cal. July 23, 2015);

26  *Dyer v. Wells Fargo Bank, N.A.*, No. 13-cv-02858-JST, 2014 WL 1900682 (N.D. Cal. May 12, 2014).

27  Here, each of these four factors weighs in favor of preliminary approval.

28

### A.     The Settlement Is the Product of Serious, Informed, Non-Collusive Negotiations

A proposed settlement is presumed to be fair and reasonable when it is the result of arms' length negotiations. *City of Seattle*, 955 F.2d at 1276; *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 375-76 (D.D.C. 2002) ("A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations'") [internal citations omitted]; *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 145-46 (E.D.N.Y. 2000) (determining fairness, the "consideration focuses on the negotiating process by which the settlement was reached").

As discussed above, the Settlement is the result of six months of arm's-length negotiations, including three full days of mediation, and numerous other meetings and telephone conferences between experienced counsel who had a comprehensive understanding of the strengths and weaknesses of each party's claims and defenses.  The negotiations were mediated by a retired judge with substantial judicial and mediation experience in class actions. Moreover, the settlement was reached only after Plaintiffs' counsel analyzed extensive materials provided by Uber, conducted interviews of Uber employees, Uber drivers and Uber customers, and performed other meticulous investigation. Given these facts, the Settlement is non-collusive. *See Chun–Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010) ("[A]rms-length negotiations including a day-long mediation before [experienced private mediator] indicate[s] that the settlement was reached in a procedurally sound manner"); *see also Satchell v. Fed. Express Corp.*, No. C 03-2659 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.").

In addition, the proposed Settlement does not contain any of the "warning signs" of collusion delineated by the Ninth Circuit, such as class counsel receiving a disproportionate portion of the settlement, "clear sailing" arrangements, or reversions of funds to Defendants. *Compare In re Bluetooth*, 654 F.3d at 946-47; *with* Stip. ¶ 45 ($28.5 million non-reversionary cash payment), ¶ 88 (no agreement on attorneys' fees).

### B.     The Settlement Presents No Deficiencies

The meaningful injunctive relief (discussed in Section III.C, *supra*) alone would justify preliminary approval of this Settlement. *See, e.g.*, *In re Ferrero Litig.*, 583 F. App'x 665, 668 (9th Cir.

1    2014) (affirming settlement approval where "injunctive relief . . [was] meaningful and consistent with

2    the relief requested in plaintiffs' complaint"); *In re TracFone Unlimited Serv. Plan Litig.*, No. C-13-

3    3440 EMC, 2015 WL 4051882, at *8 (N.D. Cal. July 2, 2015) (approving settlement where "the

4    injunctive relief [would] have significant value for both class members and the general public").  Several

5    of Plaintiffs' claims seek relief under the UCL and FAL, and "the primary form of relief available under

6    the UCL to protect consumers from unfair business practices is an injunction." *In re Tobacco II Cases*,

7    46 Cal. 4th at 319.

8        In addition to the injunctive relief, the $28.5 million Settlement Fund, plus the estimated $1.875

9    million value resulting from Uber's distribution of the Fund, amounts to an excellent result. This

10   monetary consideration for a class of approximately 25 million is substantial in relation to the relatively

11   small amount of the Safe Rides Fee charged ($1 per ride until late September 2015, and $1.12 on

12   average from the inception of the fee through January 31, 2016). (Ahdoot Decl. ¶¶ 41-42.) And, as set

13   forth in more detail in Section V.D.2, below, the Settlement Fund is significant compared to the

14   maximum potential recovery that might be achieved through continued litigation.

15       Likewise, the Settlement is reasonable when compared to other approved class action

16   settlements. For instance, in *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 943 (N.D. Cal. 2013), *aff'd*,

17   *Fraley v. Batman*, No. 13-16819, 2016 WL 145984 (9th Cir. Jan. 6, 2016), the parties reached a

18   settlement agreement prior to class certification and the court approved a settlement providing for a $20

19   million cash fund where the class size was estimated at 150 million Facebook members. *See also In re*

20   *Google Referrer Header Privacy Litig.*, No. 10-04809, 2015 WL 1520475 (N.D. Cal. Mar. 31, 2015)

21   (granting final approval to $8.5 million settlement in case with estimated 129 million class members); *In*

22   *re Netflix Privacy Litig.*, No. 11-00379, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) (granting final

23   approval to $9 million settlement in case with estimated 62 million class members); *In re Google Buzz*

24   *Privacy Litig.*, No. 10-00672, 2011 WL 7460099 (N.D. Cal. June 2, 2011) (granting final approval to

25   $8.5 million settlement in case with estimated 37 million class members).

26       In summary, given its substantial monetary and non-monetary components, the Settlement is an

27   excellent result and presents no deficiencies.

28

**C.    The Settlement Does Not Grant Preferential Treatment to Class Representatives and Provides for a Fair Allocation of Relief to All Class Members**

Under this factor, "the Court examines whether the Settlement provides preferential treatment to any class member." *Villegas v. J.P. Morgan Chase & Co.*, No. CV 09–00261 SBA (EMC), 2012 WL 5878390, at *7 (N.D. Cal. Nov. 21, 2012). This is a *per capita* settlement in which each Class Member is treated equally. This treatment is fair because the alleged misrepresentations and omissions did not distinguish between the type of Uber rideshare service (UberX, UberPOOL, *etc.*) being provided. Thus there is no reason to treat a rider differently based on the Uber service(s) he or she used. There also is no reason to treat riders differently based on the number of rides they took. A rider who used Uber more frequently is not any more likely to have relied on the alleged misrepresentations or omissions in the CAC, or to have suffered more damages, particularly given that the Safe Rides Fee was disclosed after the initial ride. Indeed, someone who rode more frequently may have been more influenced by his/her repeated prior experiences with Uber than with the challenged marketing. *See, e.g., Chow v. Neutrogena Corp.*, No. CV 12-04624 R JCX, 2013 WL 5629777, at *2 (C.D. Cal. Jan. 22, 2013) (recognizing reliance problems with "repeat purchasers" as their purchase behavior could be explained by prior experience with brand as opposed to the challenged advertising).

Finally, the payment options do not result in any preferential treatment, as each Class Member has the option to elect payment to his or her Uber Payment Account or Uber Rider Account. *See, e.g.*, *Custom LED, LLC v. eBay, Inc*, No. 12-CV-00350-JST, 2013 WL 6114379, at *9 (N.D. Cal. Nov. 20, 2013) (finding universal availability of cash payment option ensures that certain segments of the class would not benefit more than others from the distribution method).

**D.    The Settlement Falls Within the Range of Possible Approval**

To determine whether a settlement "falls within the range of possible approval," "courts primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer," taking into account the risks of continuing litigation. *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1080; *see also In re: TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2012 WL 12369590, at *3 (N.D. Cal. Oct. 15, 2012). The Court has discretion to preview the factors that ultimately inform final approval: (1) strength of the plaintiffs' case; (2) risk, expense, complexity, and likely duration of further

– 17 –

1    litigation; (3) risk of maintaining class action status throughout the trial; (4) amount offered in

2    settlement; (5) extent of discovery completed and the stage of the proceedings; (6) experience and views

3    of counsel; (7) presence of a governmental participant; and (8) reaction of class members to the

4    proposed settlement. *Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (citing

5    *Hanlon*, 150 F.3d at 1026).

6                    **1.    The Strength of Plaintiffs' Case and the Risk, Expense, Complexity, and**

7                            **Likely Duration of Further Litigation**

8            The probability of success analysis is not subject to any "particular formula," nor is the Court

9    expected to "reach any ultimate conclusions of the contested issues of fact and law which underlie the

10   merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and

11   expensive litigation that induce consensual settlements." *Garner v. State Farm Mut. Auto. Ins. Co.*, 2010

12   WL 1687832, at *9 (N.D. Cal. Apr. 22, 2010) (quoting *Rodriguez*, 563 F.3d at 965, and *Officers for Justice*

13   *v. Civil Service Com'n of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982)); *see also*

14   *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 255 (N.D. Cal. 2015). "Rather, the Court's

15   assessment of the likelihood of success is nothing more than an amalgam of delicate balancing, gross

16   approximations and rough justice." *Garner*, 2010 WL 1687832, at *9 (citing *Officers for Justice*, 688 F.2d

17   at 625) (internal quotations omitted). Given the subjective components inherent in evaluating the potential

18   range of recovery, "the Court may presume that through negotiation, the Parties, counsel, and mediator

19   arrived at a reasonable range of settlement by considering Plaintiff's likelihood of recovery." *Garner*,

20   2010 WL 1687832, at *9 (citing *Rodriguez*, 563 F.3d at 965).

21           Approval of a class settlement is particularly appropriate when plaintiffs must overcome

22   significant barriers to make their case. *Chun–Hoon*, 716 F. Supp. 2d at 851; *see also Moore v. Verizon*

23   *Comms. Inc.*, No. C 09–1823 SBA, 2013 WL 4610764, at *5 (N.D. Cal. Aug. 28, 2013) (strength of

24   defendant's case favored settlement because plaintiffs admitted they would face hurdles in establishing

25   class certification, liability, and damages); *Custom LED, LLC v. eBay, Inc,* No. 12-CV-00350-JST, 2014

26   WL 2916871, at *4 (N.D. Cal. June 24, 2014) (approving settlement where plaintiff faced "significant

27   obstacles in establishing its claims in light of the uncertainties surrounding class certification, proof of

28   damages, and [defendant's] numerous affirmative defenses"). While Plaintiffs are confident in the

1  strength of their claims, they also recognize that they would have to overcome significant obstacles to
2  succeed.

3            **a.  Plaintiffs Would have to Overcome Defendants' Forced Arbitration Provisions**

4        The first significant barrier that Plaintiffs would need to overcome absent settlement is
5  Defendants' attempt to compel arbitration and enforce the class action waiver embedded in their
6  arbitration provisions. The Parties spent significant effort briefing this issue. (*See, supra,* Section II.B.)
7  While Plaintiffs are confident that they would ultimately prevail against Defendants' unconscionable,
8  unjust, and unconstitutional forced arbitration provision, Plaintiffs also recognize the possibility that the
9  Court or the Ninth Circuit may not share this view. If Plaintiffs were forced to proceed via individual
10 arbitration, the absent class members would receive no relief. It is also possible that the Court could rule
11 that some, but not all, class members agreed to arbitrate, which would decrease the breadth of the Class
12 and limit the Class' total potential recovery.

13       Even if the Court were to deny Uber's motion to compel arbitration in its entirety, Uber could
14 then unilaterally disseminate a new arbitration agreement that would retroactively affect all current Uber
15 customers, and which may address the deficiencies upon which the Court relied in denying the motion.
16 This is precisely what Uber did in the *In Re Uber FCRA Litig.*, No. C-14-5200 EMC (N.D. Cal.), Nos.
17 15-17533, 16-15035 (9th Cir.), resulting in a quagmire of subsequent litigation concerning Uber's
18 arbitration provisions in agreements with drivers at the district court level and in the Ninth Circuit.

19           **b.  Fact Intensive Inquiries Are Pervasive**

20       "Ultimately, the merits of many of Plaintiffs' claims depend largely on a fact-intensive inquiry
21 into multiple questions," presenting another factor weighing in favor of settlement approval. *In re Wells*
22 *Fargo Loan Processor Overtime Pay Litig.*, No. MDL C-07-1841 EMC, 2011 WL 3352460, at *5 (N.D.
23 Cal. Aug. 2, 2011) (finding the strength of plaintiffs' claim in favor of final approval where plaintiff's
24 claims depended largely on "fact-intensive inquiries into multiple questions."); *see also Lilly v. Jamba*
25 *Juice Co.*, No. 13-CV-02998-JST, 2015 WL 2062858, at *3 (N.D. Cal. May 4, 2015).

26       Plaintiffs' contention that Defendants charge fees for safe rides and then do not use those
27 revenues to fund effective safety measures (*e.g.,* CAC ¶¶ 8-12) involves consideration of facts regarding
28 the amount, and effectiveness, of Defendants' safety-related expenditures, including insurance,

1 | background checks, vehicle inspections and other alleged safety measures.

2 | Plaintiffs' claims regarding Defendants' background checks (*e.g.,* CAC ¶¶ 45-46) also will

3 | require the resolution of fact-intensive inquiries, including the effectiveness of the background check

4 | process and whether Defendants' representations or omissions regarding background checks are true or

5 | misleading. In support of their defenses, Plaintiffs expect that Defendants would present evidence and

6 | arguments that: (i) their background check process includes discovery of numerous crimes and

7 | infractions that are not included in Live Scan related database(s), so even when the applicant was

8 | charged without finger printing (which might occur with some infractions relevant to driving safety),

9 | Defendants can catch infractions that a Live Scan check tethered to a fingerprint criminal database might

10 | miss; and (ii) that Uber's safety standards are often stricter than those employed by companies providing

11 | transportation services. (Ahdoot Decl. ¶ 56-61.) *See also* <https://www.sfmta.com/services/taxi-

12 | industry/become-taxi-driver> (last visited Feb. 5, 2016) (indicating one can become a licensed cab

13 | driver in San Francisco despite one recent DUI).

14 | Plaintiffs also expect that Defendants would present evidence that the Uber platform provides

15 | safety features that are not available with other services, such as: (i) the Uber App allows riders to

16 | request a ride directly from their phones and wait safely inside for the car to arrive; (ii) the Uber App

17 | typically displays the driver's name, picture, license plate number, and vehicle make and model so that

18 | riders know they are entering the right vehicle; (iii) the Uber App allows riders to check other riders'

19 | experiences with the driver; (iv) the Uber App anonymizes phone numbers so that, while riders and

20 | drivers can communicate about the pick-up, neither can learn the personal information of the other; (v)

21 | the Uber App tracks riders' and drivers' current location, allowing riders to know where they are on

22 | their journey and permitting riders to share their route and estimated time of arrival with family and

23 | friends; (vi) by keeping a record of the route taken for every ride, the Uber App creates accountability

24 | and an incentive for good behavior; and (vii) the Uber App allows for cashless transactions, which

25 | protects both riders and Drivers from becoming targets for robbery. (Ahdoot Decl. ¶ 55.)

26 | Plaintiffs' claims based on nondisclosure of the Safe Rides Fee would likewise involve

27 | numerous fact-intensive inquiries.  Defendants would likely argue that they adequately disclosed the

28 | Safe Rides Fee, and Defendants likely would proffer evidence that wherever they disclosed fares, they

1  also disclosed the Safe Rides Fee, including as a line item on receipts, and on Uber's website. (*Id.* ¶ 64.)

2  While Plaintiffs assert that the title of the Safe Rides Fee itself constitutes an actionable

3  misrepresentation, Defendants would likely argue that many Class Members did not rely on the

4  representation, and that it is permissible puffery. In addition, the CAC's allegations in this regard are

5  premised on a variety of misrepresentations, potentially raising more fact-intensive inquiries regarding

6  which Class Members were exposed to which alleged misrepresentations.

7         Plaintiffs' breach of implied contract claims also require fact-intensive inquiries. Plaintiffs

8  expect that Defendants will argue that there was no breach because: (i) their safety-related

9  representations are accurate; and (ii) Defendants expend significant sums on viable safety features

10  (Defendants will argue they spent more on safety-related features than they collected from Safe Rides

11  Fees). Defendants also are likely to argue that individualized inquiries are required into whether a valid

12  contract was formed for particular class members or groups of class members. Although Plaintiffs

13  disagree, this could pose an additional hurdle at class certification.

14         **c.  Continued Litigation Would Present Risks Establishing Liability and Damages**

15         In evaluating the Settlement, the Court should consider "the risk of continued litigation balanced

16  against the certainty and immediacy of recovery from the Settlement." *In re Omnivision*, 559 F. Supp.

17  2d 1036, 1041 (N.D. Cal. 2008) (citing *In re Mego Financial Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th

18  Cir. 2000)). This is particularly true in cases, like this one, which involve significant uncertainty and the

19  potential for years of litigation and costly appeals. *See, e.g., Rodriguez*, 563 F.3d at 966 (favoring

20  settlement where "[i]nevitable appeals would likely prolong the litigation, and any recovery by class

21  members, for years"); *Ching v. Siemens Indus., Inc.*, No. 11-cv-04838-MEJ, 2014 WL 2926210, at *4

22  (N.D. Cal. June 27, 2014) ("Generally, unless the settlement is clearly inadequate, its acceptance and

23  approval are preferable to lengthy and expensive litigation with uncertain results.") (citation omitted).

24         If the Settlement is not approved, this action will proceed to intense litigation and possibly trial

25  and appeal.  Plaintiffs and Defendants vehemently disagree about the merits of Plaintiffs' claims.

26  However, regardless of each Party's respective position, there is uncertainty about the ultimate outcome

27  of this action and proceeding with this litigation poses various risks such as forced arbitration, no

28  certification, decertification, loss on the merits, and loss on appeal, all of which would be extremely

1  costly and time-consuming to fully litigate.

2          **d.  Continued Litigation Would Present Risks Regarding Certification**

3      Another factor in the settlement calculus is the risk that Defendants could successfully oppose

4  class certification. *Churchill*, 361 F.3d at 575 (holding that courts should consider "the risk of

5  maintaining class action status throughout the trial" at the approval stage). Plaintiffs believe that class

6  certification is appropriate in this action and that the Court should certify the Class for settlement

7  purposes. However, Plaintiffs are cognizant of the risk that the Court may not certify a class at all, may

8  not certify all claims asserted in the CAC, or may limit the size of any class.

9      For instance, even if Plaintiffs obtain favorable rulings on Defendants' arbitration motions, the

10  arbitration issue could arguably undermine Plaintiffs' ability to demonstrate commonality and

11  predominance. Plaintiffs do not believe that this argument has merit, but some courts have held that

12  class certification should be denied where the enforceability of an arbitration agreement varies by class

13  member. *See, e.g., Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 728 (9th Cir. 2007) (class

14  certification should be denied where enforceability of arbitration would vary depending on class

15  members' state of residence); *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 861-63 (D.

16  Md. 2013) (denying certification where "individual questions of law and fact as to the enforcement of

17  [arbitration] provisions of class members' contracts predominate").

18      Defendants will likely contend that their registration process varies depending on how the user

19  registered (via the App or the website), what type of smartphone he or she had, and which version of the

20  website or App he or she used. *See, e.g., Mena* Dkt. Nos. 31-36. These variables could affect whether a

21  user had adequate notice of the arbitration agreement depending on how this notice was displayed

22  during the registration process. Even Plaintiffs' opposition to the arbitration motions recognized that the

23  assent inquiry may hinge on idiosyncratic features of each user and his or her smartphone, such as its

24  screen size and the user's preferred brightness settings. *See Mena* Dkt. No. 37 at 11-22. In light of these,

25  and similar, considerations, this Court or the Ninth Circuit might ultimately conclude that individualized

26  questions predominate over any common questions.

27      Finally, even if Plaintiffs are successful in gaining certification of their claims, the class certified

28  may ultimately be smaller than the nationwide Class asserted in the CAC and to whom the Settlement

1  will confer its benefits.  *See, e.g.*, *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012).

2         **2.**       **Defendants' Payment of $28.5 Million Is Significant Compared to the**

3                    **Maximum Potential Recovery Available**

4        In addition to injunctive relief—including, as noted above, Defendants' agreement to stop

5  charging any fees labeled or described as a "Safe Rides Fee"—the Settlement would require Defendants

6  to pay $28.5 million to the Class. "[C]ompar[ing] the settlement amount to the parties' 'estimates of the

7  maximum amount of damages recoverable in a successful litigation'" suggests the Settlement merits

8  approval.  *Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068 MMC, 2007 WL 221862, at *4 (N.D. Cal. Jan.

9  26, 2007) *aff'd*, 331 F. App'x 452 (9th Cir. 2009) (quoting, *In re Mego*, 213 F.3d at 459).

10        Without any discount for the significant risks of continued litigation, including arbitration, class

11  certification, and Defendants' defenses on the merits, Plaintiffs estimate the maximum potential

12  recovery available if they were successful on all of their claims, including their breach of implied

13  contract claims on behalf of a nationwide class, at $132 million (or approximately $5.33 per Class

14  Member). (Ahdoot Decl., ¶¶ 70-78.) This figure makes aggressive assumptions about revenues that

15  could be recovered and ignores many of the safety-related costs that Defendants have identified. (*Id.*

16  ¶ 76.) The $28.5 million Settlement Fund amounts to approximately 21.55% of this estimated maximum

17  potential recovery.

18        This amount is fair, especially given the substantial risks that Plaintiffs would face prior to and at

19  trial. Indeed, many courts have approved settlement values well below this range. *See, e.g., Custom*

20  *LED*, 2014 WL 2916871, at *4 ("[C]ourts have held that a recovery of only 3% of the maximum

21  potential recovery is fair and reasonable when the plaintiffs face a real possibility of recovering nothing

22  absent the settlement."); *In re OmniVision Techs.*, 559 F. Supp. 2d at 1042 (6% of potential damages); *In*

23  *re LDK Solar Secs. Litig.*, No. 07-5182 WHA, 2010 U.S. Dist. LEXIS 87168 at *7 (N.D. Cal. July 29,

24  2010) (5% of potential damages); *In re Heritage Bond Litig.*, No. 02–ML–1475–DT, 2005 WL

25  1594389, at *8–9 (C.D. Cal. June 10, 2005) (median amount recovered in securities class action

26  settlements was 2.7% in 2002, 2.8% in 2003, 2.3% in 2004).

27        The monetary component of the Settlement is significant compared to the maximum potential

28  recovery available, suggesting the Settlement merits approval.

### 3. Class Counsel Performed Sufficient Research and Analysis to Adequately Assess the Settlement and the Strengths and Weaknesses of the Class' Claims

"This factor evaluates whether the parties have sufficient information to make an informed decision about settlement." *Larsen v. Trader Joe's Co.*, No. 11-cv-05188-WHO, 2014 WL 3404531, at *5 (N.D. Cal. July 11, 2014) (internal quotations omitted). "In the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, formal discovery is not a necessary ticket to the bargaining table." *Bellinghausen*, 306 F.R.D. at 257 (internal quotations omitted). "Rather, the court's focus is on whether the parties carefully investigated the claims before reaching a resolution." *Id.* (internal quotations omitted).

Here, Plaintiffs requested, received, and reviewed extensive documents and information from Defendants. *See* Section II.E, *supra*. Plaintiffs fully understand the merits of this case, and this factor weighs in favor of settlement.

### 4. The Recommendations of Experienced Class Counsel Favor Approval

"Where a settlement is the product of arms-length negotiations conducted by capable and experienced counsel, the court begins its analysis with a presumption that the settlement is fair and reasonable." *Garner*, 2010 WL 1687832, at *13; *see also Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) (great weight given to the recommendation of counsel who are the most closely acquainted with the facts of the litigation). Plaintiffs' counsel have broad experience litigating and trying consumer and class action cases. In their view, the Settlement provides substantial benefits to the Class, especially when one considers the attendant expense, risks, delays, and uncertainties of litigation, trial and post-trial proceedings. (Ahdoot Decl., ¶ 69; Arias Decl., ¶ 23, Dkt. 78; Coulson Decl. ¶¶ 16-17, Dkt. 77.)

## VI. THE PROPOSED FORM AND METHOD OF NOTICE IS THE BEST NOTICE PRACTICABLE AND SHOULD BE APPROVED

Class notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Trust,* 339 U.S. 306, 314 (1950). Notice must clearly and concisely state the

1    following, in plain, easily understood language: (i) the nature of the action; (ii) the class definition; (iii)

2    the class claims; (iv) that a class member may enter an appearance through an attorney; (v) that the court

3    will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting

4    exclusion; and (vii) the binding effect of a class judgment on members. Fed. R. Civ. P. 23(c)(2)(B).

5         Here, the proposed notice program will include direct notice to virtually all Class Members, and

6    at a minimum is designed to reach 80% of the Class, which is reasonable under the circumstances. (Stip.

7    Ex. I ¶¶ 27-28.) Moreover, the Summary Notice and Long Form Notice are written in clear and concise

8    language and contain the information required by Rule 23(c)(2)(B). (*Id.* ¶ 39.)  Accordingly, the forms

9    of notice and plan of dissemination should be approved.

10   **VII.    THE COURT SHOULD SET A SCHEDULE FOR FINAL APPROVAL**

11        In connection with the preliminary approval of the Settlement, the Court must set a final

12   approval hearing date, dates for dissemination of notice to the Class, deadlines for objecting to the

13   Settlement, opting out of the Class, and filing papers in support of the Settlement. Plaintiffs propose the

14   schedule included in the Notice of Motion, above, and set forth in the concurrently filed [Proposed]

15   Preliminary Approval Order. (Stip. Ex. D.)

16   **VIII.   CONCLUSION**

17        The proposed Settlement is fair, presents no obvious deficiencies, and falls within the range of

18   possible approval. Plaintiffs therefore request that the Court grant preliminary approval and enter an

19   order substantially in the form of the accompanying [Proposed] Preliminary Approval Order. (*Id.*)

20   Dated: July 14, 2016                              Respectfully Submitted,

21

22                                                     **AHDOOT & WOLFSON, PC**

23                                                     /s/ Robert Ahdoot
                                                       Tina Wolfson
24                                                     Robert Ahdoot
                                                       Theodore W. Maya
25                                                     Keith Custis
                                                       Meredith S. Lierz
26                                                     1016 Palm Avenue
                                                       West Hollywood, California 90069
27                                                     Tel: (310) 474-9111; Fax: (310) 474-8585

28                                                     *Attorneys for Plaintiffs and the Proposed Class*

**ARIAS, SANGUINETTI, STAHLE & TORRIJOS, LLP**

/s/ Alfredo Torrijos
Mike Arias
Alfredo Torrijos
6701 Center Drive West, Suite 1400
Los Angeles, California 90045-7504
Tel: (310) 844-9696; (Fax) 310-861-0168

*Attorneys for Plaintiffs and the Proposed Class*

**LIDDLE & DUBIN, PC**

/s/ Nicholas Coulson
Nicholas Coulson (admitted *pro hac vice*)
975 E. Jefferson Avenue
Detroit, Michigan 48207
Tel: 313-392-0015; Fax: 313-392-0025

*Attorneys for Plaintiffs and the Proposed Class*

## ATTORNEY ATTESTATION

Pursuant to Civil Local Rule 5-1(i), I, Robert Ahdoot, hereby attest that concurrence in the filing of this document has been obtained from the other signatories on this document.

DATED: February 11, 2016

By:   */s/ Robert Ahdoot*
Robert Ahdoot