UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MATTHEW PHILLIBEN, et al.,

    Plaintiffs,

v.

UBER TECHNOLOGIES, INC., et al.,

    Defendants.

Case No. 14-cv-05615-JST

**ORDER DENYING MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

Re: ECF No. 95

Before the Court is Plaintiffs' unopposed Motion for Preliminary Approval of Class Action Settlement. ECF No. 95. For the reasons set forth below, the motion is denied.

**I.    BACKGROUND**

This motion arises from two putative class actions against Defendants Uber Technologies, Inc., and Raiser, LLC ("Uber") revolving around Uber's alleged misrepresentations and omissions regarding its "Safe Rides Fee" and the safety measures, background checks, and other efforts it takes to provide safety for its customers. See ECF No. 67; see also ECF No. 74 at 4-5. Motions to Stay Proceedings pending arbitration were filed in both original actions (this one, as well as Mena v. Uber, 3:15-cv-00064-JST), but both motions were later vacated after the parties informed the Court that they had reached a settlement in principle. ECF No. 64. On January 4, 2016, in light of the parties having reached a settlement, the Court granted a stipulated request to consolidate the Philliben and Mena matters. ECF No. 66. Plaintiffs Matthew Philliben, Julian Mena, Todd Schreiber, Nate Coolidge, Ernesto Mejia, and Byron McKnight (collectively, "Plaintiffs") filed a consolidated class action complaint three days later. ECF No. 67. The consolidated complaint brings eight causes of action: (1) Breach of Implied Contract under California law; (2) Breach of Implied Contract under Illinois law; (3) Breach of Implied Contract under Massachusetts law; (4) Violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, et seq.; (5) Unlawful

Business Practices in violation of Cal. Bus. & Prof. Code § 17200, et seq.; (6) Unfair Business Practices in violation of section 17200, et seq.; (7) Violation of the Illinois Consumer Fraud Act, 815 Ill. Comp. Stat. 502/2, et seq.; and (8) False Advertising in violation of Cal. Bus & Prof. Code § 17500, et seq. Id. ¶ 14. In the consolidated complaint, Plaintiffs seek monetary relief as well as equitable relief enjoining Uber from continuing the alleged harmful conduct. See id. at 40.

Before filing the stipulation of settlement, the parties participated in three in-person mediation sessions conducted by the Honorable Carl J. West (Ret.) of JAMS during August and October, 2015. ECF No. 74 at 6; see also ECF No. 96 ¶¶ 16, 19. Additionally, Plaintiffs requested and received "thousands of pages of responsive documents and sworn responses" from Uber, including "documents bearing on Defendants' background checks, alleged safety expenditures, the Safe Rides Fee and resulting revenues, and Uber's representations, advertising, and marketing regarding safety." ECF No. 96 ¶ 27; see also ECF No. 74 at 7-8. Plaintiffs' Counsel also "conducted ten extensive interviews of key witnesses over the course of three days," including with "current and former high level Uber employees with direct knowledge of facts at issue in the Actions, including safety representations, safety measures, alleged safety expenditures, details regarding the Safe Rides Fee, user databases, and other relevant areas of Uber's operations." ECF No. 96 ¶ 29; see also ECF No. 74 at 7-8.

Plaintiffs seek to represent a class, certified for the purposes of settlement only, composed of "all persons who, from January 1, 2013 to January 31, 2016, used the Uber smartphone application ("App") or website to obtain service from one of Uber's Rideshare Services in the United States or its territories and who have a U.S. Payment Profile." ECF No. 74 ¶ 3. Uber's Rideshare Services are defined as "all transportation services that are arranged through the App or website, regardless of type of ride or service that is requested (such as UberX, UberSUV, UberBlack, UberPool, etc.)." Id.

On February 11, 2016, the parties filed a stipulated settlement agreement, pursuant to which Uber agrees to pay $28.5 million[1] in cash to create a Settlement Fund. ECF No. 74 ¶ 32.

---

[1] Plaintiffs state that this figure "does not attribute any monetary value to the significant injunctive relief included in the Settlement," ECF No. 95 at 17 n.10, specifically terms "precluding Defendants from naming any fee associated with their service a 'Safe Rides Fee' and from using

1  The net distribution amount available to class members would be equal to the total settlement
2  amount of $28.5 million minus: (1) up to $800,000 Settlement Administrator's fees; (2) an
3  estimated $175,000 in transaction costs; (3) $3,000 in service awards, subject to Court approval;
4  and (4) $7.125 million in Attorneys' fees and expenses (25% of the Settlement Fund), subject to
5  Court approval.  ECF No. 96 ¶ 68.

6  Funds available for class members will be distributed equally to each class member on a
7  *per capita* basis.  ECF No. 95 at 15 n.4.  The record indicates that the putative class includes
8  24,812,917 members.  ECF No. 96 ¶ 32.  Assuming all of the above deductions, the amount
9  available for distribution to class members would equal $20.697 million, which Plaintiffs calculate
10  equates to approximately $0.82 for each member of the putative class.[2]  Id. ¶ 68.

11  The settlement provides for no reversion to Uber; any residual funds would be paid to the
12  National Consumer Law Center.  ECF No. 74 ¶¶ 75-76.

## II. JURISDICTION

The Court has jurisdiction over this action under 28 U.S.C. § 1332(d).

## III. PRELIMINARY APPROVAL

### A. Legal Standard

The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class actions.  Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992).  The settlement of a certified class action must be "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  As the Ninth Circuit has explained, "[t]he purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights."  In re Syncor ERISA Litig., 516 F.3d 1095, 1100 (9th Cir. 2008).

Where the "parties reach a settlement agreement prior to class certification, courts must

---

certain terms in Commercial Advertising regarding safety and background checks, among other relief," id. at 11; see also ECF No. 74 ¶ 47.  Plaintiffs also note that the settlement fund does not "account for the added value attributable to Defendants' agreement to make payments to those Class Members who elect to receive their Settlement Share via a payment to their Uber Payment Account" and estimate the value of that agreement to be $1.875 million.  ECF No. 95 at 17 n.10.

[2] The Court's math produces a figure that is approximately a penny higher, but the difference is not material here.

peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003).   In these situations, settlement approval "requires a higher standard of fairness and a more probing inquiry than may normally be required under Rule 23(e)." Dennis v. Kellogg Co., 697 F.3d 858, 864 (9th Cir. 2012) (internal quotation marks and citation omitted).  Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 947 (9th Cir. 2011).

> At a preliminary approval stage, the Court looks to see if the settlement agreement
>
> > (1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval.

Harris v. Vector Mktg. Corp., No. C–08–5198 EMC, 2011 WL 1627973, at *7 (N.D. Cal. Apr. 29, 2011); see also In re Tableware Antitrust Litig., 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007). The proposed settlement need not be ideal, but it must be fair and free of collusion, consistent with a plaintiff's fiduciary obligations to the class. Hanlon, 150 F.3d at 1027 (explaining that "[s]ettlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion"). "In determining whether the proposed settlement falls within the range of reasonableness, perhaps the most important factor to consider is plaintiffs' expected recovery balanced against the value of the settlement offer." Cotter v. Lyft, Inc., Case No. 13-cv-4065-VC, -- F. Supp. 3d --, 2016 WL 1394236, at *4 (N.D. Cal. Apr. 7, 2016) (internal quotation omitted).

The Court considers the settlement as a whole, rather than its components, and lacks the authority to "delete, modify or substitute certain provision." Id. at 1026 (quoting Officers for Justice v. Civil Serv. Comm'n of San Francisco, 688 F.2d 615, 630 (9th Cir. 1982)). Rather, "[t]he settlement must stand or fall in its entirety." Id. Ultimately, the "decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge." City of Seattle, 955 F.2d at 1276 (citation omitted).

**A.     Analysis**

Because the settlement was reached prior to class certification, the Court will apply "a higher standard of fairness and a more probing inquiry than may normally be required under Rule 23(e)." Dennis, 697 F.3d at 864 (internal quotation marks and citation omitted).  For the reasons discussed below, the Court concludes that the settlement's terms unfairly provide preferential treatment to certain putative class members and fall outside the range of possible approval.  Accordingly, the Court denies preliminary approval of the proposed settlement agreement.

### 1.     Non-Collusive Negotiations

Because this settlement was reached prior to certification of the class, the Court must examine it for evidence of collusion with a higher level of scrutiny.  In re Bluetooth, 654 F.3d at 946.  Signs of collusion include, but are not limited to: (1) a disproportionate distribution of the settlement fund to counsel; (2) negotiation of a "clear sailing provision"; and (3) an arrangement for funds not awarded to revert to defendants rather than to be added to the settlement fund.  Id. at 947.

In examining the means by which the parties arrived at a settlement, the Court concludes that the negotiations and agreement were non-collusive.  The stipulated settlement was reached after the parties engaged in motion practice, conducted significant discovery, and participated in private mediation.  See ECF No. 74 at 5, 7-8; see also ECF No. 96 ¶¶ 10-19, 26-30.  The settlement "was reached as a result of extensive arms'-length negotiations between the Parties and their counsel, occurring over the course of a number of months and three separate, in-person mediation sessions with a respected mediator." ECF No. 74 at 8.

Other signs support the conclusion that the settlement was not the product of collusion. Counsel has not requested a disproportionate portion of the settlement fund.  The settlement also does not contain a "clear sailing provision" or a reversionary clause.  ECF No. 74 ¶¶ 75-76.  All of the net settlement award would be distributed to the class and settlement money that goes uncashed would be distributed to the National Consumer Law Center.  Id.; see In re Bluetooth, 654 F.3d at 947 (discussing reversionary clauses as a sign of collusion).

### 2. Obvious Deficiencies

In application, "obvious deficiencies" has become a useful catch-all for problems other than preferential treatment or inadequate consideration.[3] The Court has not identified any obvious deficiencies with the settlement. As set forth below, the Court concludes that the settlement improperly provides preferential treatment to certain class members, and that the amount of the settlement falls outside the range of possible approval. Because these are separate criteria within the preliminary approval standard, however, these are not "obvious deficiencies."

### 3. Preferential Treatment

Under this factor, the Court looks to whether the settlement agreement provides preferential treatment to any class member. The Court finds that it does.

As an initial matter, the settlement agreement authorizes Plaintiffs to seek service awards for their contributions to the case, ECF No. 74 ¶ 84, and Plaintiffs' counsel have stated their intention to seek no more than $500 each in service awards for the class representatives, see ECF No. 74-5, Ex. E at 10. The Ninth Circuit permits service awards to named plaintiffs in the appropriate circumstances. See, e.g., Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 958-69 (9th Cir. 2009). The Court will evaluate the requests for service awards at the final approval hearing. It will also wait until the final approval hearing to evaluate requests for attorneys' fees.

The settlement itself identifies a single class with no sub-classes, which includes persons who, during a 37-month period, purchased Uber's Rideshare Services, or "all transportation

---

[3] Although the standard formulation requires the Court to identify any "obvious deficiencies" in a proposed settlement, neither the common law nor Rule 23 contain a checklist of "deficiencies" to choose from. The formulation appears to have come from a prior version of the Manual for Complex Litigation. See, e.g., In re Tableware Antitrust Litig., 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (citing Manual for Complex Litigation, Second § 30.44 (1985)).[3] The current Manual no longer uses the phrase. Manual for Complex Litigation, Fourth (2004).

Examples of individual shortcomings identified in other cases include ambiguity regarding the consideration to be received by class members, Boyd v. Avanquest N. Am. Inc, No. 12-CV-04391-WHO, 2015 WL 4396137, at *4 (N.D. Cal. July 17, 2015) (holding that lack of clarity about when vouchers for free software would be effective was "obvious deficiency"); an overly broad release, Lusby v. Gamestop Inc., 297 F.R.D. 400, 413 (N.D. Cal. 2013); Karvaly v. eBay, Inc., 245 F.R.D. 71, 90 (E.D.N.Y. 2007); too brief an opt-out period, Lusby, 297 F.R.D. at 414; and "the failure to provide class members the opportunity to object to Plaintiff's motion for attorney's fees and costs," Bellinghausen v. Tractor Supply Co., 303 F.R.D. 611, 621 (N.D. Cal. 2014).

services that are arranged through the App or website, *regardless of type of ride or service* that is requested (such as UberX, UberSUV, UberBlack, UberPool, etc.)." ECF No. 74 ¶ 3 (emphasis added). The settlement proposes to divide the settlement on a *per capita* basis, resulting in a payout to each class member of approximately 82 cents.

There are two flaws with this arrangement pertaining to preferential treatment. First, by not distinguishing between class members based on the type of service they used, the parties overlook significant differences between the class members. In particular, though Plaintiffs allege that "[a]ll Class Members were subjected to the false . . . advertising alleged in the Complaint in addition to the Safe Rides Fee itself," ECF No. 96 ¶ 74, the record before the Court shows that Uber only charged a Safe Rides Fee for "certain Uber ride options." ECF No. 67 ¶ 6; see also ECF No. 96 ¶ 47 (identifying uberSUV as one service that does not include a Safe Rides Fee). Plaintiffs concede that not all class members paid a Safe Rides Fee, but characterize those who never paid a Safe Rides Fee as a "relatively small percentage of Class Members." Id. ¶ 74. In fact, though the Court has granted the parties' motion to seal this percentage, ECF No. 91, it represents a substantial portion of the class.

This in turn creates two problems: the settlement proposes to compensate persons who haven't been injured, and it does so at the expense of persons who have been. While the first concern may not be enough to disallow a settlement at this stage, the second one is. It simply is not the case, as plaintiffs contend, that "there is no reason to treat a rider differently based on the Uber service(s) he or she used." ECF No. 95 at 27.

Second, the proposed settlement seeks to divide the available funds between all class members equally regardless of the number of Safe Rides Fees each class member paid. In other words, as between two Uber customers, one of whom used the service 20 times and the other only once, the settlement compensates them the same – even though the first customer suffered an injury that is 20 times greater than the first. Plaintiffs do not justify this discrepancy, and it does not withstand scrutiny: if the claimed injury is the payment of a fee, it stands to reason that the appropriate compensation for each injured party would depend on the number of fees that party paid. Nor is there any reason not to allocate the funds according to degree of injury, because this

is not a case in which records exist only of the identity of the class members but not the number of their transactions.

Plaintiffs assert that providing each putative class member an equal share is appropriate because "[a] rider who used Uber more frequently is not any more likely to have relied on [Uber's] alleged misrepresentations or omissions . . . or to have suffered more damages, particularly given that the Safe Rides Fee was disclosed after the initial ride." Id. This greatly overstates the significance of the alleged disclosure. Granted, disclosure of the *existence* of the Safe Rides Fee after a customer's initial ride arguably puts that customer on notice that they may be charged the same fee again as part of a later ride. However, it does not correct any misrepresentations regarding the *basis* of that fee that Plaintiffs identify in their complaint. Plaintiffs have alleged, *inter alia*, that Uber falsely or misleadingly represented that it ensures "the safest possible platform for Uber riders and drivers, including an *industry-leading* background check process, regular motor vehicle checks, driver safety education [and] development of safety features in the app," ECF No. 67 ¶ 6 (emphasis in original); that it sets "the strictest safety standards possible," id. ¶ 26; that its "background checking process and standards are consistent across the United States and often more rigorous than what is required to become a taxi driver," id. ¶ 31; that it has "background checks that exceed any local or national standard," id. ¶ 32; and that its background checks "go back the maximum allowable by the Fair Credit Reporting Act" and disqualify applications who appear on the National Sex Offender Registry," id. ¶ 35. To the extent class members relied on these misrepresentations – assuming Plaintiffs are able to prove they were false – they were just as damaged by the last Safe Rides fee they paid as by the first one.

Plaintiffs also cite to Chow v. Neutrogena Corp., No. CV 12-04624 R JCX, 2013 WL 5629777 (C.D. Cal. Jan. 22, 2013), to argue that "someone who rode more frequently may have been more influenced by his/her repeated prior experiences with Uber than with the challenged marketing." ECF No. 95 at 27. But for the reasons stated above, Chow is inapposite. Chow involved a motion for class certification based on allegations of whether the skin care products at issue "worked as advertised." Id. at *2. In denying the motion, the court noted that "a significant portion of consumers who purchased the product were repeat purchasers," and therefore it would

be difficult to distinguish between "mere favorability toward products bearing the Neutrogena brand name, for example, and reliance upon specific advertised benefits of the products," as well as "between repeat purchasers who actually received benefits from the product and repeat purchasers who were deceived again." Id.

That reasoning does not apply here. In Chow, Plaintiffs alleged that Neutrogena made unspecified representations about a product, but that the product did not work as advertised. Plaintiffs are not alleging that they purchased Uber's service because of Uber's representations regarding the Safe Rides Fee or that Uber's service did not work as advertised. Rather, they are alleging that Uber charged consumers an additional fee for certain internal safety measures that were not in fact implemented. Unlike in Chow, the fee is not alleged to be the reason Plaintiffs used Uber. As such, little can be inferred from the fact that some class members were repeat users. It would make no difference, for example, if consumers continued to use Uber based on favorability towards Uber's brand name, because they would still be victims of Uber's misrepresentations regarding its safety measures. Also, there would be no way for a regular Uber consumer to verify whether she was actually receiving the benefits promised in exchange for the Safe Ride Fees.

In sum, the parties propose to pay all class members equally, despite the record showing that some class members paid no Safe Ride Fee at all, ECF No. 96 ¶¶ 32-33, and that other class members paid more than one, and potentially even many, Safe Ride Fees during the class period, id. ¶ 73. Because the proposed settlement fails to allocate compensation among class members according to the type and number of Uber services purchased, the Court finds it would unfairly provide preferential treatment to certain class members at the expense of others.

### 4. The Range of Possible Approval

Finally, the Court must consider whether the settlement agreement falls within the range of possible approval. Here, too, the settlement must be rejected.

The Court primarily looks at the value to class members of the settlement compared to their potential recovery in a successful litigation. Harris, 2011 WL 1627973, at *10; see also In re Mego Fin. Corp. Sec. Litig., 213 F.3d at 459. In evaluating the fairness and adequacy of a

settlement, the Court balances the following factors: "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement." Churchill Vill., L.L.C. v. Gen. Elec., 361 F.3d 566, 575 (9th Cir. 2004). "This list is not exclusive and different factors may predominate in different factual contexts." Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1376 (9th Cir. 1993). [4]

In regards to the first three factors, the Plaintiffs raise strong arguments that settlement is preferable in light of the risks inherent in continuing to litigate the case. They note that "they would have to overcome significant obstacles to succeed," ECF No. 95 at 28, including Uber's attempt to compel arbitration and to enforce a class action waiver, id. at 28-29. Plaintiffs also acknowledge that the success of their claims would require numerous fact-intensive inquiries and therefore that there is the risk they would not obtain class certification, as well as the risk that they would fail to establish Uber's liability. See id. at 29-32.

The Court agrees that there would be significant obstacles in Plaintiffs' litigation path. The parties completed a full round of briefing on Uber's motions to compel arbitration pursuant to alleged arbitration clauses, before the motions were eventually stayed pending settlement discussions. See ECF Nos. 25, 37, 38, 49. The briefing on this motion raised several issues, including the delegation of the question of arbitrability, whether there was mutual assent, and unconscionability. See id. Further, as the Court discusses below, there are potential problems in regards to the putative class as currently defined. Plaintiffs also note that the parties have engaged in extensive informal discovery. ECF No. 74 at 7-8, and that counsel, who are experienced on both sides, both hold the view that the settlement is favorable. See, e.g., ECF No. 96 at 26-31.

These points weigh in favor of preliminary approval, but they must be balanced against the most important factor of the value of the settlement to class members as compared to their

---

[4] Here, for example, there is no governmental participant, and the Court cannot gauge the reaction of the class members at this preliminary stage.

1  potential recovery. As noted, the proposed agreement would create a $28.5 million settlement
2  fund. Subtracting for administrative costs, attorneys' fees, and other expenses, and ignoring the
3  value of the settlement's "equitable relief" and alleged savings from providing payments through
4  Uber's infrastructure, Plaintiffs estimate each class member would receive $0.82 from the
5  settlement. Comparing that amount to the average $1.12 initial Safe Rides Fee paid by most class
6  members each time they took an Uber ride, Plaintiffs contend that this is an "excellent result" that
7  is "substantial in relation to the relatively small amount of the Safe Rides Fee charged," ECF No.
8  95 at 26. They also estimate that a "maximum potential recovery," if they succeeded on every
9  claim, would total $132 million, or $5.33 per class member. ECF No. 95 at 33. Thus, Plaintiffs
10 assert that the $28.5 million settlement is approximately 21.55% of the estimated maximum
11 potential recovery and that this percentage is fair in light of the risks of litigation and in
12 comparison to other cases. See ECF No. 95 at 33.

13  However, there are multiple problems with this analysis. First, the comparison between
14 the expected $0.82 recovery share per class member and the average initial Safe Rides Fee of
15 $1.12 rings hollow, because it assumes that class members could recover no more than a single fee
16 in damages when, in fact, a significant portion of the class paid multiple fees over the course of
17 multiple rides. As discussed above, Plaintiffs' argument for why additional fees likely did not
18 harm class members is unpersuasive.

19  More importantly, while Plaintiffs' Motion for Preliminary Approval compares the
20 settlement amount to their estimated "maximum potential recovery" of $132 million, Uber has in
21 fact earned $▮ in total revenue from their Safe Rides Fee – well over ▮ times the
22 amount of Plaintiffs' estimate, and almost ▮ times the amount of the settlement fund. ECF No.
23 96 ¶ 41. Plaintiffs' supporting declaration asserts that basing the total potential recovery on the
24 lower figure is appropriate, as Plaintiffs must "recognize that they and the Class will not be able to
25 seek the full amount of what they paid for their Uber rides, because they obviously received some
26 value for the service." ECF No. 96 ¶ 70. Thus, Plaintiffs "calculat[ed] the difference between
27 what Plaintiffs paid for 'safety' and what Defendants spent on effective 'safety' measures for the
28 benefit of the Class." ECF No. 96 ¶ 70. As explained in their declaration, Plaintiffs performed

11

this calculation using information provided by Uber regarding its safety-related expenditures, such as background checks and vehicle inspections, as well as its insurance costs. Plaintiffs acknowledge that while Defendants "will certainly contend that these expenditures should be credited in full against the Safe Rides Fee revenues, Plaintiffs would argue that many of these safety-related expenditures should not credited." Id. ¶ 75. To account for this disagreement, Plaintiffs make what they characterize as an "aggressive assumption": "that, other than insurance, every safety-related cost identified by defendants has zero value to the Class." Id. ¶ 76.

In fact, insurance costs represent more than two-thirds of the amount Uber claims to have spent on "safety," so it would be difficult to characterize Plaintiffs' assumption as "aggressive." Rather, the assumption does something contrary to the notion of total potential recovery: give full credit to one of Uber's most important arguments.

Nor is the blanket crediting of all insurance costs warranted by the record. Uber's insurance expenditures, as described in Plaintiffs' declaration, are as follows:

> Defendants maintain insurance for trips on the Uber platform, including a commercial insurance policy that provides for $1 million of liability coverage during a trip. Defendants state they also provide general/excess liability insurance that provides the same level of protection for incidents that do not involve a vehicle. Defendants also state that, during the time that a driver is available but between trips the driver also is backed by an additional policy that covers driver liability for bodily injury up to $50,000/individual/accident with a total of $100,000/accident and up to $25,000 for property damage.
> ...
> Drivers' liability to third parties is covered from the moment a driver accepts a trip to its conclusion. . . . Defendants state Uber also holds $1 million of uninsured/underinsured motorist bodily injury coverage per incident. According to Defendants, in the event that another motorist causes an accident and does not carry adequate insurance, this policy covers bodily injury to all occupants of the rideshare vehicle.

Id. ¶ 47, 62.

This paragraph seems to describe garden variety liability insurance of the kind carried by many firms, not "industry-leading" steps Uber took to protect the safety of its passengers. By Plaintiffs' logic, any corporation could charge a similar "Safe Product Fee" simply for maintaining corporate insurance policies that most people would consider an ordinary cost of doing business.

12

But even assuming that some portion of Uber's insurance expense would support a Safe Rides Fee, the foregoing description shows that the appropriate portion is something far less than the entire amount. The primary purpose of Uber's insurance policies appears to be the protection of Uber, not its customers. Thus, the policies insure against liability arising from harm done to various other parties besides class members (e.g. pedestrians, Uber drivers, and other drivers); include a "commercial insurance policy," which presumably at least partially serves to protect Uber from potential liability unrelated to passenger safety; and include protection for incidents between trips – that is, when no customer is even in the vehicle. Plaintiffs' assertion that these policies provide "valuable safety features" to class members is hard to credit. ECF No. 96 ¶ 75. Indeed, it could even be argued that it is inaccurate to describe insurance as safety-related at all, since it merely compensates Uber passengers for harm suffered rather than preventing the occurrence of harm.[5]

The parties may respond that the overestimation caused by subtracting all of Uber's insurance costs is offset by the decision to attribute no value at all to Uber's other safety expenditures, even though some of them likely provided some value to consumers. As noted above, this argument holds little weight given the lopsided ratio between Uber's insurance expenditures and non-insurance expenditures. Moreover, Plaintiffs give short shrift to their own claims regarding the inadequacy of Uber's safety measures. Plaintiffs themselves note that their "complaint attacks the efficacy of Uber's background check process" and alleges "it is virtually worthless because it does not include finger printing or other biometric identification," ECF No. 96 ¶ 75, despite Uber touting its safety measures as "industry-leading" and "more rigorous than what is required to become a taxi driver," ECF No. 67 ¶¶ 6, 31. In light of these complexities, it is unnecessarily simplistic – and unfair to the class – to assume that subtracting all insurance costs

---

[5] As multiple courts have recognized, there is academic support for the "moral hazard" theory that insurance actually undermines public safety. A.M.I. Diamonds Co. v. Hanover Ins. Co., 397 F.3d 528, 530 (7th Cir. 2005)("Moral hazard refers to the effect of insurance in causing the insured to relax the care he takes to safeguard his property because the loss will be borne in whole or part by the insurance company."); see also King Cty. v. Travelers Ins. Co., No. C94-1751Z, 1996 WL 257135, at *2 (W.D. Wash. Feb. 20, 1996). The Court does not pursue that question further here.

1  but no non-insurance costs will result in a reasonable estimation of maximum possible recovery.[6]

2  To be sure, Plaintiffs are correct to assume that at trial they would be unlikely to recover the full amount of revenue Uber obtained from its Safe Rides Fees. However, their explanation for their maximum potential recovery estimation, as well as their justification of the $28.5 million settlement amount, is inadequate. While not inconceivable, the Court finds it highly improbable that this amount is sufficient in light of the total revenue available for recovery and the significant doubt regarding the degree to which Uber's purported safety investments should be credited as effective investments in class member safety. Under these circumstances, the Court finds that Plaintiffs have not adequately explained why a gross settlement fund amount of $28.5 million is fair, adequate, and reasonable compared to what class members paid Uber for safety. Consequently, the Court finds the proposed settlement falls below the range of possible approval.

In sum, the proposed settlement does not fairly and reasonably protect the class. The settlement ignores the fact that one portion of the class has paid no Safe Rides Fee at all and that another portion has paid numerous fees. Plaintiffs also fail to explain why their proposed settlement amount is reasonable in light of the total Safe Rides Fee revenues reported by Uber. Accordingly, preliminary approval must be denied.

## IV.  CLASS CERTIFICATION

Class certification under Rule 23 is a two-step process. First, a plaintiff must demonstrate that the four requirements of Rule 23(a) are met: numerosity, commonality, typicality, and adequacy. "Class certification is proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied." Wang v. Chinese Daily News, Inc., 737 F.3d 538, 542 (9th Cir. 2013) (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-51 (2011)).

Second, a plaintiff must establish that one of the bases for certification in Rule 23(b) is met. Here, Plaintiff invokes Rule 23(b)(3) and must establish that "questions of law or fact common to class members predominate over any questions affecting only individual members,

---

[6] Nor do Plaintiffs grapple with the fact that many of their claims focus particularly on Uber's misrepresentations regarding their safety measures, including specific descriptions of their background checks, vehicle checks, education, and other features. It is unclear to the Court how insurance policies, regardless of the degree to which they benefit the class members' safety, would bear on the falsity of these claims.

1    and that a class action is superior to other available methods for fairly and efficiently adjudicating

2    the controversy." Fed. R. Civ. P. 23(b)(3).

3          The party seeking class certification bears the burden of demonstrating that all four

4    requirements of Rule 23(a) and at least one of the three requirements under Rule 23(b) are met.

5    See Wal-Mart, 564 U.S. at 350.

6          When determining whether to certify a class for settlement purposes, a court must pay

7    "heightened" attention to the requirements of Rule 23. Amchem Prods., Inc. v. Windsor, 521 U.S.

8    591, 620 (1997). Indeed, "[s]uch attention is of vital importance, for a court asked to certify a

9    settlement class will lack the opportunity, present when a case is litigated, to adjust the class,

10   informed by the proceedings as they unfold." Id. (citations omitted).

11         In addition, "[w]hile it is not an enumerated requirement of Rule 23, courts have

12   recognized that 'in order to maintain a class action, the class sought to be represented must be

13   adequately defined and clearly ascertainable.'" Vietnam Veterans of Am. v. C.I.A., 288 F.R.D.

14   192, 211 (N.D. Cal. 2012) (quoting DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir. 1970)).

### A. Numerosity

16   Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is

17   impracticable." Plaintiff contends that this requirement is satisfied because the settlement class

18   includes 24,812,917 members. ECF No. 95 at 21; see also ECF No. 96 ¶ 32. Because the joinder

19   of almost 25 million plaintiffs would be impracticable, the numerosity requirement is met.

### B. Typicality

21   In certifying a class, courts must find that "the claims or defenses of the representative

22   parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The purpose

23   of the typicality requirement is to assure that the interest of the named representative aligns with

24   the interests of the class." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992). "The

25   test of typicality 'is whether other members have the same or similar injury, whether the action is

26   based on conduct which is not unique to the named plaintiffs, and whether other class members

27   have been injured by the same course of conduct.'" Id. (quoting Schwartz v. Harp, 108 F.R.D.

28   279, 282 (C.D. Cal. 1985)).

Here, Plaintiffs argue that the typicality requirement is "satisfied because plaintiffs' claims are 'reasonably co-extensive with those of absent class members,'" and that "[t]he injuries suffered by Plaintiffs are the same as those of the Class and result from Defendants' safety-related representations, omissions, and the imposition of and disclosures regarding the Safe Rides Fee." ECF No. 95 at 21 (quoting Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998)).

In fact, as discussed above, the injuries suffered by Plaintiffs are not the same as those suffered by the class and were not caused by the same course of conduct. Plaintiffs all paid Safe Rides Fees and claim injuries resulting from the improper imposition and disclosure of such Fees. See ECF No. 67 ¶¶ 109-37. But a sizeable number of class members can claim no such injuries. Consequently, the Court cannot conclude that Plaintiffs' injuries are typical of the entire class.

### C. Commonality and Predominance

For the purposes of Rule 23(a)(2), "even a single common question will do." Wal-Mart, 564 U.S. at 359 (internal quotation marks and citation omitted). The common contention, however, "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. at 350. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Id. (emphasis in original) (citation omitted).

In seeking to certify a Rule 23(b)(3) class, Plaintiff must further show that these common questions "predominate over any questions affecting only individual members." The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." Hanlon, 150 F.3d at 1022 (citation omitted).

Here, Plaintiffs argue that there are numerous common questions, including "whether

16

Defendants' representations and omissions regarding the Safe Rides Fee and Defendants' safety practices were misleading, whether revenues were used for the stated purpose, whether the statements created implied contracts with the Class Members, whether such contracts were breached, and whether defendants' practices violated the law." ECF No. 95 at 21; see also ECF No. 67 ¶ 142.

However, as discussed above, not all of these questions are common to the proposed class. A sizeable portion of the class did not pay a Safe Rides Fee, and Plaintiffs' three claims for breach of implied contract depend entirely on questions concerning those fees. The distinction between members who paid no fee – or, conversely, members who paid numerous fees and may therefore be entitled to additional compensation – introduces individualized questions that would threaten to override whatever issues could be commonly resolved. As a result, the Court is unable to find that questions of law or fact common to the class predominate over questions affecting only individual class members.

### D.     Adequacy of Representation

"The adequacy of representation requirement . . . requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 462 (9th Cir. 2000). The requirement "'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a)." Amchem, 521 U.S. at 626 n.20 (1997) (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982)). Among other functions, these requirements serve to determine whether "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Falcon, 457 U.S. at 157 n.13.

Here, Plaintiffs state that they are adequate representatives because there are no conflicts of interests and because "Plaintiffs seek the same remedy as all Class Members." ECF No. 95 at 21-22. Plaintiffs additionally assert that "proposed Class Counsel have extensive experience litigating and settling class actions . . . and are well qualified to represent the Class." Id. at 22; see also ECF No. 96 at 26-31. At this time, the Court has no concerns regarding any potential

conflicts of interest, or whether Plaintiffs and their counsel will prosecute the case vigorously on behalf of the class.

### E. Superiority

"The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." Hanlon, 150 F.3d at 1023. Here, the judicial economy achieved through common adjudication undoubtedly makes a class action superior to any alternative procedures for resolving the claims of almost 25 million putative class members.

### F. Ascertainability

While not enumerated in Rule 23, "courts have recognized that 'in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable.'" Vietnam Veterans of Am. v. C.I.A., 288 F.R.D. 192, 211 (N.D. Cal. 2012) (quoting DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir. 1970)). "[A] class definition is sufficient if the description of the class is 'definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member.'" Id. (quoting O'Connor v. Boeing N. Am., Inc., 184 F.R.D. 311, 319 (C.D. Cal. 1998)).

The Court finds that the class definition contained in the settlement agreement satisfies this requirement. The class is defined all persons who, during a 37-month period, used the Uber App or website to obtain an Uber rideshare service in the United States and U.S. territories and who has a U.S. payment profile. ECF No. 74 ¶ 3. Furthermore, "[t]he exact size of the proposed class and the identity of all class members can be readily ascertained from Defendants' records." ECF No. 67 ¶ 141; see also ECF No. 95 ¶¶ 31-36.

In sum, because Plaintiffs have failed to demonstrate typicality, commonality, and predominance, class certification must be denied.

### CONCLUSION

For the foregoing reasons, the Court denies certification of the proposed settlement class and denies preliminary approval of the proposed settlement without prejudice.

A Case Management Conference is hereby scheduled for Wednesday, October 19, 2016 at 2:00 p.m.  A Joint Case Management Statement is due on October 10, 2016 by 5:00 p.m.

**IT IS SO ORDERED**.

Dated:  August 30, 2016

_____
JON S. TIGAR
United States District Judge