Robert Ahdoot, SBN 172098
rahdoot@ahdootwolfson.com
Tina Wolfson, SBN 174806
twolfson@ahdootwolfson.com
Theodore Maya, SBN 223242
tmaya@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
1016 Palm Avenue
West Hollywood, California 90069
Tel: 310-474-9111; Fax: 310-474-8585

*Attorneys for Plaintiffs*,
Julian Mena, Todd Schreiber, Nate Coolidge,
and Ernesto Mejia

Mike Arias, SBN 115385
mike@asstlawyers.com
Alfredo Torrijos, SBN 222458
alfredo@asstlawyers.com
**ARIAS, SANGUINETTI, STAHLE &
TORRIJOS, LLP**
6701 Center Drive West, Suite 1400
Los Angeles, California 90045-7504
Tel: 310-844-9696; Fax: 310-861-0168

*Attorneys for Plaintiffs*,
Byron McKnight

*(Additional counsel on signature page)*

REDACTED VERSION OF
DOCUMENT(S) SOUGHT TO
BE SEALED

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BYRON MCKNIGHT, JULIAN MENA, TODD SCHREIBER, NATE COOLIDGE, and ERNESTO MEJIA, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> UBER TECHNOLOGIES, INC., a Delaware Corporation, and RASIER, LLC, a Delaware Limited Liability Company, <br><br> Defendants. | Case No. 3:14-cv-05615-JST <br><br> The Honorable Jon S. Tigar <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date: July 6, 2017 <br> Time: 2:00 p.m. <br> Place: Courtroom 9 – 19th Floor |

1  **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2       **PLEASE TAKE NOTICE** that on July 6, 2017 at 2:00 p.m., in Courtroom 9 of the above-

3  captioned Court before the Honorable Jon S. Tigar, Plaintiffs Julian Mena, Todd Schreiber, Nate

4  Coolidge, Ernesto Mejia, and Byron McKnight (collectively, "Plaintiffs") will and hereby do move for

5  an Order Granting Preliminary Approval of Class Action Settlement, pursuant to the Amended

6  Stipulation of Settlement filed concurrently.

7       More specifically, Plaintiffs move for an Order: (1) granting preliminary approval of the

8  proposed Amended Settlement; (2) certifying a Class for settlement purposes; (3) approving the parties'

9  proposed Notice Program and forms of notice; (4) directing that the notice of the proposed Amended

10  Settlement be disseminated to the Class; (5) approving the procedures for Class Members to exclude

11  themselves from the Amended Settlement or object to the Settlement; (6) appointing Julian Mena, Todd

12  Schreiber, Nate Coolidge, Ernesto Mejia, and Byron McKnight as Class Representatives for the Class;

13  (7) appointing Tina Wolfson and Robert Ahdoot of Ahdoot & Wolfson, PC; Mike Arias and Alfredo

14  Torrijos of Arias, Sanguinetti, Stahle & Torrijos, LLP; and Nicholas Coulson of Liddle & Dubin, PC as

15  Class Counsel; (8) appointing Epiq Systems, Inc. as the Settlement Administrator specified in the

16  Amended Settlement; and (9) setting the following schedule on further proceedings to determine

17  whether the proposed Amended Settlement is fair, reasonable, and adequate and whether an order

18  awarding attorneys' fees and reimbursement of expenses and service awards should be approved, which

19  would set dates to be calculated from the date on which the Court enters an order granting this motion,

20  as indicated:

| Event | Date |
|---|---|
| Initial Date For Publishing Notice | _____ (30 days after entry of preliminary approval order) |
| Deadline For Completing Notice Program | _____ (60 days after entry of preliminary approval order) |
| Deadline For Plaintiffs' Counsel To File Any Motion For Award Of Attorneys' Fees And Service Awards | _____ (91 days after entry of preliminary approval order; 14 days before objection deadline) |

| Event | Date |
|---|---|
| Deadline For Class Members To Submit Objections To The Proposed Settlement Or Requests For Exclusion | _____ (105 days after entry of preliminary approval order) |
| Deadline To Submit Payment Election Forms | _____ (105 days after entry of preliminary approval order) |
| Deadline for Settlement Administrator to file list of exclusions with the Court | _____ (14 days before Fairness Hearing) |
| Deadline for replies to objections | _____ (7 days before Fairness Hearing) |
| Deadline For Plaintiffs' Counsel To File Motion For Final Approval Of Class Action Settlement | _____ (7 days before Fairness Hearing) |
| Fairness Hearing | _____ (140 days after entry of preliminary approval order, or such other date as the Court deems appropriate) |

This motion is made pursuant to Fed. R. Civ. P. 23 and is based upon: this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the Amended Stipulation of Settlement; the declarations of Plaintiffs' proposed Class Counsel (Robert Ahdoot, Mike Arias, and Nicholas Coulson); the declaration of Richard Dubois, on behalf of the proposed *cy pres* recipient (the National Consumer Law Center); and such evidence and argument as the Court may consider at the hearing on this motion.

Dated: June 1, 2017                    Respectfully Submitted,

                                       **AHDOOT & WOLFSON, PC**

                                       */s/ Robert Ahdoot*
                                       Tina Wolfson
                                       Robert Ahdoot
                                       Theodore W. Maya
                                       1016 Palm Avenue
                                       West Hollywood, California 90069
                                       Tel: (310) 474-9111; Fax: (310) 474-8585

                                       *Attorneys for Plaintiffs and the Proposed Class*

**ARIAS, SANGUINETTI, STAHLE & TORRIJOS, LLP**

*/s/ Alfredo Torrijos*
Mike Arias
Alfredo Torrijos
6701 Center Drive West, Suite 1400
Los Angeles, California 90045-7504
Tel: (310) 844-9696; (Fax) 310-861-0168

*Attorneys for Plaintiffs and the Proposed Class*

**LIDDLE & DUBIN, PC**

*/s/ Nicholas Coulson*
Nicholas Coulson (admitted *pro hac vice*)
975 E. Jefferson Avenue
Detroit, Michigan 48207
Tel: 313-392-0015; Fax: 313-392-0025

*Attorneys for Plaintiffs and the Proposed Class*

## ATTORNEY ATTESTATION

Pursuant to Civil Local Rule 5-1(i), I, Robert Ahdoot, hereby attest that concurrence in the filing of this document has been obtained from the other signatories on this document.

Dated: June 1, 2017


By:   */s/ Robert Ahdoot*
         Robert Ahdoot

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ............................................................................................................. 1

II.  SUMMARY OF LITIGATION, INVESTIGATION, AND SETTLEMENT ........................................ 3

     A. The Original Complaints, the Arbitration Motions, and the CAC ................................ 3

     B. The Settlement Negotiations ................................................................................... 4

     C. Plaintiffs' Counsel's Investigation ........................................................................... 4

III. THE PROPOSED AMENDED SETTLEMENT ....................................................................... 5

     A. The Class To Be Certified for Settlement Purposes ................................................... 5

     B. Monetary Relief .................................................................................................... 5

          1. Distribution of the Settlement Fund ................................................................. 6

          2. Class Members' Estimated Individual Recovery ................................................ 6

     C. Non-Monetary and Injunctive Relief ....................................................................... 7

     D. Dissemination of Notice to the Class ....................................................................... 7

     E. Service Awards to Class Representatives and Attorneys' Fees and Expenses ............... 8

     F. Release Provisions ................................................................................................ 8

     G. Opt-Out Procedure and Opportunity to Object ......................................................... 9

IV. CLASS ACTION TREATMENT IS APPROPRIATE ................................................................ 9

     A. This Action Satisfies the Requirements of Rule 23(a) ................................................ 9

     B. The Predominance and Superiority Requirements of Rule 23(b)(3) are Satisfied ......... 10

     C. Plaintiffs' Counsel Should Be Appointed As Class Counsel Under Rule 23(g) ............ 11

V.  THE AMENDED SETTLEMENT MEETS THE STANDARD FOR PRELIMINARY
    APPROVAL ................................................................................................................ 11

     A. The Amended Settlement Is the Product of Serious, Informed, Non-Collusive Negotiations ........ 12

     B. The Amended Settlement Presents No Deficiencies .................................................. 12

     C. The Amended  Settlement Does Not Grant Preferential Treatment to Class Representatives and
        Provides for a Fair Allocation of Relief to All Class Members .................................... 13

     D. The Amended Settlement Falls Within the Range of Possible Approval ....................... 14

          1. Plaintiffs Face Significant Risks In Continuing The Litigation .............................. 14

               a. Merits Defenses ................................................................................... 14

               b. Arbitration ......................................................................................... 17

               c. Class Certification ............................................................................... 18

          2. $32.5 Million Is Significant Compared to the Potential Recovery at Trial .............. 20

               a. The Settlement Value Is Fair in Comparison to the Maximum Potential Recovery, Not
                  Accounting for any Safety-Related Costs ................................................. 20

               b. The Settlement Value Is Fair in Comparison to the Maximum Potential Recovery at
                  Trial, Accounting for Safety-Related Costs ............................................... 20

          3. Experienced Class Counsel Performed Sufficient Research and Analysis and Recommend
             Approval ........................................................................................... 24

# TABLE OF CONTENTS
### (continued)

Page

VI.   THE PROPOSED FORM AND METHOD OF NOTICE IS THE BEST NOTICE PRACTICABLE AND SHOULD BE APPROVED ........................................................................ 25

VII.  THE COURT SHOULD SET A SCHEDULE FOR FINAL APPROVAL ...................................... 25

VIII. CONCLUSION ......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S.Ct. 1184 (2013)...........................................11

*Avilez v. Pinkerton Gov't Servs., Inc.,* 596 F. App'x 579 (9th Cir. 2015) .......................................19

*Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245 (N.D. Cal. 2015) ..................................25

*Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) ........................................... 9

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004) ...................................18

*Chun–Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848 (N.D. Cal. 2010) .............................12

*Cordas v. Uber Techs., Inc.*, No. 16-CV-04065-RS, 2017 WL 658847 (N.D. Cal. Jan. 5, 2017) ........ 18, 19

*Custom LED, LLC v. eBay, Inc.*, No. 12-cv-00350-JST, 2014 WL 2916871 (N.D. Cal. June 24, 2014) ..................................................................................2, 21, 24

*Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ....................................20

*Cullinane v. Uber Techs., Inc.*, No. CV 14-14750-DPW, 2016 WL 3751652 (D. Mass. July 11, 2016)................................................................................................18, 19

*Curbia v. Uber Techs, Inc.,* No. A-16-CA-544-SS, 2017 WL 1034731 (W.D. Tex. Mar. 16, 2017) ... 18, 19

*Dennis v Kellogg*, 697 F.3d 858 (9th Cir. 2012)............................................................. 6

*Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350 (2010)............................................15

*Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884 (N.D. Cal. 2015)......................................20

*Figy v. Amy's Kitchen*, No. 13-cv-3816-SI, 2013 WL 6169503 (N.D. Cal. Nov. 25, 2013)...................15

*Garner v. State Farm Mut. Auto. Ins. Co.*, No. 08-cv-1365-CW-EMC, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ...........................................................................................25

*Gomez v. Lincare, Inc.*, 173 Cal. App. 4th 508 (2009).................................................15

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ........................................ 10, 14

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011)..........................8, 12

*In re Clorox Consumer Litig.*, 301 F.R.D. 436 (N.D. Cal. 2014) ......................................20

*In re Ferrero Litig.*, 583 F. App'x 665 (9th Cir. 2014) ...............................................13

*In re First Capital Life Ins. Co.*, 34 Cal. App. 4th 1283 (1995) .....................................15

*In re Google Referrer Header Privacy Litig.*, 87 F. Supp. 3d 1122 (N.D. Cal. 2015) .....................21

*In re LDK Solar Secs. Litig.*, No. 07-5182 WHA, 2010 U.S. Dist. LEXIS 87168 (N.D. Cal. July 29, 2010)................................................................................................24

*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000)......................................25

*In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008)..............................21, 24

*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078 (N.D. Cal. 2007)............................12, 14

*In re Tobacco II Cases*, 446 Cal. 4th 298 (2009) ......................................................13

*In re Toys R Us-Delaware, Inc.*, 295 F.R.D. 438 (C.D. Cal. 2014)......................................19

*In re TracFone Unlimited Serv. Plan Litig.*, No. C-13-3440 EMC, 2015 WL 4051882 (N.D. Cal. July 2, 2015)..............................................................................................13

**TABLE OF AUTHORITIES**

(continued)

Page

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2012 WL 12369590 (N.D. Cal. Oct. 15, 2012) ............................................................................................................................. 12

*In re Uber FCRA Litig.*, No. C-14-5200 EMC (N.D. Cal.) ...................................................... 20

*In re Veritas Software Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 30880 (N.D. Cal. Nov. 15, 2005) .......... 24

*Kwan v. SanMedica Int'l*, No. 15-15496, 2017 WL 1416483 (9th Cir. Apr. 21, 2017) ............................. 12

*L.A. Taxi Cooperative, Inc. v. Uber Techs., Inc.*, No. 15-cv-01257-JST (N.D. Cal.) ........................... 15, 16

*Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012) ................................................................ 6

*Linney v. Cellular Alaska Partnership*, 151 F.3d 1234 (9th Cir. 1998) ............................................ 12

*Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718 (9th Cir. 2007) ........................................... 19

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) .................................................... 20

*Meadows v. Dickey's Barbecue Restaurants Inc.*, 144 F. Supp. 3d 1069 (N.D. Cal. 2015) ..................... 19

*Metter v. Uber Techs., Inc.*, No. 16-CV-06652-RS, 2017 WL 1374579 (N.D. Cal. Apr. 17, 2017)..... 18, 19

*Meyer v. Kalanick*, 200 F. Supp. 3d 408 (S.D.N.Y. 2016) ........................................................ 18

*Mullane v. Central Hanover Trust,* 339 U.S. 306 (1950) .......................................................... 26

*Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004) .............................. 25

*O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110 (N.D. Cal. 2016) ..................................... 18, 19

*Officers for Justice v. Civil Service Com'n of City and Cty. of San Francisco*, 688 F.2d 615 (9th Cir. 1982) ......................................................................................................................... 25

*Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) ................................................................... 10

*Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) ................................................ 12, 24

*Smith v. Am. Greetings Corp.*, No. 15-cv-2577-JST, 2015 WL 4498571 (N.D. Cal. July 23, 2015).... 14, 20

*Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943 (9th Cir. 1976) .................................................. 12

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ..................................................... 9, 10

*Williams v. Gerber Products Co.*, 552 F.3d 934 (9th Cir. 2008) ................................................. 11

*Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087 (9th Cir. 2010) ....................................... 11

**STATUTES**

28 U.S.C. §1715 ........................................................................................................ 6

815 ILCS 502/2 ......................................................................................................... 3

Cal. Bus. & Prof. Code §17200 ...................................................................................... 3

Cal. Bus. & Prof. Code §17500 ...................................................................................... 3

Cal. Civ. Code §1750 .................................................................................................. 3

**OTHER AUTHORITIES**

FEDERAL JUDICIAL CENTER, JUDGES' CLASS ACTION NOTICE AND CLAIMS PROCESS CHECKLIST AND PLAIN LANGUAGE GUIDE (2010) ........................................................................................ 8

Manual for Complex Litigation (2d ed. 1985) ...................................................................... 12

**TABLE OF AUTHORITIES**

**(continued)**

**Page**

**RULES**

Fed. R. Civ. P. 23(a) ............................................................................................................ 9, 10

Fed. R. Civ. P. 23(b) ................................................................................................................ 11

Fed. R. Civ. P. 23(c) ................................................................................................................ 26

Fed. R. Civ. P. 23(g) ................................................................................................................ 11

1   **I.      INTRODUCTION**

2          Plaintiffs and Defendants Uber Technologies, Inc. and Rasier, LLC (collectively "Defendants" or

3   "Uber") have reached agreement on the concurrently-filed Amended Stipulation of Settlement

4   ("Amended Settlement" or "Am. Stip.").[1]  If approved, the Amended Settlement will resolve claims

5   arising out of Defendants' alleged representations and omissions regarding the safety of Uber, the "Safe

6   Rides Fee," and driver background checks.  Defendants would establish a $32.5 million, non-

7   reversionary Settlement Fund, and Defendants would agree to refrain from using the term "Safe Rides

8   Fee" and certain other terms regarding safety and background checks in their Commercial Advertising.

9          The parties previously reached a settlement on February 11, 2016 (the "2016 Settlement").  *See*

10  Dkt. Nos. 74-78.  The Court denied preliminary approval without prejudice ("Denial Order," Dkt. 98),

11  identifying several issues that the Court found questionable.  After several months of additional,

12  extensive, mediated negotiations to address these issues (which included three separate mediation

13  sessions and a settlement conference before the Hon. Chief Magistrate Judge Joseph C. Spero), the

14  parties reached the Amended Settlement.

15         The first issue the Court raised in its Denial Order was that the original settlement covered riders

16  who had not paid a Safe Rides Fee.  (Denial Order at 7.)  Accordingly, the Amended Settlement

17  encompasses a class consisting only of riders who paid a Safe Rides Fee, which reduces the class size by

18  over 2 million members.  The second issue was that the settlement did not take into account the number

19  of rides per rider.  (*Id.* at 7-9.)  In the Amended Settlement, damages are measured, in part, by the

20  number of Safe Rides Fee rides a rider took, with each rider receiving approximately 25 cents for his or

21  her first ride, and 5 cents for each ride thereafter.  This allocation method was vetted with Chief

22  Magistrate Judge Spero and reflects, among other things: (i) an attempt to make recovery for each and

23  every class member feasible in light of administrative costs; and (ii) the relative strength of claims based

24  on the first ride versus claims based on subsequent rides, after disclosure of the Safe Rides Fee.

25         The final issue the Court raised was that Plaintiffs had not shown that the $28.5 million

26  settlement amount fell within the range of possible approval.  (*Id.* at 9:23-14:11.)  In the Amended

27  Settlement, the fund has increased to $32.5 million, even though the class size has decreased by almost

28

---

[1]    Unless otherwise stated, capitalized terms have the same meaning as in the Amended Settlement.

1   10 percent.  Furthermore, the parties have negotiated to reduce the maximum cap on the costs of notice

2   and administration, from $800,000 (Dkt. 74-9 at ¶ 37) to $487,000 (Am. Stip. Ex. I at ¶ 37), increasing

3   the funds available for distribution to the Class.

4          Plaintiffs demonstrate, in Section V.D.2 below, through a revised analysis that addresses each

5   issue previously raised by the Court, why the $32.5 million Amended Settlement is well within the range

6   of possible approval—even if one ignores the substantial risks that Plaintiffs face through continued

7   litigation, including the risks presented with respect to arbitration, class certification, and proving

8   liability and damages in excess of the Settlement Fund on a class-wide basis at trial.  Indeed, the $32.5

9   Settlement Fund represents approximately 6.9% of Defendants' total Safe Rides Fee revenues, without

10  accounting for *any* of Defendants' safety-related costs, despite this Court's previous observation that,

11  "[t]o be sure, Plaintiffs are correct to assume that at trial they would be unlikely to recover the full

12  amount of revenue Uber obtained from its Safe Rides Fees."  (Denial Order at 14:2.)  And 6.9% of the

13  potential recovery at trial is enough, alone, to merit preliminary approval.  *See, e.g.*, *Custom LED, LLC*

14  *v. eBay, Inc.*, No. 12-cv-00350-JST, 2014 WL 2916871, at *4 (N.D. Cal. June 24, 2014) ("[C]ourts have

15  held that a recovery of only 3% of the maximum potential recovery is fair and reasonable when the

16  plaintiffs face a real possibility of recovering nothing absent the settlement.").  As Plaintiffs' revised

17  potential recovery analysis shows, a conservative estimate that accounts for some, but not all, of

18  Defendants' safety-related costs, reveals that the Amended Settlement represents ▓% to ▓% of the

19  actual, potential recovery at trial (ignoring the many risks that continued litigation presents to the Class).

20  Plaintiffs submit that, whichever assumptions one makes concerning their likelihood of success at trial,

21  the monetary component of the Amended Settlement, alone, brings it within the range of reasonableness

22  and establishes that it merits preliminary approval.

23         Accordingly, Plaintiffs respectfully request that the Court preliminarily approve the Amended

24  Settlement, authorize implementation of the notice program, schedule a final Fairness Hearing, and set a

25  schedule including the deadlines described in the Notice of Motion above.

26

27

28

**MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT (NO. 3:14-CV-05615-JST)**

1    II.    SUMMARY OF LITIGATION, INVESTIGATION, AND SETTLEMENT

2        A.    The Original Complaints, the Arbitration Motions, and the CAC

3        *The Original Complaints*.  On December 23, 2014, plaintiffs Philliben[2] and McKnight filed a

4    nationwide class action, No. 3:14-cv-05615 ("*McKnight*"), which asserted causes of action for violations

5    of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §17500 *et seq*., and Unfair

6    Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200 *et seq*., and which alleged, *inter alia*,

7    misrepresentations and omissions regarding Defendants' "Safe Rides Fee," safety measures, alleged

8    expenditures, and driver background checks.  *McKnight* Dkt. 1.  On January 6, 2015, Andrea Pappey

9    filed a nationwide (or in the alternative California, Illinois, and Massachusetts) class action, No. 3:15-

10   cv-00064 ("*Mena*").  This complaint was later amended, and Plaintiffs Mena, Schreiber, Coolidge, and

11   Mejia joined as class representatives, while Andrea Pappey withdrew.  *Mena* alleged breach of implied

12   contract; violations of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §1750 *et*

13   *seq*.; and violations of the UCL, FAL, and the Illinois Consumer Fraud Act, 815 ILCS 502/2, *et seq*.

14   ("ICFA") in connection with alleged misrepresentations and omissions regarding Defendants' Safe

15   Rides Fee, safety measures, alleged expenditures, and driver background checks.  *Mena* Dkt. 28.  The

16   Court related the two cases on February 18, 2015.  *McKnight* Dkt. 23; *Mena* Dkt. 19.

17       *The Arbitration Motions*.  Defendants filed a Motion to Stay Proceedings Pending Arbitration in

18   *McKnight* (*McKnight* Dkt. 25-29, 38-40), which the *McKnight* plaintiffs opposed (*id.* Dkt. 37).

19   Defendants filed a similar motion in *Mena* (*Mena* Dkt. 31-36, 39-41), which the *Mena* plaintiffs opposed

20   (*id.* Dkt. 37-38, 42, 45, 46).  These motions were vacated after the 2016 Settlement.  Dkt. 87.

21       *The CAC*.  Plaintiffs filed a Consolidated Amended Complaint ("CAC") asserting claims

22   seeking damages for breach of implied contract and violations of the CLRA, UCL, FAL, and ICFA.

23   *McKnight* Dkt. 67.  The CAC alleges, *inter alia*, that Uber charges a Safe Rides Fee without properly

24   disclosing it prior to the ride (CAC ¶¶ 41, 54-58, 61, 64); that Uber makes a number of

25   misrepresentations and/or omissions regarding its safety efforts, expenditures, and background checks.

26   *Id.* ¶¶ 25, 26-27, 29-40, 65; and that Uber does not use the Safe Rides Fee to pay for effective efforts to

27

28   2    On May 18, 2017, a Stipulation of Partial Dismissal of Matthew Philliben was filed by Byron
     McKnight dismissing all claims related to Matthew Philliben without prejudice.  This matter is hereafter
     referred to herein as *McKnight, et al v. Uber Technologies, Inc., et al.  McKnight*, Dkt. 121.

1  provide safe rides.  *Id.* ¶¶ 79, 89.  Defendants dispute the allegations and deny any and all liability.

2  ### B.    The Settlement Negotiations

3  After the arbitration motions were briefed, the parties began a series of arms' length settlement

4  negotiations, including three full days of mediation and numerous face-to-face and telephonic meetings

5  between counsel and with the mediator, the Honorable Carl West (Ret.) of JAMS.  (Decl. of Robert R.

6  Ahdoot ("Ahdoot Decl.") ¶¶ 15-19.)  A settlement was reached, and a motion for preliminary approval

7  was denied without prejudice.  *McKnight* Dkt. 98 (the "Denial Order").  After the Denial Order, the

8  parties continued to engage in extensive settlement negotiations and exchange of information.  (Ahdoot

9  Decl. ¶¶ 27-30.)  The additional negotiations included three in-person mediation sessions with mediator

10  Robert J. Kaplan of Judicate West, as well as a settlement conference with the Chief Magistrate Judge

11  Joseph C. Spero to address class allocation issues.  (*Id.* ¶ 27.)

12  ### C.    Plaintiffs' Counsel's Investigation

13  Before initiating these Actions, Plaintiffs researched Defendants' representations, marketing,

14  business practices and promotional efforts, interviewed a number of riders and drivers, and investigated

15  facts and applicable law and standards relating to background checks and commercial transportation

16  service safety.  (*Id.* ¶ 6.)  Furthermore, Plaintiffs' researched and analyzed the merits of the potential

17  causes of action and defenses.  (*Id.* ¶¶ 6, 31.)  Plaintiffs continued these efforts after filing the Actions

18  and before entering into the 2016 Settlement and the Amended Settlement.  (*Id.* ¶ 7.)

19  Plaintiffs submitted comprehensive requests for information regarding their allegations and

20  Defendants' anticipated defenses, and Defendants provided thousands of pages of responsive documents

21  and sworn responses.  Plaintiffs thoroughly analyzed and evaluated all information provided, including

22  documents bearing on Defendants' background checks, alleged safety expenditures, the Safe Rides Fee

23  and resulting revenues, and Defendants' representations, advertising, and marketing regarding safety.

24  (*Id.* ¶ 31.)  Plaintiffs' investigation also included a detailed inspection and testing of Defendants' ride

25  share App across various operating system platforms; consultations with experts; interviews of

26  witnesses, drivers, and putative class members; the evaluation of documents and information related to

27  other litigation against Defendants; as well as extensive factual and legal research regarding arbitration,

28  the sufficiency of the claims, and the appropriateness of class certification.  (*Id.* ¶¶ 32, 35.)

Plaintiffs conducted ten extensive interviews of key current and former high level Uber employees with direct knowledge of the facts at issue, including safety representations, safety measures, alleged safety expenditures, details regarding the Safe Rides Fee, user databases, and other relevant areas of Uber's operations.  (*Id.* ¶ 32.)  After the Denial Order, Plaintiffs' investigation continued, and Plaintiffs sought and received updated information as well as thousands of pages of additional documents, deposition transcripts, and expert reports from related cases.  (*Id.* ¶ 34.)

## III.    THE PROPOSED AMENDED SETTLEMENT

### A.    The Class To Be Certified for Settlement Purposes

Plaintiffs seek certification of the following Class for settlement purposes:

all persons who, from January 1, 2013 to January 31, 2016, used the Uber App or website to obtain service from one of the Uber Ride Services With A Safe Rides Fee in the United States or its territories.[3]

(Am. Stip. ¶ 6.)  Compared to the CAC, the Class has been refined to include only, and define more precisely, U.S. riders, and to include only those who paid a Safe Rides Fee.  The class period now ends January 31, 2016, instead of "the date that notice of this class action is disseminated."  (CAC ¶ 138.)

### B.    Monetary Relief

Defendants will pay $32.5 million in cash, an increase of $4 million from the 2016 Settlement, to create a Settlement Fund that will be used for payments to Class Members, the costs of notice and settlement administration (estimated to be $300,000-450,000 and capped at $487,000; Stip. Ex. I ¶ 37),

---

[3] The capitalized terms in this class definition are defined as follows:

"Uber Ride Services With A Safe Rides Fee" means all transportation services that were arranged through Defendants' website or the Uber App where a Safe Rides Fee was paid (such as UberX, etc.). "Uber App" means the Uber smartphone application by which riders may request Uber Rideshare Services. "Uber Rideshare Services" means all transportation services that are arranged through Defendants' website or the Uber App, regardless of type of ride or service that is requested. "Uber" means the companies, incorporated in the State of Delaware as Uber Technologies, Inc. and Rasier, LLC, who operate the ride share service commonly known as Uber. Excluded from the Class are (a) all persons who are employees, directors, and officers of Uber Technologies, Inc. and Raiser, LLC; and (b) the Court and Court staff. "Employees" means any person whose Uber account email address ended with "@uber.com" as of May 8, 2017.

(Am. Stip. ¶ 6.)

Court-approved Service Awards, and Attorneys' Fees and Expenses.  (Am. Stip. ¶ 55.)  There is no reversion to Defendants.  (*Id.* ¶ 52.)  Unless the Class Member opts for a different payment method via PayPal or bank account via eCheck, Uber will distribute each Class Member's Settlement Share through Uber's infrastructure, providing an estimated additional $1,687,500 in settlement value and reducing the administrative costs.  (Am. Stip. § IV.C, ¶¶ 67-79, & Ex. I ¶ 38**.**)

## 1.    Distribution of the Settlement Fund

Class Members will receive their Settlement Share by electing one of three options: (1) payment to their PayPal account, (2) payment to their bank account via eCheck, or (3) payment to their Uber Rider Account (meaning it will be paid toward their next Uber ride), by submitting the Payment Election Form within 105 days from entry of the Preliminary Approval Order.  (Am. Stip. ¶ 106 & Ex. C)  In the event Class Members do not submit a Payment Election Form, the Settlement Share will automatically be paid to their Uber Rider Account.  (Am. Stip. ¶¶ 2, 67.)[4]  If Class Members who receive the Settlement Share as a payment toward their next Uber ride do not use Uber's Rideshare Service within 365 days of the Effective Date, Defendants will pay the Settlement Share to Class Members' default payment method on file (*e.g.*, U.S. credit card, PayPal) with Uber.  (Am. Stip. ¶ 68.)  Prior to this payment, the Settlement Administrator will email the respective Class Members reminding them to ensure their current payment information.  (*Id.* ¶ 88.)  While the Amended Settlement strives to confer the Settlement Shares to Class Members, in the event the entire amount of the Settlement Fund is not paid to Class Members, any residual will be paid to the National Consumer Law Center ("NCLC"), which was selected in compliance with *Lane v. Facebook, Inc.*, 696 F.3d 811, 820 (9th Cir. 2012), and *Dennis v. Kellogg*, 697 F.3d 858, 865-69 (9th Cir. 2012).  (Am. Stip. ¶ 80.)  NCLC is a non-profit organization committed to protecting consumers and promoting fairness in the marketplace and has committed to use any *cy pres* funds to support consumer education.  (Declaration of Richard Dubois at ¶ 12.)

## 2.    Class Members' Estimated Individual Recovery

The $32.5 million Settlement Fund presents an average value of approximately $1.45 per Class

---

[4]    The Payment Election Form can be submitted online or by mail and will be available upon request or by download on the Settlement website.  (Am. Stip. Ex. C.)

1   Member based on a Class size of 22.4 million Members.  (Ahdoot Decl. ¶ 39.)  After accounting for

2   administration costs (which include costs related to notice and distribution of cash via paypal or

3   eCheck), attorneys' fees, and service awards, each Class Member will receive $0.25 for their first Safe

4   Rides Fee Service and $0.05 for each subsequent Safe Rides Fee Service.  (*Id.* ¶¶ 83-86.)  The average

5   Settlement Share would be approximately $1.07, which is significant in relation to the average initial

6   Safe Rides Fee of $1.14 (paid by Class Members prior to disclosure of that fee after their first Uber

7   ride).  (*Id.* ¶ 82.)  The $32.5 million figure does not attribute any monetary value to the significant

8   injunctive relief in the Amended Settlement, or to the added value of using Uber's infrastructure to make

9   payments to Class Members.

10         **C.**     **Non-Monetary and Injunctive Relief**

11         Uber agreed to take significant measures as part of the 2016 Settlement and will be bound by its

12   commitment if the Amended Settlement is approved.  These measures include, but are not limited to,

13   changes to how Uber describes its background check process, and its agreement to refrain from using

14   statements such as "safest ride on the road," "industry-leading," and certain other statements that

15   Plaintiffs challenge in the CAC in any Commercial Advertising.  (Am. Stip. ¶ 47.)  Defendants also

16   agree not to charge any fee entitled "Safe Rides Fee."  (*Id.* ¶ 6.)  The Amended Settlement thus

17   addresses substantially all of the objectionable conduct alleged in the CAC, despite Defendants' denial

18   of liability.

19         **D.**     **Dissemination of Notice to the Class**

20         The Notice program is the best practicable notice possible.  (Am. Stip. Ex. I ¶ 40.)  Class

21   Members will directly receive the Summary Notice (*Id.* Ex. G) at the email addresses associated with

22   their Uber Rider Accounts.  (*Id.* ¶ 85(d)(i) & Ex. I ¶¶ 17-19.)  Based on recent experience,

23   approximately 97% of the email addresses should be valid.  (Ahdoot Decl. ¶ 45.)

24         The notice program also will include Internet advertising, including sponsored search listings on

25   major search engines and banner ads appearing on a network of various websites.  (Am. Stip. ¶ 85(d)(ii)

26   & Ex. I ¶ 21-23.)  The Long Form Notice (*Id.* Ex. E) will be made available on a settlement website

27   (www.RideShareSettlement.com) and upon request through a toll-free number.  (*Id.* ¶¶ 85(c), 85(d)(iii).)

28   A Publication Notice (*Id.* Ex. H) also will be published in accordance with the CLRA (Cal. Civ. Code

1  § 1781(d)).  (Am. Stip. ¶¶ 85(d)(ii) & Ex. I ¶ 20.)  The notice plan will reach no less than 80% of Class

2  Members, and likely over 90%.  (*Id.* Ex. I ¶ 16.)  *See also* FEDERAL JUDICIAL CENTER, JUDGES' CLASS

3  ACTION NOTICE AND CLAIMS PROCESS CHECKLIST AND PLAIN LANGUAGE GUIDE 3 (2010) ("It is

4  reasonable to reach between 70–95% [of the class].").

5      The Summary Notice will refer Class Members to the Settlement website, which will make

6  available the Long Form Notice, Payment Election Form, Stipulation, and other relevant Court

7  documents.  (Am. Stip. ¶ 85(b) & Ex. I ¶ 19.)  The toll-free number will also provide Settlement-related

8  information.  (*Id.* ¶ 85(c) & Ex. I ¶ 25.)  Finally, Defendants will comply with the requirements of 28

9  U.S.C. §1715 ("CAFA") (Am. Stip. ¶ 82), and Plaintiffs' Counsel will place links to the Settlement

10  website on the homepages of their websites.

11      **E.      Service Awards to Class Representatives and Attorneys' Fees and Expenses**

12      The Settlement allows each Plaintiff to apply for a Service Award no later than 14 days prior to

13  the objection/exclusion deadline, to be paid out of the Settlement Fund.  (Am. Stip. ¶ 124.)  Plaintiffs'

14  intention to seek no more than $500 for each Class Representative is disclosed on the notice forms.  (*Id.*

15  Ex. E.)  By that same deadline, Class Counsel will apply for an Attorneys' Fees and Expense Award to

16  be paid from the Settlement Fund and will not seek fees in excess of 25% of the Settlement Fund.  *See In*

17  *re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011).)  This maximum amount is

18  stated on the notice forms.  (Am. Stip. Ex. E.)

19      There is no agreement between the parties as to the amount of Service Awards or attorneys' fees

20  or expenses, nor is the Settlement conditioned on them.  Moreover, the procedure for, and the allowance

21  or disallowance of, any attorneys' fees, costs, expenses, or reimbursement is not part of the Amended

22  Settlement and is to be considered separately from the fairness, reasonableness, and adequacy of the

23  Settlement.  (*Id.* ¶ 93.)  Should the Court award less than the amount sought for Service Awards and/or

24  attorneys' fees and costs, the balance will remain in the Settlement Fund and be applied toward the

25  calculation of the Settlement Shares for Class Members.  (*Id.* ¶ 38.)

26      **F.      Release Provisions**

27      If the Court grants final approval of the Amended Settlement, Class Members will be deemed to

28  have released Defendants of all claims, known or unknown, that were asserted or could have been

1  asserted in the litigation.  (Am. Stip. ¶¶ 30-33, § VIII.)  The Released Claims are tied to "the allegations

2  in the Action."  (*Id.* ¶ 31.)  Claims for personal injury are excluded.  (*Id.*)

3         **G.**    **Opt-Out Procedure and Opportunity to Object**

4        Any potential Class Member may request to be excluded from the Class by sending a written

5  request to the Settlement Administrator postmarked on or before a date no later than 90 days after the

6  Court orders preliminary approval.  (Am. Stip. Exs. D-E.)  Valid requests must include information

7  described in the Notice, including a statement that the person wishes to be excluded from the Class.  (*Id.*

8  ¶ 121 & Ex. E.)  Any Class Member who does not request to be excluded may object to the Amended

9  Settlement, Class Counsel's fee application, and/or the requests for Service Awards.  (*Id.* ¶ 119.)  To be

10  considered, an objection must either be mailed to the Class Action Clerk or filed with the Court and

11  must be in writing, personally signed by the objector, and include the information prescribed by the

12  Notice.  (*Id.* & Exs. D-E.)

13  **IV.**    **CLASS ACTION TREATMENT IS APPROPRIATE**

14        **A.**    **This Action Satisfies the Requirements of Rule 23(a)**

15        "Parties seeking class certification must satisfy each of the four requirements of Rule 23(a)—

16  numerosity, commonality, typicality, and adequacy[.]"  *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121,

17  1124 (9th Cir. 2017).  The Class includes over 22 million members (Ahdoot Decl. ¶ 39), satisfying Rule

18  23(a)(1)'s numerosity requirement.  (*See* Denial Order at 15 (finding numerosity satisfied).)

19        ***Commonality***.  Rule 23(a)(2) requires that "there [be] questions of law or fact common to the

20  class."[5]  Common questions include whether Defendants' representations and omissions regarding the

21  Safe Rides Fee and Defendants' safety practices were misleading, whether revenues were used for the

22  stated purpose, whether the statements created implied contracts with the Class Members, whether such

23  contracts were breached, and whether Defendants' practices violated the law.  In the Denial Order, the

24  Court noted that the inclusion of class members who did not pay a Safe Rides Fee precluded a finding of

25  commonality.  (Denial Order at 16-17.)  The Amended Settlement resolves this issue because all Class

---

27  [5]   "Commonality requires the plaintiff to demonstrate that the class members have suffered the same

28  injury."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2556 (2011).  This means that the class claims "must depend on a common contention . . . of such a nature that it is capable of class wide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*

Members paid a Safe Rides Fee.

*Typicality*.  Rule 23(a)(3)'s requirement that "the claims or defenses of the representative parties are typical of the claims or defenses of the class" is satisfied because plaintiffs' claims are "reasonably co-extensive with those of absent class members." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  Plaintiffs' claims stem from the same common course of conduct as the claims of the Class. The injuries suffered by Plaintiffs are the same as those of the Class and result from Defendants' safety-related representations, omissions, and the imposition of, and disclosures regarding, the Safe Rides Fee. Typicality is therefore satisfied.  *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014).  The Denial Order found that the named Plaintiffs' claims were not typical because all named Plaintiffs had paid a Safe Rides Fee, while many members of the 2016 Settlement class had not.  (Denial Order at 15-16.)  In the Amended Settlement, all Class Members have paid a Safe Rides Fee, eliminating this issue.

*Adequacy*.  "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Hanlon,* 150 F.3d at 1020.  As the Court noted, there are no conflicts of interest here.  (Denial Order at 17-18.)  Plaintiffs seek the same remedy as all Class Members: relief to address claims arising from Defendants' safety-related representations and the imposition of, and disclosures regarding, the Safe Rides Fee.  Plaintiffs' interests are perfectly aligned with the interests of the Class.  Further, proposed Class Counsel have extensive experience litigating and settling class actions, including false advertising, breach of contract, and unlawful business practices claims on behalf of consumers.  They have demonstrated expertise in handling all aspects of complex litigation and class actions and are well qualified to represent the Class. (Ahdoot Decl. Ex. A; Arias Decl. ¶¶ 4-13; Coulson Decl. ¶¶ 2-6.)  Plaintiffs and proposed Class Counsel remain fully committed to advancing the interests of, and obtaining relief for, the Class Members, as evidenced by the terms of the Amended Settlement.

### B.     The Predominance and Superiority Requirements of Rule 23(b)(3) are Satisfied

Rule 23(b)(3)'s predominance requirement is satisfied here.  The rule does not require plaintiffs to prove each element of their claim with class-wide proof.  *See Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013).  Plaintiffs need only show that "common questions

1  'predominate over any questions affecting only individual [class] members.'" *Id.* (quoting Fed. Rule

2  Civ. Proc. 23(b)(3)).  The claims in this case are based upon uniform conduct and uniform

3  representations and omissions regarding safety.  There are no predominating individual issues because,

4  under Plaintiffs' legal theories, the objective reasonable consumer standard applies to determining

5  liability, as well as to the materiality of the alleged non-disclosures or alleged misrepresentations.  *See*

6  *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1089, 1092-93 (9th Cir. 2010) (predominance

7  requirement met where state's consumer protection statute is based upon the objective reasonable

8  consumer standard); *Williams v. Gerber Products Co.*, 552 F.3d 934, 938-39 (9th Cir. 2008) (reasonable

9  consumer standard applies to California's consumer protection statutes).  In the Denial Order, the Court

10  found no predominance because the settlement included class members who did not pay a Safe Rides

11  Fee.  Denial Order at 16-17.  Now, all Class Members will have paid a Safe Rides Fee.

12      As this Court found, a class action is superior to other available methods for the fair and efficient

13  adjudication of this controversy because "the judicial economy achieved through common adjudication

14  undoubtedly makes a class action superior to any alternative procedures for resolving the claims of

15  almost 25 million putative class members."  (Denial Order at 18.)  This remains true in the Amended

16  Settlement, which encompasses a class in excess of 22 million members, satisfying Rule 23(b)(3)'s

17  superiority requirement.

18      **C.     Plaintiffs' Counsel Should Be Appointed As Class Counsel Under Rule 23(g)**

19      Rule 23(g)(1) states that "a court that certifies a class must appoint class counsel."  As discussed

20  above, Plaintiffs' counsel are well-qualified and merit appointment as class counsel.

21  **V.    THE AMENDED SETTLEMENT MEETS THE STANDARD FOR PRELIMINARY APPROVAL**

22

23      There is an "overriding public interest in settling and quieting litigation," *Van Bronkhorst v.*

24  *Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976), and the Ninth Circuit "has long deferred to the private

25  consensual decision of the parties" to settle.  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir.

26  2009), *vacated on other grounds* 688 F.3d 645.  Settlements of complex class actions prior to trial are

27  strongly favored.  *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1238 (9th Cir. 1998).

28      To grant preliminary approval, the Court need only find that the settlement falls within "the

range of reasonableness."  *In re: TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2012 WL

– 11 –

12369590, at *3 (N.D. Cal. Oct. 15, 2012).  A settlement falls within the range of reasonableness if:

"[1] the proposed settlement appears to be the product of serious, informed, non-collusive negotiations,

[2] has no obvious deficiencies, [3] does not improperly grant preferential treatment to class

representatives or segments of the class, and [4] falls within the range of possible approval."  *In re*

*Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (quoting Manual for Complex

Litigation § 30.44 (2d ed. 1985)).  Here, each of these four factors weighs in favor of preliminary

approval.

### A.    The Amended Settlement Is the Product of Serious, Informed, Non-Collusive Negotiations

In its Denial Order, the Court found that "the negotiations and agreement were non-collusive,"

(Dkt. 98 at 5), and this is also true for the Amended Settlement.  The parties' exhaustive negotiations

continued at arms' length with the assistance of an experienced mediator (Robert Kaplan of Judicate

West), as well as Chief Magistrate Judge Spero (who worked with the parties on the issue of allocation),

and the Amended Settlement was only reached after Plaintiffs analyzed extensive additional information

from Defendants, as demonstrated in the concurrently filed Ahdoot Declaration.  *See Chun–Hoon v.*

*McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010) ("[A]rms-length negotiations including

a day-long mediation . . .  indicate[s] that the settlement was reached in a procedurally sound manner").

The Amended Settlement also does not contain any of the "warning signs" of collusion delineated by the

Ninth Circuit.  *Compare In re Bluetooth*, 654 F.3d at 946-47; *with* Am. Stip. ¶ 45 (non-reversionary cash

payment), ¶ 88 (no agreement on attorneys' fees).

### B.    The Amended Settlement Presents No Deficiencies

The meaningful injunctive relief alone would justify preliminary approval of this Amended

Settlement.  *See In re Ferrero Litig.*, 583 F. App'x 665, 668 (9th Cir. 2014) (affirming settlement

approval where "injunctive relief . . . [was] meaningful and consistent with the relief requested in

plaintiffs' complaint"); *In re TracFone Unlimited Serv. Plan Litig.*, No. C-13-3440 EMC, 2015 WL

4051882, at *8 (N.D. Cal. July 2, 2015) (approving settlement where "the injunctive relief [would] have

significant value for both class members and the general public").  Several of Plaintiffs' claims seek

relief under the UCL and FAL, and "the primary form of relief available under the UCL to protect

consumers from unfair business practices is an injunction."  *In re Tobacco II Cases*, 46 Cal. 4th 298, 319

– 12 –

1    (2009).  In addition, as demonstrated in Section V.D.2 below, the Settlement Fund is significant

2    compared to the potential recovery at trial and the substantial risks Plaintiffs face in this action.

3         **C.    The Amended Settlement Does Not Grant Preferential Treatment to Class
              Representatives and Provides for a Fair Allocation of Recovery to All Class
4             Members**

5         In its Denial Order, the Court rejected a pure *per capita* allocation.  (Denial Order at 7.)  In the

6    Amended Settlement, each Class Member is expected to receive $0.25 for his or her first ride that

7    included a Safe Rides Fee, and then $0.05 for each subsequent ride that included a Safe Rides Fee.  The

8    parties agreed on this allocation method after numerous discussions between the parties and the

9    Mediator, as well as a settlement conference with Chief Magistrate Judge Spero.

10        There are multiple reasons for the higher recovery for the first Safe Rides Fee.  First, the 25-cent

11   baseline level of recovery is high enough to justify the administrative cost of distributing each

12   Settlement Share.  If, instead, equal payments were made for every ride, a large number of class

13   members would receive only $0.06, $0.12, or $0.18.  (Ahdoot Decl. ¶ 84.)

14        Second, Plaintiffs premise their claims in part on the allegation that Defendants did not properly

15   disclose the Safe Rides Fee.  (*E.g.*, CAC ¶ 55 ("Uber did not clearly and conspicuously disclose, if at all,

16   the Safe Rides Fee to consumers.").)  However, Uber provides a receipt after every ride that expressly

17   discloses the Safe Rides Fee, making this claim stronger for the first ride than for subsequent rides.  *E.g.*,

18   CAC ¶ 58 (alleging that the Safe Rides Fee is separately itemized on the customer's electronic receipt).

19        Third, Defendants will likely argue that people who repeatedly choose to ride Uber are motivated

20   by features such as ease of payment, speed of service, and quality and reliability of service.  (*See, e.g.*,

21   Ahdoot Ex. B  (Berkeley Study) at PM00065028.)  This argument is less persuasive with respect to the

22   first ride, when the rider has no prior personal experience with Uber upon which to rely.  In its Denial

23   Order, this Court noted that disclosure of the Safe Rides Fee on the first receipt, while arguably putting

24   customers on notice of the fee, does not correct any of the misstatements alleged in the complaint about

25   how Uber expends its Safe Rides Fee (*e.g.*, on "industry leading background checks").  (Denial Order at

26   8:7-21.)  While Plaintiffs agree with the Court, they cannot ignore Defendants' contentions and likely

27   evidence on this issue.  For example, as discussed in more detail in Section D.1.a, below, Uber has data

28   showing that only REDACTED REDACTED REDACTED REDACTED of riders (depending upon the statement at issue) could have seen the

1   challenged statements.  (Ahdoot Decl. Ex. C at PM00071003.)  This data supports providing more

2   compensation for the first ride than for subsequent rides, because Plaintiffs' nondisclosure theory does

3   not require a showing of exposure to the challenged advertising on a class-wide basis.

### D.   The Amended Settlement Falls Within the Range of Possible Approval

5           To determine whether a settlement "falls within the range of possible approval," "courts

6   primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer,"

7   taking into account the risks of continuing litigation.  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at

8   1080.  In doing so, courts balance a number of non-exclusive factors: "the strength of the plaintiffs'

9   case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class

10   action status throughout the trial; the amount offered in settlement; the extent of discovery completed

11   and the stage of the proceedings; the experience and views of counsel; the presence of a governmental

12   participant; and the reaction of class members to the proposed settlement."  *Smith v. Am. Greetings*

13   *Corp.*, No. 15-cv-2577-JST, 2015 WL 4498571, at *6 (N.D. Cal. July 23, 2015) (citation omitted).

### 1.   Plaintiffs Face Significant Risks In Continuing The Litigation

#### a.   <u>Merits Defenses</u>

16           Following the 2016 Settlement, Defendants continued to litigate the related case (Dkt. 36) of *L.A.*

17   *Taxi Cooperative, Inc. v. Uber Techs., Inc.*, No. 15-cv-01257-JST (N.D. Cal.) ("*LA Taxi*") through the

18   completion of fact discovery and the exchange of expert reports.  (Ahdoot Decl. ¶¶ 74-77, 82-84.)  Tens

19   of thousands of pages of documents were produced, over twenty depositions were taken (many for

20   multiple days), and the parties submitted reports and rebuttal reports from a total of seven expert

21   witnesses.  (*Id.*)  To the extent not precluded by the Protective Order in the case, discovery from *LA Taxi*

22   was provided to Plaintiffs, and such documents demonstrates the risks Plaintiffs will face on the merits.

23           **Evidence of Limited Viewership**.  The challenged statements at issue in this case are either:

24   (a) on Uber's website or blogs; (b) on receipts emailed to riders (where the words "Safe Rides Fee," but

25   no other challenged statement, appears); or (c) contained in news media.  In *LA Taxi*, many of the same

26   statements were litigated.  For instance, this Court granted Uber's motion to dismiss, on First

27   Amendment grounds, with respect to challenged statements contained in news media.  *LA Taxi* Dkt. 44

28   at 13:14-15 ("Because the challenged statements made to the media are not commercial speech, the

1  motion to dismiss is granted as to those statements").

2  REDACTED REDACTED  REDACTED REDACTED  REDACTED REDACTED  REDACTED REDACTED

3  REDACTED REDACTED  REDACTED REDACTED  REDACTED REDACTED  REDACTED REDACTED

4  REDACTED REDACTED  REDACTED REDACTED  REDACTED REDACTED                    . (Ahdoot Decl. Ex.

5  C at PM00071003.)  Defendants will argue that false advertising claims require that plaintiffs actually be

6  exposed to the challenged advertising. *See Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1363

7  (2010); *Figy v. Amy's Kitchen*, No. 13-cv-3816-SI, 2013 WL 6169503, at *4 (N.D. Cal. Nov. 25, 2013).

8  Similarly, Defendants will argue that class members who did not see the alleged description of how the

9  Safe Rides Fee revenues would be expended (*i.e.*, did not see the alleged offer) could not have an

10  implied contract that guaranteed those expenditures. *See In re First Capital Life Ins, Co.*, 34 Cal. App.

11  4th 1283, 1288 (1995) ("A meeting of the minds is essential to the formation of a valid contract.");

12  *Gomez v. Lincare, Inc.*, 173 Cal. App. 4th 508, 525 (2009) (elements of a claim for breach of an express

13  or implied contract are the same).

14       **Evidence of Lack of Materiality**. Defendants also produced an expert survey from the *LA Taxi*

15  case, which utilized test and control groups. (Ahdoot Decl. Ex. D.) REDACTED REDACTED

16  REDACTED REDACTED  REDACTED REDACTED  REDACTED REDACTED  REDACTED REDACTED

17  REDACTED REDACTED  REDACTED REDACTED  REDACTED REDACTED  REDACTED REDACTED

18  REDACTED REDACTED    (*Id.* at PMM00070631-3, 648-49.) REDACTED REDACTED

19  REDACTED REDACTED  REDACTED REDACTED  REDACTED REDACTED  REDACTED REDACTED

20  REDACTED REDACTED         (*Id.* at PMM00070651.)  Although Plaintiffs do not concede that

21  Defendants' surveys were properly constructed or dispositive, they do present risk on the issue of

22  materiality, which is Plaintiffs' burden to prove.

23       **Evidence of Lack of Falsity**.  Plaintiffs also bear the burden of proving falsity. *Kwan v.*

24  *SanMedica Int'l*, No. 15-15496, 2017 WL 1416483, at *7 (9th Cir., April 21, 2017). The CAC alleges

25  that many of Defendants' statements are false because Defendants' practices are allegedly inferior to

26  those of taxi companies. Although Plaintiffs believe that they would prevail, proving such contentions

27  is not without risk. For example, in *LA Taxi*, Defendants adduced evidence that many taxi companies

28  only perform background checks in the state in which they operate, as compared to Uber's nationwide

background checks.  (Ahdoot Decl. Ex. E (Boyle Dep.) at 40:21-41:28, PMM00078858-59.)

Defendants also adduced evidence that taxi companies at times have more lax screening criteria than

Defendants.  While Uber contends that it will not onboard a driver who has had even one DUI in the

past seven years, in San Francisco a person can drive a taxi even if he had a DUI.  *See* San Francisco

Municipal Transportation Agency, *How to Become a Taxi Driver*, at 1(6), *available at*

<http://www.sfmta.com/services/taxi-industry/become-taxi-driver> (last visited May 31, 2017)

(excluding drivers with "two or more recent convictions of driving under the influence within the

previous five years").

Defendants also produced evidence that some taxi companies permit vehicle inspections to be

performed by non-mechanics (Ahdoot Decl. Ex. E at PMM0007891-92), and utilize unsafe vehicles.

For instance, a San Diego State University study found that 94.05% of taxis that were stopped for traffic

violations were taken out of service because of safety violations.  *See* San Diego State University,

*Driven to Despair: A Survey of San Diego Taxi Drivers* 6 (May 2013), *available at* <http://www.taxi-

library.org/san-diego-taxi-report-may-2013.pdf> (last visited June 1, 2017).  In addition to attacking the

safety of taxis, Defendants likely will argue that their "industry" also includes black cars and limousines,

which apparently have no background check requirements at all.  (Ahdoot Decl. Ex. F.)

Finally, Defendants will cite to academic and industry sources who have concluded that there is

no data showing that fingerprint-based background checks are superior to name/SSN-based checks (such

as the ones Uber uses).  (Ahdoot Decl. Ex. G at 101-02.)  For instance, in 2016, the Transportation

Research Board (of the National Academies of Sciences, Engineering, and Medicine) published a study

concluding that: "Although both the established taxi industry and the new TNCs provide detail about

their background check methodologies, the committee was unable to find any careful empirical studies

on the effectiveness of any of these methodologies with respect to passenger safety.  Current practice,

which strikes many as reasonable and prudent, is not evidence of best possible practice."[6]  (*Id*. at 104.)

Similarly, after analysis of extensive written submissions and three days of evidentiary hearings, the

Maryland Public Service Commission authorized Uber to perform its own background check instead of

Maryland's fingerprint-based checks which the Commission can only approve when the Commission

---

[6]    "TNC" refers to transportation network companies, such as Uber's Rasier-CA, LLC, and Lyft.

1  concludes (as it did) that the alternative is "at least as comprehensive and accurate" as the background

2  check that is normally required.  (Ahdoot Decl. Ex. H (Maryland Decision) at PMM0080341.)

3  Although Plaintiffs do not concede any of this, it poses a significant risk given that it is Plaintiffs'

4  burden to prove the falsity.

5  **b.  <u>Arbitration</u>**

6  Another significant risk that Plaintiffs and the Class face is Defendants' arbitration agreements

7  and class action waivers.  (*See* Dkt. 25; *Mena* Dkt. 31 (motion to compel arbitration briefing).)  A

8  finding that all or some of Defendants' arbitration agreements and class action waivers "are valid and

9  enforceable would substantially change the scope and course of Plaintiffs' case, as it would likely

10  require the vast majority of the class to go to arbitration."  *O'Connor v. Uber Techs., Inc.*, 201 F. Supp.

11  3d 1110, 1123 (N.D. Cal. 2016).  Thus, "Plaintiffs face a considerable risk that they will not proceed as

12  a class action in any court, or at least be limited to a class action greatly reduced in size." *Id.*   Indeed, in

13  light of the amounts at issue here it is doubtful that even a single member of the Class would pursue his

14  or her individual claims in arbitration.  *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th

15  Cir. 2004) ("The realistic alternative to a class action is not 17 million individual suits, but zero

16  individual suits, as only a lunatic or a fanatic sues for $30.").  Recent conflicting decisions regarding the

17  enforceability of the arbitration agreement at issue in this case highlight this risk.

18  *Assent.*  Three courts have ruled in Uber's favor on the issue of assent.  In *Cordas v. Uber*

19  *Techs., Inc.*, No. 16-CV-04065-RS, 2017 WL 658847 (N.D. Cal. Jan. 5, 2017), Judge Seeborg held that

20  Uber's registration process adequately notified riders that, by completing their registration, they were

21  agreeing to abide by Uber's terms and conditions.  *Id.* at *4.  Courts in the Western District of Texas and

22  the District of Massachusetts have reached the same conclusion.  *Curbia v. Uber Techs, Inc.,* No. A-16-

23  CA-544-SS, 2017 WL 1034731, at *5 (W.D. Tex. Mar. 16, 2017); *Cullinane v. Uber Techs., Inc.*, No.

24  CV 14-14750-DPW, 2016 WL 3751652, at *7 (D. Mass. July 11, 2016).  In contrast, Judge Rakoff in

25  the Southern District of New York held that completion of Uber's registration process did not constitute

26  assent.  *Meyer v. Kalanick*, 200 F. Supp. 3d 408, 420 (S.D.N.Y. 2016).  In addition, Judge Seeborg

27  denied Uber's arbitration motion in *Metter v. Uber Techs., Inc.*, No. 16-CV-06652-RS, 2017 WL

28  1374579 (N.D. Cal. Apr. 17, 2017).  In *Metter*, Judge Seeborg reaffirmed his reasoning in *Cordas* but

1   concluded that there was a factual dispute as to notice because, there, plaintiff was able to show that

2   Uber's notice was "obscured immediately" by an electronic keyboard. *Id.* at *3. *Cullinane, Meyer,* and

3   *Metter* have been appealed to the First, Second, and Ninth Circuits, respectively.

4       ***Unconscionability.*** Plaintiffs have argued that Uber's arbitration agreement is unconscionable.

5   (*McKnight* Dkt. 37 at 8-20; *Mena* Dkt. 37 at 22-25.) Three courts have held that the arbitrator must

6   decide this issue based on the agreement's incorporation of the AAA rules (which provide for

7   arbitrability to be decided by the arbitrator). *See Cordas*, 2017 WL 658847, at *5; *Cubria*, 2017 WL

8   1034731, at *6; *Cullinane*, 2016 WL 3751652, at *10. In *Meadows v. Dickey's Barbecue Restaurants*

9   *Inc.*, 144 F. Supp. 3d 1069 (N.D. Cal. 2015), this Court refused to treat incorporation of the AAA rules

10  as delegation to the arbitrator in the context of an unsophisticated party. *Id.* at 1078. However, both

11  *Cordas* and *Curbia* held that the sophistication of the party is irrelevant to the delegation issue. *Cordas*,

12  2017 WL 658847, at *5; *Cubria*, 2017 WL 1034731, at *6. As this Court recognized in *Meadows,* the

13  Ninth Circuit has not yet decided this issue. 144 F. Supp. 3d at 1078. Additionally, even if this Court

14  decides conscionability, the Court may not decide it in Plaintiffs' favor. *See, e.g., id.* at 1078, 1087

15  (finding no delegation to the arbitrator; then finding no unconscionability and compelling arbitration).

16      The above arbitration decisions highlight the serious risk that Plaintiffs face with respect to the

17  issue of arbitration, including on appeal—which is certain to occur if Defendants' motion is denied. *See*

18  *O'Connor*, 201 F. Supp. 3d at 1132 ("substantial risk on the arbitration question… would have the effect

19  of substantially altering – if not effectively terminating – the class action in this Court" and therefore

20  justifies approval of "a settlement providing for monetary relief reflecting a 90% discount off the verdict

21  value"); *In re Toys R Us-Delaware, Inc.*, 295 F.R.D. 438, 452 (C.D. Cal. 2014) (approving settlement

22  where "the parties would have faced the expense and uncertainty of litigating an appeal").

23                    **c.  Class Certification**

24      Plaintiffs also face risks with respect to obtaining and maintaining class certification.  For

25  instance, even if Plaintiffs prevail in convincing the Court and the Ninth Circuit that at least some of the

26  named Plaintiffs did not agree to arbitrate their dispute with Uber – either because they encountered the

27  same keyboard obscuring problem alleged in *Metter* or because of other circumstances – Defendants

28  will argue that these are individualized issues that preclude class certification or diminish the size of the

1    class.  *See, e.g., Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 728 (9th Cir. 2007)

2    (predominance defeated where defendant's arbitration defense "would necessitate a state-by-state review

3    of contract conscionability jurisprudence"); *Avilez v. Pinkerton Gov't Servs., Inc.,* 596 F. App'x 579 (9th

4    Cir. 2015) (putative class representative could not satisfy the "adequacy" or "typicality" requirements

5    where the class "include[d] individuals who signed class action waivers").[7]

6           Similarly, as discussed in Section V.D.1.A, above, Defendants are likely to proffer Google

7    Analytics data purporting to show that a very small percentage of riders could have seen the web pages

8    and blogs containing the challenged statements.  In *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595-

9    96 (9th Cir. 2012), the Ninth Circuit held that, where advertising is limited in scope, there is no basis for

10   a presumption of reliance and that this precludes a finding of predominance under Rule 23(b)(3).

11   Similarly, in *In re Clorox Consumer Litig.*, 301 F.R.D. 436, 444-45 (N.D. Cal. 2014), this District held

12   that sixteen months of television commercials, as well as the presence of the challenged statements on

13   the back of some of the packaging at issue in the case, still was not extensive enough to merit a

14   presumption of exposure, thereby denying class certification.  Indeed, Uber already has prevailed on this

15   argument in this District.  Considering misrepresentations appearing "primarily on [Uber's] website,

16   blog, and e-mail messages, rather than on the Uber app itself," Judge Chen held that:

17           [A]lthough there may have been a consistent misrepresentation, there is insufficient
18           evidence that all customers during the class period were likely exposed to the
             misrepresentation. . . . Uber's advertisements on its website and blog posts here are
19           comparable to that in *Mazza* [and] *In re Clorox Litigation* . . . In each of these cases, as
             well as the instant case, there is no evidence that it was "highly likely" all members of the
20           proposed class saw the allegedly misleading statements made in the advertisements. . . .
             The burden was on Plaintiff to prove sufficient exposure.  To the extent Plaintiff seeks to
21           include in the class all consumers who may have been exposed to the website and blog
             posts, Plaintiff failed to carry that burden.

22   *Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 900 (N.D. Cal. 2015).  These risks weigh in favor of

23   settlement now.  *Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (settlement

24   approval analysis includes the risk of maintaining class action status throughout the trial); *Smith v. Am.*

25

26   _____
     [7]   Even if Plaintiffs defeat Uber's arbitration motion, Uber could then unilaterally disseminate a new
27   arbitration agreement that would retroactively affect all current Uber customers, and which may address
     the deficiencies upon which the Court relied in denying the motion.  This is precisely what Uber did in
28   *In Re Uber FCRA Litig.*, No. C-14-5200 EMC (N.D. Cal.), Nos. 15-17533, 16-15035 (9th Cir.),
     resulting in a quagmire of subsequent litigation concerning Uber's arbitration provisions in agreements
     with drivers at the district court level and in the Ninth Circuit.

*Greetings*, No. 14-cv-02577-JST, 2015 WL 4498571, at *7 (N.D. Cal. July 23, 2015) (same).

### 2.   $32.5 Million Is Fair, Reasonable and Adequate When Compared to the Potential Recovery at Trial

#### a.   The Settlement Value Is Fair in Comparison to the Maximum Potential Recovery, Not Accounting for any Safety-Related Costs

Defendants' revenues from the Safe Rides Fee during the Class Period were $470,706,387. (Ahdoot Decl. ¶ 46.)  As this Court previously recognized, however, "Plaintiffs are correct to assume that at trial they would be unlikely to recover the full amount of revenue Uber obtained from its Safe Rides Fee." (Denial Order at 14:2-3.)  Accordingly, and as explained in more detail in the following subsection, $470,706,387 is likely beyond the outer limit of the maximum potential recovery Plaintiffs could achieve at trial, or sustain on appeal following trial, given Defendants' safety-related costs.

Nonetheless, even if $470,706,387 were used as the benchmark for reasonableness, the $32.5 million fund yields a recovery percentage of 6.9%, which is within the range of possible approval.  "'[I]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair.' . . . Indeed, courts have held that a recovery of only 3% of the maximum potential recovery is fair and reasonable when the plaintiffs face a real possibility of recovering nothing absent the settlement." *Custom LED, LLC v. eBay, Inc.*, No. 12-cv-00350-JST, 2014 WL 2916871, at *4 (N.D. Cal. June 24, 2014) (quoting *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008)); *see also, e.g.*, *In re Google Referrer Header Privacy Litig.*, 87 F. Supp. 3d 1122, 1132 (N.D. Cal. 2015) (holding $8.5 million settlement was fair although "theoretical value" of the case was "in the trillion of dollars," because of "the substantial legal obstacles to recovery through litigation").

#### b.   The Settlement Value Is Fair in Comparison to the Maximum Potential Recovery at Trial, Accounting for Safety-Related Costs

The true potential recovery at trial is likely less than $470.7 million, which means that the Settlement Fund represents a much higher percentage of the likely recovery.  Defendants have identified a number of costs that they vigorously contend must be deducted from Safe Rides Fee revenues.  In the following table, Plaintiffs present a range of possible outcomes at trial, accounting for Defendants' various proffered offsets:

| Cost Description | Cost Amount | Recovery Percentage Accounting for Cost[8] | Citation |
|---|---|---|---|
| Background Checks, Vehicle Inspections, and Anonymous Texting | REDACTED REDACTED | REDACTED RED REDACTED RED | Ahdoot Decl. ¶¶ 49, 51, 57 |
| Safety-Related Employees, Documentation, and Support | REDACTED REDACTED REDACTED REDACTED | REDACTED RED REDACTED RED | Ahdoot Decl. ¶¶ 56, 58 |
| Trip Insurance (Period 3 Discounted) | $REDACTED REDACTED REDACTED REDACTED | REDACTED RED REDACTED RED | Ahdoot Decl. ¶ 55 |
| Total | REDACTED REDACTED | REDACTED REDAC REDACTED REDACT | Ahdoot Decl. ¶¶ 49, 51, 55-58 |

Plaintiffs believe that a reasonable estimate of their actual maximum potential recovery at trial, putting aside the risks presented by continued litigation, should include Defendants' safety-related expenditures on background checks (Ahdoot Decl. ¶ 49), vehicle inspections (Ahdoot Decl. ¶ 51), and anonymous texting (Ahdoot Decl. ¶ 57), all of which arguably provide primary and direct benefit to riders.[9]  If only these costs ($REDACTED REDACTED in total) are deducted from total Safe Rides Fee revenues, then the $32.5 million Settlement Fund would represent approximately REDACTED R of the total maximum potential recovery (again excluding the risks of continued litigation).  If one also includes the costs of the safety-related employees (Ahdoot Decl. ¶ 56) and of safety-related documentation and support (Ahdoot Decl. ¶ 58), the percentage figure rises to REDACTED RED total.

Given the Court's conclusion in its Denial Order that insurance costs were inappropriately deducted from revenues, the preceding analysis excludes any insurance related costs.[10]  However,

---

[8]    "Recovery Percentage" figures in this table are calculated based on the $32.5 million Settlement Fund, divided by total Safe Rides Fee revenue ($470,706,387), minus the amount of the particular cost(s) identified.

[9]    Although Plaintiffs' allegations attack the sufficiency of Defendants' background check procedures, some background check is undoubtedly preferable to no background check, and Plaintiffs believe that it is appropriate to include background check costs in the analysis.

[10]    The Court previously noted that it was not clear to what extent insurance expenditures benefit rider safety.  (Denial Order at 12-13.)  Although Plaintiffs would argue at trial that insurance does not ensure rider safety, Defendants would have counter-arguments and evidence that a jury might find persuasive.  For instance, the California Public Utilities Commission—which regulates TNCs—identifies insurance coverage as a "safety requirement."  (Ahdoot Decl. Ex. I (CPUC Decision Sept.

– 21 –

1    Defendants continue to vigorously contend that insurance costs should be included in any offset.  At a

2    minimum, the risk that the jury would accept Defendants' arguments in this regard cannot be entirely

3    ignored.  Thus, Plaintiffs present more specific insurance cost information than that presented in

4    connection with the prior motion for preliminary approval, which allows the Court to conduct a more

5    detailed analysis of insurance costs, if it is inclined to do so.

6         In light of the Court's reasoning in the Denial Order (Denial Order at 12:25-13:8), Plaintiffs

7    obtained from Defendants information concerning insurance expenditures on *trip insurance* policies.

8    Defendants' commercial general liability and corporate insurance program expenditures are not included

9    in these figures.  (Ahdoot Decl. ¶ 52.)  In order to further identify insurance costs that benefit *riders*, as

10   opposed to other constituencies such as drivers, Uber, and pedestrians, Uber's trip insurance costs are

11   broken into three periods: "Period 1" (the App is turned on but a ride has not yet been requested);

12   "Period 2" (after a ride is requested but before the rider is picked up); and "Period 3" (during the ride).

13   (*Id.* ¶ 53.)  If the Court is inclined to consider Defendants' position regarding insurance, of these

14   periods, "Period 3" is likely the one that could most appropriately be deducted from Safe Rides Fee

15   revenues, given that insurance during the ride does clearly benefit riders.

16        Because Uber asserts it does not track how much of the "Period 3" costs are attributable to

17   protection of riders versus other constituencies, the "Period 3 Discounted" line item, above, discounts

18   Period 3 insurance expenditures on bodily injury liability and uninsured/underinsured ("UM") coverage

19   by two-thirds, in order to account, roughly, for the potential benefit to groups other than riders, such as

20   drivers and third parties (*e.g.*, pedestrians and people in other cars).  Thus, if only these Period 3

21   Discounted insurance costs are included in the analysis, along with the costs of background checks,

22   vehicle inspections, and anonymous texting, then the $32.5 million Settlement Fund would represent

23   approximately [REDACTED] of the total maximum potential recovery (again excluding other risk factors

24   briefed above).  Or if, as shown in the table above, Period 3 Discounted insurance costs are included

25   along with all other non-insurance safety-related costs, including the costs of Safety-Related Employees

26

27   2013) at 26.)  Similarly, the California Department of Insurance states that the insurance maintained by
     TNCs is "essential to making sure *passengers*, other drivers and pedestrians are protected when ride-
28   sharing vehicles are on the road."  Cal. Dept. of Ins., *New Insurance Rules For Ride-Share Companies
     and Drivers Take Effect Today* (July 1, 2015), *available at* <http://www.insurance.ca.gov/0400-
     news/0100-press-releases/2015/release067-15.cfm> (last visited May 30, 2017) (emphasis added).

1    and of safety-related documentation and support, the recovery percentage rises to REDACTED REDACTED REDACTED.

2        Regardless of which, if any, of the costs described above are included in the analysis, the

3    Amended Settlement falls within the range of reasonableness and merits preliminary approval. *See*

4    *Custom LED*, 2014 WL 2916871, at \*4 ("[C]ourts have held that a recovery of only 3% of the maximum

5    potential recovery is fair and reasonable when the plaintiffs face a real possibility of recovering nothing

6    absent the settlement."); *In re OmniVision Techs.*, 559 F. Supp. 2d at 1042 (6% of potential damages); *In*

7    *re LDK Solar Secs. Litig.*, No. 07-5182 WHA, 2010 U.S. Dist. LEXIS 87168, at \*7 (N.D. Cal. July 29,

8    2010) (5% of potential damages); *In re Veritas Software Corp. Sec. Litig.,* 2005 U.S. Dist. LEXIS

9    30880, at \*5 (N.D. Cal. Nov. 15, 2005) (from 1991 to 2003, the median percentage of losses paid in

10   settlement ranged from 2.7% to 7.2%), *vacated in part on other grounds*, 496 F.3d 962 (9th Cir. 2007).

11       Finally, the various recovery analyses set forth above do not account for litigation risks related to

12   arbitration, class certification, or Defendants' merits defenses.  When any one of those defenses is

13   considered, the potential recovery is dramatically reduced.  For instance:

14   • If Defendants prevail on arbitration or class certification, the class could receive nothing.

15   • If the jury concludes that Plaintiffs can only recover on their nondisclosure of the Safe
16     Rides Fee theory for the first ride (given the receipt disclosure), then the total first Safe
       Rides Fees recoverable under this theory would be $25 million.
17

18   • Defendants' statements on the Safety Webpage and describing the Safe Rides Fee
       changed over time, and it is unclear which statements a jury might find sufficient to
19     support Plaintiffs' false advertising claims.  For instance, the phrase "industry leading"
       (emphasized in the CAC) was removed from the Safety Webpage and Safe Rides Fee
20     description by October 2014.  CAC, ¶ 43.  After that, instead of describing their
       background checks as "industry leading," Defendants described them as "federal, county,
21     and multi-state."

22   • Defendants will argue that page view data for the webpages containing challenged
23     statements demonstrate that the representations were seen by a small percentage of the
       Class.  If they succeed, Plaintiffs would recover at most a fraction of $450 million.
24

25       These examples are not meant to be exhaustive, but they underscore the point that any potential

26   recovery analysis must be considered in relation to the significant risks Plaintiffs face going forward.

27   *See, e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (settlement amount

28   reasonable "in light of the uncertainties of trial and difficulties" plaintiffs faced in proving their case).

1    As the Ninth Circuit has held, the probability of success analysis is not subject to any "particular

2    formula by which [the] outcome must be tested," *Rodriguez,* 563 F.3d 965, nor is the Court to "reach

3    any ultimate conclusion of the contested issues of fact and law which underlie the merits of the dispute,

4    for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation

5    that induce consensual settlements." *Officers for Justice v. Civil Service Com'n of City and Cty. of San*

6    *Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). Rather, the Court's assessment of the likelihood of

7    success is "nothing more than an amalgam of delicate balancing, gross approximations, and rough

8    justice. *Id.* (citations omitted). In light of the serious risks Plaintiffs face and the potential recovery

9    analysis set forth above, preliminary approval should be granted.

10        **3.    Experienced Class Counsel Performed Sufficient Research and Analysis**
            **and Recommend Approval**

11

12        "In the context of class action settlements, as long as the parties have sufficient information to

13    make an informed decision about settlement, 'formal discovery is not a necessary ticket to the

14    bargaining table.'" *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 257 (N.D. Cal. 2015) (citation

15    omitted). "Rather, the court's focus is on whether 'the parties carefully investigated the claims before

16    reaching a resolution.'" *Id.* (citation omitted). Here, Plaintiffs requested, received, and reviewed

17    extensive documents and information from Defendants. *See* Section II.E, *supra*. Plaintiffs fully

18    understand the merits of this case, and this factor weighs in favor of settlement.

19        Moreover, "[w]here a settlement is the product of arms-length negotiations conducted by capable

20    and experienced counsel, the court begins its analysis with a presumption that the settlement is fair and

21    reasonable." *Garner v. State Farm Mut. Auto. Ins. Co.*, No. 08-cv-1365-CW-EMC, 2010 WL 1687832,

22    at *13 (N.D. Cal. Apr. 22, 2010); *see also Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D.

23    523, 528 (C.D. Cal. 2004) ("'Great weight' is accorded to the recommendation of counsel, who are most

24    closely acquainted with the facts of the underlying litigation.") (citation omitted). Plaintiffs' counsel

25    have broad experience litigating and trying consumer and class action cases. In their view, the Amended

26    Settlement provides substantial benefits to the Class, especially when one considers the attendant

27    expense, risks, delays, and uncertainties of litigation, trial, and appeals. (Ahdoot Decl. ¶ 69; Arias Decl.

28    ¶ 23; Coulson Decl. ¶¶ 16-17.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VI.  THE PROPOSED FORM AND METHOD OF NOTICE IS THE BEST NOTICE PRACTICABLE AND SHOULD BE APPROVED

Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Trust,* 339 U.S. 306, 314 (1950).  Notice must clearly and concisely state the following, in plain, easily understood language: (i) the nature of the action; (ii) the class definition; (iii) the class claims; (iv) that a class member may enter an appearance through an attorney; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members.  Fed. R. Civ. P. 23(c)(2)(B).

Here, the proposed notice program will include direct notice to virtually all Class Members, and at a minimum is designed to reach 80% of the Class, which is reasonable under the circumstances.  (Stip. Ex. I ¶¶ 27-28.)  Moreover, the Summary Notice and Long Form Notice are written in clear and concise language and contain the information required by Rule 23(c)(2)(B).  (*Id.* ¶ 39.)  Accordingly, the forms of notice and plan of dissemination should be approved.

## VII.  THE COURT SHOULD SET A SCHEDULE FOR FINAL APPROVAL

In connection with the preliminary approval of the Amended Settlement, the Court must set a final approval hearing date; dates for dissemination of notice to the Class; and deadlines for objecting to the Settlement, opting out of the Class, and filing papers in support of the Settlement.  Plaintiffs propose the schedule included in the Notice of Motion, above, and set forth in the concurrently filed [Proposed] Preliminary Approval Order.  (Am. Stip. Ex. D.)

## VIII.  CONCLUSION

The Amended Settlement is fair, presents no deficiencies, and falls within the range of possible approval.  Plaintiffs therefore request that the Court grant preliminary approval and enter an order substantially in the form of the accompanying [Proposed] Preliminary Approval Order.

///

///

Dated: June 1, 2017                    Respectfully Submitted,

**AHDOOT & WOLFSON, PC**

*/s/ Robert Ahdoot*
Tina Wolfson
Robert Ahdoot
Theodore W. Maya
1016 Palm Avenue
West Hollywood, California 90069
Tel: (310) 474-9111; Fax: (310) 474-8585

*Attorneys for Plaintiffs and the Proposed Class*


**ARIAS, SANGUINETTI, STAHLE & TORRIJOS, LLP**

*/s/ Alfredo Torrijos*
Mike Arias
Alfredo Torrijos
6701 Center Drive West, Suite 1400
Los Angeles, California 90045-7504
Tel: (310) 844-9696; (Fax) 310-861-0168

*Attorneys for Plaintiffs and the Proposed Class*


**LIDDLE & DUBIN, PC**

*/s/ Nicholas Coulson*
Nicholas Coulson (admitted *pro hac vice*)
975 E. Jefferson Avenue
Detroit, Michigan 48207
Tel: 313-392-0015; Fax: 313-392-0025

*Attorneys for Plaintiffs and the Proposed Class*


## ATTORNEY ATTESTATION

Pursuant to Civil Local Rule 5-1(i), I, Robert Ahdoot, hereby attest that concurrence in the filing of this document has been obtained from the other signatories on this document.

Dated:  June 1, 2017                    By:     */s/ Robert Ahdoot*
                                                Robert Ahdoot