Robert Ahdoot, SBN 172098
rahdoot@ahdootwolfson.com
Tina Wolfson, SBN 174806
twolfson@ahdootwolfson.com
Theodore Maya, SBN 223242
tmaya@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
1016 Palm Avenue
West Hollywood, California 90069
Tel: 310-474-9111; Fax: 310-474-8585

*Attorneys for Plaintiffs*,
Julian Mena, Todd Schreiber, Nate Coolidge,
and Ernesto Mejia

Mike Arias, SBN 115385
mike@asstlawyers.com
Alfredo Torrijos, SBN 222458
alfredo@asstlawyers.com
**ARIAS, SANGUINETTI, STAHLE &
TORRIJOS, LLP**
6701 Center Drive West, Suite 1400
Los Angeles, California 90045-7504
Tel: 310-844-9696; Fax: 310-861-0168

*Attorneys for Plaintiffs*,
Byron McKnight

*(Additional counsel on signature page)*

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BYRON MCKNIGHT, JULIAN MENA, TODD SCHREIBER, NATE COOLIDGE, and ERNESTO MEJIA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>UBER TECHNOLOGIES, INC., a Delaware Corporation, and RASIER, LLC, a Delaware Limited Liability Company,<br><br>Defendants. | Case No. 3:14-cv-05615-JST<br><br>The Honorable Jon S. Tigar<br><br>**DECLARATION OF ROBERT AHDOOT IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date: July 6, 2017<br>Time: 2:00 p.m.<br>Place: Courtroom 9 – 19th Floor |

**DECL. OF ROBERT AHDOOT ISO MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT (CASE NO. 3:14-CV-05615-JST)**

I, Robert Ahdoot, declare as follows:

1. I am an attorney licensed to practice in all courts in the State of California, and a founding member of the law firm of Ahdoot & Wolfson, PC ("AW"). I submit this declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement in this action. The matters stated herein are true of my own knowledge or, where indicated, I am informed and believe that they are true. If called upon as a witness, I could and would competently testify as follows.

2. A true and correct copy of my CV is attached hereto as **Exhibit A**, which demonstrates that AW and I are well qualified to serve as Class Counsel in this action.

## BACKGROUND AND WORK PERFORMED BY AW

3. On or about January 6, 2015, AW filed a putative class action lawsuit on behalf of Andrea Pappey and others similarly situated, against Uber Technologies, Inc., in the United States District Court for the Northern District of California, Case No. 3:15-cv-00064 ("*Mena*"). On or about April 13, 2015, (i) the Complaint filed in *Mena* was amended to, among other things, add Plaintiffs Julian Mena, Todd Schreiber, Nate Coolidge, and Ernesto Mejia as representative Plaintiffs, and (ii) Andrea Pappey withdrew from the *Mena* lawsuit as a plaintiff. The *Mena* lawsuit asserted causes of action for Breach of Implied Contract (pursuant to California, Illinois, and Massachusetts law), alleged violations of California's Consumers Legal Remedies Act (Cal. Civ. Code § 1750 *et seq.*), California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*), California's False Advertising Law (Cal. Bus. & Prof. Code § 17500 *et seq.*), and Illinois Consumer Fraud Act (815 ILCS 502/2, *et seq.*) and which alleged, *inter alia*, that Defendants made misrepresentations and omissions regarding their "Safe Rides Fee," their safety measures, and the nature and character of their background checks, on behalf of a putative nationwide class, or in the alternative, a California, Illinois, and Massachusetts class of consumers. (*Mena* Dkt. No. 28).

4. On or about February 16, 2015, the parties filed a joint stipulation to relate *Mena* and Northern District of California Case No. 4:14-cv-05615 ("*Philliben*").[1] The Court granted this

---

[1] The Parties stipulated to the dismissal of named plaintiff Matthew Philliben on or around May 18, 2017. (Philliben Dkt. No. 122). However, for consistency and ease of reference, the Parties continue to refer to the case as *Philliben*.

– 1 –

**DECL. OF ROBERT AHDOOT ISO MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT (CASE NO. 3:14-CV-05615-JST)**

stipulation on or about February 18, 2015 (*Philliben*, Dkt. No. 23; *Mena*, Dkt. No. 19), and ordered that *Mena* and *Philliben* are related.

5. Plaintiffs' Counsel in *Mena* and *Philliben* cooperated in organizing a leadership structure to effectively and efficiently prosecute the claims on behalf of Plaintiffs and the proposed Class.

6. Before initiating these actions, AW investigated the underlying facts and analyzed the veracity of the claims. AW researched Defendants' representations, marketing, business practices and promotional efforts, interviewed users of Uber's Rideshare Service and a number of Uber drivers, and investigated facts and applicable law and standards relating to background checks and commercial transportation service safety. Furthermore, AW researched and analyzed the merits of the potential causes of action pursuant to state statutory and common law.

7. AW continued these efforts after filing *Mena* and before entering into the settlement, and conducted a thorough examination, investigation, and evaluation of the relevant law and facts to assess the merits of the claims and defenses.

8. In addition, AW analyzed the pleadings and motion practice in all of the related cases before this court, as well as additional cases involving Uber's safety messaging.

9. On or about May 4, 2015, Defendants filed an Administrative Motion To Determine Whether Cases Should Be Related seeking to relate *Mena* and *Philliben* to a lawsuit entitled *L.A. Taxi Cooperative, Inc. et al. v. Uber Technologies, Inc. et al.*, Case No. 3:15-cv-01257, filed on or about March 18, 2015 in the United States District Court for the Northern District of California ("*L.A. Taxi*") (*Philliben*, Dkt. Nos. 34 to 35). The Court granted this Motion on or about May 12, 2015 (*Philliben*, Dkt. No. 36).

10. On or about May 4, 2015, in the response to the first amended complaint filed in *Mena*, Defendant, Uber Technologies, Inc. filed a Motion to Stay Proceedings Pending Arbitration (*Mena*, Dkt. Nos. 31 to 36). The *Mena* plaintiffs filed their response in opposition to this Motion on or about May 13, 2015 (*Mena*, Dkt. Nos. 37 to 38) and Defendants filed their Reply on or about May 26, 2015 (*Mena*, Dkt. Nos. 39 to 41).

11. On or about June 1, 2015, the *Mena* plaintiffs filed an Objection to and Motion To Strike Reply Evidence Re Defendant's Motion To Stay Proceedings Pending Arbitration, or in the Alternative,

Request for a Surreply (*Mena*, Dkt. No. 42). On or about June 2, 2014, the Court granted the *Mena* plaintiffs leave to file a Surreply and continued the hearing on Defendant's Motion to Stay from June 11, 2015 to July 2, 2015. (*Mena*, Dkt. No. 43).

12. On or about June 9, 2015, the *Mena* plaintiffs filed a Surreply In Opposition To Defendant's Motion To Stay Proceedings Pending Arbitration. (*Mena*, Dkt. No. 45.) On or about June 10, 2015, the *Mena* plaintiffs also filed a Statement of Recent Decision In Support of Plaintiffs' Opposition To Defendant's Motion To Stay Proceedings Pending Arbitration. (*Mena*, Dkt. 46.)

13. On or about June 29, 2015, the Parties filed a Stipulation and Proposed Order For A Temporary Stay Pending Mediation (*Mena*, Dkt. 48; *Philliben*, Dkt. 48); and on or about July 29, 2015, the Parties filed a Stipulation With Proposed Order For A Second Temporary Stay Pending Mediation. (*Mena*, Dkt. 52; *Philliben*, Dkt. 51.)

14. On July 29, 2015, the Parties filed a Stipulation and Protective Order (*Mena* Dkt. 49; *Philliben* Dkt. 50), which was entered by the Court on August 3, 2015 (*Mena* Dkt. 51; *Philliben* Dkt. 52).

15. The parties began settlement discussions almost two years ago. After the arbitration motions were fully briefed, the parties began discussing possible settlement, which resulted in a long series of arms'-length negotiations, including six separate days of mediation, a settlement conference before the Chief Magistrate Judge Joseph C. Spero, and numerous face-to-face and telephonic meetings between counsel and with the mediators.

16. On or about August 24, 2015, I attended an in-person mediation session with the Honorable Carl J. West (Ret.) of JAMS, which was attended by all proposed class counsel and defense counsel.

17. I am informed and believe that Judge West is a highly respected and experienced class action mediator, who had joined JAMS following eighteen years on the bench, spending the most recent ten years as a judge with the Los Angeles County Superior Court's complex litigation panel.

18. On or about September 17, 2015, the Parties filed a Joint Stipulation and Proposed Order Updating the Court on Settlement Discussions and Requesting Extension of Temporary Stay Pending Further Mediation (*Mena*, Dkt. 56; *Philliben*, Dkt. 57).

19. On or about October 2, 2015, I attended, along with co-counsel, a second in-person mediation session and, on or about October 30, 2015, a third in-person mediation session, all with Judge West.

20. On or about November 16, 2015, the Parties filed a Stipulation and Proposed Order Updating the Court on the Settlement Discussions and Requesting Extension of Temporary Stay.

21. The parties reached a settlement in principle in December 2015.

22. On or about December 14, 2015, the Parties filed a Stipulation and Proposed Order Updating the Court on the Parties' Settlement in Principle and Requesting that Arbitration Hearing be Vacated.

23. After reaching a settlement in principle, the parties commenced memorializing the full Settlement, which generated numerous additional rounds of comprehensive and often spirited negotiations. The parties extensively negotiated each specific aspect of the Stipulation, including each of its nine (9) exhibits. For example, counsel negotiated and meticulously refined the final notice program and each document comprising the notice (the Long Form Notice, Summary Notice, and Banner Ads for certain Internet advertising), with the assistance of a class action notice expert, to ensure that the information disseminated to Class Members is clear and concise.

24. On or about January 7, 2016, Plaintiffs filed a Consolidated Class Action Complaint, which asserted causes of action for Breach of Implied Contract, alleged violations of California's Consumers Legal Remedies Act (Cal. Civ. Code § 1750 *et seq.*), California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*), California's False Advertising Law (Cal. Bus. & Prof. Code § 17500 *et seq.*), and Illinois Consumer Fraud Act (815 ILCS 502/2, *et seq.*) and which alleged, *inter alia*, that Defendants made misrepresentations and omissions regarding their "Safe Rides Fee," their safety measures, and the nature and character of their background checks, on behalf of a putative nationwide class, or in the alternative, a California, Illinois, and Massachusetts class of consumers (*Philliben,* Dkt. 67).

25. The Stipulation of Settlement was filed with the Court on February 11, 2016. (Philliben, Dkt. 74) ("First Stipulation"). A motion for preliminary approval of the First Stipulation was filed the same day. (Philliben, Dkt. 75-3) ("2016 Settlement").

26. On August 30, 2016, the Court issued an Order Denying Motion For Preliminary Approval of Class Action Settlement (*Phililben*, Dkt. 98) ("Denial Order").

27. Following the Denial Order, the Plaintiffs and Defendants began discussions and negotiations regarding a new settlement. The Parties agreed upon a new mediator, Robert J. Kaplan, Esq. of Judicate West, to assist in these negotiations, and I personally participated in three (3) in-person mediations on October 5, 2016, November 22, 2016, and January 5, 2017. The Parties also met in-person on December 7, 2016 and conducted numerous telephonic discussions and negotiations both among themselves and with the new mediator.

28. The Parties reached an amended settlement in principle in February 2017.

29. The Parties subsequently attended a settlement conference before Chief Magistrate Judge Joseph C. Spero on March 7, 2017 to address class allocation issues.

30. The parties then worked to update the First Stipulation and its respective exhibits and declarations, and agreed to an Amended Stipulation of Settlement ("Amended Stipulation") on May __, 2017. As with the First Stipulation, counsel negotiated and refined the Amended Stipulation to reflect the revised class definition and other changes to the First Stipulation.

31. Before entering into the First Stipulation and the Amended Stipulation, Plaintiffs, by and through their respective counsel, conducted a thorough examination, investigation, and evaluation of the relevant law, facts, and allegations to assess the merits of the claims and potential claims to determine the strength of liability, potential remedies, and all defenses thereto.

32. Plaintiffs, through their counsel, conducted an extensive investigation into the facts and law relating to the matters alleged in their respective Complaints, including (i) the extent, nature and quality of Defendants' safety procedures during the Class Period; (ii) Defendants' representations and disclosures regarding the safety of Defendants' ride share services; (iii) Defendants' representations and disclosures regarding the Safe Rides Fee; (iv) financial data relating to Defendants' safety related expenditures and revenues; (v) the size and composition of the Class; and (vi) data relating to the Class' use of Defendants' ride share services. This investigation included obtaining and reviewing documents and written responses from Defendants, detailed inspections and testing of Defendants' ride share App among various operating system platforms, consultations with experts, numerous interviews of

witnesses (including ten (10) current and former high level employees and executives of Defendants), drivers, and putative class members, the evaluation of documents and information related to other litigations against Defendants (including updated productions since the date of the First Stipulation), as well as extensive factual and legal research as to arbitration issues relating to this Action, and the sufficiency of the claims and appropriateness of class certification.

33.     Plaintiffs submitted comprehensive requests for information relevant to their allegations and Defendants' anticipated defenses and Defendants provided thousands of pages of responsive documents and sworn responses (including responses and documents after the date of the First Stipulation).  Plaintiffs' Counsel thoroughly analyzed and evaluated all provided information, including documents bearing on Defendants' background checks, alleged safety expenditures, the Safe Rides Fee and resulting revenues, and Defendants' advertising and marketing regarding safety.

34.     As noted, these exchanges of information continued after the Denial Order, and Defendants provided updated information to Plaintiffs, plus thousands of pages of additional documents, as well as deposition transcripts and expert reports from related cases.

35.     Plaintiffs' investigation also included a detailed inspection and testing of Defendants' ride share App across various operating system platforms, consultations with experts, interviews of witnesses, drivers, and putative class members, the evaluation of documents and information related to other litigation against Defendants, as well as extensive factual and legal research regarding arbitration, the sufficiency of the claims, and the appropriateness of class certification.

36.     As mentioned above, Plaintiffs' Counsel conducted ten extensive interviews of key witnesses over the course of three days at Uber's offices and other locations in San Francisco. Counsel interviewed current and former high level Uber employees with direct knowledge of facts at issue in the Actions, including safety representations, safety measures, alleged safety expenditures, details regarding the Safe Rides Fee, user databases, and other relevant areas of Uber's operations.

37.     The First Stipulation and the Amended Stipulation were reached as a result of extensive arm's-length negotiations between the Parties and their counsel, occurring over the course of a number of months and six separate, in-person mediation sessions with respected mediators, the Honorable Carl J. West (Ret.) of JAMS and Robert J. Kaplan, Esq.. of Judicate West.  Following the sixth in-person

mediation, the Parties continued to engage in extensive settlement discussion through the mediator, and amongst each other, until a settlement in principal was reached. The parties then attended a settlement conference before the Honorable Chief Magistrate Judge Joseph C. Spero. Before and during these settlement discussions and mediations, Defendants provided voluminous documents and information to the Plaintiffs. This arms'-length exchange provided Plaintiffs and their counsel with sufficient information to evaluate the claims and potential defenses and to meaningfully conduct informed settlement discussions.

## SUMMARY OF VERIFIED INFORMATION RECEIVED FROM DEFENDANTS

38. As part of the investigation described above, Plaintiffs propounded information requests on Defendants and received verified responses (including updated responses in light of the Court's Denial Order) to those requests. The following paragraphs describe facts disclosed in Defendants' verified responses.

39. Defendants' verified responses state that there are 22,398,091 Class Members, and that as of May 8, 2017, approximately [REDACTED] of Class Members had used Uber in the prior twelve months.

40. Defendants' verified responses state that their records indicate that Class Members have taken [REDACTED] rides.

41. Defendants' verified responses state that their records indicate that Class Members have taken 403,477,437 rides on which a Safe Rides Fee was charged.

42. Defendants' verified responses state that, as a general matter, they obtain the name, phone number, and e-mail address provided by each user when the user signed up for Uber, and that Uber does not collect or maintain users' physical addresses.

43. [REDACTED] By "hard" bounce back rate, Defendants mean that the user's email address or domain name no longer exists, or that the server completely blocked delivery.

44. [REDACTED] By "soft" bounce back rate, Defendants mean that the email address was valid, but there

– 7 –

was a temporary delivery issue, for example because the user's inbox is full or the server is temporarily down.

45. Defendants' verified responses state that, for class settlement notices sent via email to Uber riders in *Tadepalli v. Uber Technologies, Inc., et. al.*, the initial bounce back rate was around five percent (5%), and the final bounce back rate was around three percent (3%).

46. Defendants' verified responses state that $470,706,387 in Safe Rides Fee revenue has been collected through January 31, 2016, and that of this revenue, $25,558,798 in first Safe Rides Fee revenue has been collected through the same date. Defendants' verified responses also state that the average first Safe Rides Fee paid by all class members who paid a Safe Rides Fee through January 31, 2016, was $1.14. From April 2014 to November 2015, Defendants state that they collected an estimated [REDACTED] in Safe Rides Fees from riders.

47. Defendants provide several possible explanations as to why their Safe Rides Fee revenue figures vary from those provided prior to Plaintiffs' initial motion for preliminary approval. Defendants point out that the class definition has changed, and so the resulting class composition has changed and with it the number of class members, trips, and revenue on those trips is different. In addition to the definitional change, the information being provided is calculated by querying databases that have information on over two billion rides, and Defendants state that they expect to see small movements in the data when querying extremely large data sets over multi-year periods. Further, since the last time information was calculated, Defendants state that they lost the ability to determine where fare adjustments were made for most of the rides taken during the class period. Accordingly, if a fare was later zeroed out in its entirety, including the Safe Rides Fee, that Safe Rides Fee may now be counted as paid. Defendants state that, while it is impossible to know precisely what caused the current information to differ from the previous information, they have confirmed the current data is Uber's best estimate of the revenue and rides for the class, as defined in the Amended Stipulation of Settlement.

48. Defendants' verified responses state that: (1) in April 2014, Defendants began collecting a Safe Rides Fee for each trip on Uber products such as uberX and uberXL to cover Defendants' safety-related costs; (2) the Safe Rides Fee was rolled out to each city in the United States over several weeks; from the time of the initial rollout until around late September 2015, the Safe Rides Fee was the same in

DECL. OF ROBERT AHDOOT ISO MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION
SETTLEMENT (CASE NO. 3:14-CV-05615-JST)

1  every city - $1.00 per ride; and (3) starting around late September 2015, the amount of the Safe Rides
2  Fee was modified, and it varied by city within a range of $1.00 - $2.50.  According to Defendants this
3  change was made to reflect the fact that in some cities certain costs have increased.  By the end of
4  February 2016, Defendants stopped charging the Safe Rides Fee and began charging a Booking Fee.

5       49.     According to Defendants' verified responses, Defendants screen their drivers, and have
6  relied on vendors to perform these background checks, including primarily Hirease and Checkr.
7  Defendants state these background checks are run prior to onboarding drivers.  Defendants state that,
8  these background check costs total an estimated [REDACTED] through January 31, 2016.  Defendants
9  state this amount does not include some of the indirect costs associated with screening Drivers, and that
10 background check costs have continued to be incurred since January 31, 2016.

11      50.     According to Defendants' verified responses, in many cities Drivers are subject to a
12 motor vehicle inspection before the Driver is allowed to accept trip requests via the Uber App.  Drivers
13 have a variety of options for having their vehicle inspected.  These options include inspection facilities
14 operated by Defendants or reimbursed inspections performed by mechanics.  The cost and precise
15 process for each vehicle inspection varies by city.

16      51.     According to Defendants' verified responses, Defendants estimate that they have spent at
17 least [REDACTED] on vehicle inspections through July 27, 2015, and likely more given that there are
18 estimated inspection costs that Defendants have not included in this figure.  [REDACTED REDACTED
19 REDACTED REDACTED  REDACTED REDACTED
20 REDACTED REDACTED  REDACTED REDACTED]

21      52.     According to Defendants' verified responses, Defendants maintain automobile insurance
22 for trips on the Uber platform, including a trip insurance policy that provides for at least $1 million of
23 liability coverage.   During the class period, Defendants state they have spent an estimated [REDACTED]
24 [REDACTED] on trip insurance bearing the characteristics described below, and insurance costs have continued
25 to be incurred since then.  This sum only includes coverage for *trip* insurance, meaning that it only
26 includes the costs for automobile insurance coverage during trips, en route for an accepted trip request,
27 or when a Driver is logged into the App but has not yet accepted a trip request.  Defendants state that
28

neither this sum nor any sum set forth herein includes any portion of Defendants' commercial general liability or corporate insurance program expenditures.

53. According to Defendants' verified responses, Defendants state that their trip insurance expenditures can be divided into three categories based on the status of a trip request:

- Period 1: The Driver is logged in to the App, but has not accepted a trip request.
- Period 2: The Driver has accepted a trip request and is en route to pick up a rider.
- Period 3: The Driver has picked up a rider and is on a trip.

54. According to Defendants' verified responses, Defendants further state that during Period 1, the Driver is backed by a policy that covers Driver liability for bodily injury up to $50,000 per person with a total of $100,000 per accident and up to $25,000 for property damage liability. This policy may be contingent to a Driver's personal insurance policy depending on the jurisdiction, meaning it will only pay if the Driver's own insurance declines coverage or pays zero. For Periods 2 and 3, Defendants state that they hold a liability insurance policy that provides at least $1 million of coverage per accident. Drivers' liability to third parties is covered from the moment a Driver accepts a trip to its conclusion. This policy is expressly primary to any personal auto coverage (though it does not take precedence over any commercial auto insurance for the vehicle). Defendants also state that they hold at least $1 million of uninsured/underinsured ("UM") motorist bodily injury coverage per accident. In the event that another motorist causes an accident and does not carry adequate insurance, this policy covers bodily injury to all occupants of the rideshare vehicle. Defendants state that UM coverage is important, for instance, to provide protection in the event that the other driver is at fault but does not have insurance or is underinsured. Coverage also extends to hit and run accidents.

55. According to Defendants' verified responses, looking specifically to Periods 2 and 3 (when the Driver is en route to pick up a rider or when a rider is in the vehicle), Defendants estimate that they incurred [REDACTED REDACTED REDACTED REDACTED] in costs during the class period to provide the coverage described above. Looking only to Period 3 (when a rider is in the vehicle), Uber estimates that it incurred [REDACTED REDACTED REDACTED REDACTED] in costs to provide the coverage described above. This coverage includes liability coverage, UM coverage, personal injury protection ("PIP") coverage where required by law (which provides limited no-fault coverage items such as medical expenses), and property damage coverage. Of the estimated

1   [REDACTED] in costs for Period 3 trip insurance, Defendants state that an estimated [REDACTED]
2   provided property damage coverage, and the remaining [REDACTED] is estimated as the cost of
3   providing liability, UM, and PIP coverage during Period 3.

4       56.    According to Defendants' verified responses, because core components of the Uber
5   platform and application relate in some way to safety, most jobs at Uber in some form or fashion
6   encompass safety related functions for at least a portion of the work performed. However, in order to
7   provide an estimate of personnel costs directly related to safety and readily subject to estimation,
8   Defendants focus on in-house teams focused on safety. Defendants state that the safety technology team
9   develops certain safety features for the Uber App that are cumulative to safety features intrinsic in the
10  platform, including but not limited to Driver verification and safe driving metrics. According to
11  Defendants the safety security operations team includes staff dedicated to background checks,
12  compliance, and prevention. [REDACTED REDACTED  REDACTED REDACTED
13  REDACTED REDACTED] Defendants also state that, for current and former employees, salary
14  information was collected from Defendants' Human Resources department. Defendants state that [REDACTED]
15  was added to these salaries in order to account for benefits, bonuses, overhead, and other costs,
16  consistent with Defendants' accounting practices. Based on this process, Defendants state they incurred
17  an estimated [REDACTED] in costs for safety-related headcount (like those described above) through
18  January 31, 2016, and they continued to be incurred. From October 2015 to January 2016, these costs
19  were estimated using data from the third quarter of 2015. This estimation is likely conservative, [REDACTED
20  REDACTED REDACTED]. Defendants assert that the [REDACTED] charge for
21  benefits and other items is conservative, as actual costs for Defendants' personnel, including equity,
22  would be much higher.

23      57.    According to Defendants' verified responses, Defendants allow riders and Drivers to call
24  or text message each other anonymously. Defendants state they spent an estimated [REDACTED] on
25  anonymous communications through January 31, 2016, and these costs continue to be incurred.

26      58.    According to Defendants' verified responses, Defendants receive feedback from riders
27  and Drivers, and they incur costs to develop and run their rider and driver feedback software platform.
28  According to Defendants' verified responses, Defendants also have processes in place to ensure that

1  documentation submitted by Drivers, including drivers' licenses, vehicle registration, and vehicle
2  inspection forms, are reviewed and verified. Defendants state the together these support-related safety
3  costs are estimated to total REDACTED REDACTED through January 31, 2016, and they continue to be incurred.
4  From October 2015 to January 2016, these costs were estimated using data from the third quarter of
5  2015. This estimation is likely conservative, REDACTED REDACTED
6  REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED.

7      59.    According to Defendants' verified responses, excluding insurance, the safety costs
8  discussed above total an estimated REDACTED REDACTED through January 31, 2016.

9      60.    According to Defendants' verified responses, their claimed safety cost calculations set
10 forth above do not include many of the additional features of the Uber App that contribute to safety,
11 including but not limited to cashless payments and GPS monitoring.

12     61.    In their verified responses, Defendants state that they undertake numerous efforts to
13 protect rider safety. Defendants state that, for example, the ability for a rider to share his or her ETA
14 was added to the App on or around September 2013.

15     62.    In their verified responses, Defendants state there are many safety features that are built
16 into the Uber App itself: Before the ride, the App allows riders to request a ride directly from their
17 phones, and wait safely inside for the car to arrive. The App typically displays the Driver's name,
18 picture, license plate number, and vehicle make and model so riders know they are entering the right
19 vehicle. The rider can also check whether others have had a good experience with the Driver. In
20 addition, riders can communicate with Drivers using anonymized phone numbers for both rider and
21 Driver to coordinate their pickup location. Defendants also state the App allows for cashless
22 transactions, which Defendants contend protects both riders and Drivers from being targets for robbery.
23 Additionally, the rider's current location is marked so riders know where they are on their journey and if
24 they are on the right route. Defendants state riders can easily share their trip details, including the
25 specific route and estimated time of arrival, with family and friends at the touch of a button. Defendants
26 also keep a record of this route creating, they state, accountability and a strong incentive for good
27 behavior. Defendants state these features also make it easy for Defendants to work with law enforcement
28 in the event there is an incident. After the ride is complete, riders can rate their Driver using a five-star

rating system. This provides information for future riders who can view the Driver's rating before accepting a ride. In addition, Defendants state they provide 24/7 customer support so riders can report any incident that may have occurred during their ride. Defendants also state they can also provide feedback to and educate Drivers as part of the rating system.

63. In their verified responses Defendants state that Drivers undergo a rigorous pre-screening process before being allowed to access the platform. Through third parties (formerly Hirease and currently Checkr), Defendants review a Driver's driving history and criminal history (in some cases, a governmental regulator performs a background check). In California, for example, Defendants state Checkr performs Defendants' criminal history screening. People seeking to sign up as a Driver are required to provide detailed information, including their full name, date of birth, social security number, driver's license number, a copy of their driver's license, vehicle registration, insurance, and proof of a completed vehicle inspection. According to Defendants, with the potential Driver's approval, Checkr then performs a background check. Defendants state this includes a social security trace to identify addresses associated with the potential Driver's name during the past seven years, and then a search for the potential Driver's name and addresses in a series of national, state, and local databases for convictions in the last seven years. According to Defendants these include the Dru Sjodin National Sex Offender Public Website, National Criminal Search, and several different databases used to flag suspected terrorists.

64. According to Defendants' verified responses, upon identifying a potential criminal record, Checkr sends someone to review the record in-person at the relevant courthouse or, if possible, pulls the record digitally. Defendants state their Driver screenings also pull the Motor Vehicle Registration (MVR) file associated with the license number provided. Defendants state the purpose of running these background checks is to identify offenses and other information that may disqualify potential Drivers from using Uber.

65. According to Defendants' verified responses, the primary criteria that lead to disqualification are felonies (within a prescribed period of time) for driving under the influence, fraud, reckless driving, hit and run, violent crimes (assault, battery, homicide), acts of terror, sexual offenses, crimes involving property damage, theft (burglary, stealing, robbery, etc.), fatal accidents, or

resisting/evading arrest. Potential Drivers are also disqualified if they appear on the DOJ50-State Sex Offender Registry or the Dru Sjodin National Sex Offender Public Website, or on a series of databases that flag suspected terrorists.

66. According to Defendants' verified responses, Drivers must provide their licensing and vehicle documentation before being able to drive on the Uber platform, and there are minimum vehicle requirements for each Uber platform. REDACTED REDACTED REDACTED REDACTED  REDACTED REDACTED REDACTED REDACTED .

67. According to Defendants' verified responses, in the event of dangerous behavior by a rider or Driver, Defendants' response team can deactivate that person's account, immediately preventing him or her from accessing the platform again. Defendants contend this removes incentive for bad behavior and prevents it from being repeated on the platform. Defendants state education classes are also available to Drivers.

68. According to Defendants' verified responses, in many cities Drivers must submit a vehicle inspection form. The details of these inspections vary depending on the city and local laws and ordinances. For example, Defendants state that, in California, potential uberX vehicles must undergo a 19-point inspection that includes the vehicle's lights (headlight, tail light, turn lights, brake lights), brake pads/shoes, steering (ball joints, tie rods, rack & pinion, bushings), windshield and other windows, tires (including tread depth), safety belts (for Driver and each passenger), and other aspects of the vehicle. According to Defendants if the potential Driver's vehicle does not pass the inspection, it cannot be used on the Uber platform. In addition, Defendants state that Uber requires Drivers to provide proof of automobile insurance.

69. Defendants' verified responses indicate that, where fares are listed, the Safe Rides Fee is disclosed. Defendants state this includes in the Uber App as part of the Fare Detail, as a separate line item on riders' receipts, and on Uber's website (*e.g.* https://www.uber.com/cities/san-francisco). Defendants state that, when a new product is introduced in a given city, the announcement frequently references the Safe Rides Fee (if it applies to that product). *E.g.* https://newsroom.uber.com/msp/introducing-uberxl-the-roomier-low-cost-ride-in-the-twin-cities/.

70. Defendants also state the Safe Rides Fee is disclosed in the Safe Rides Fee description, available in the Uber App and on Uber's website. A hyperlinked question mark ("?") on riders' receipts takes users to the Safe Rides Fee description. For example, the hyperlink current takes riders to https://help.uber.com/h/4fa83c50-ab30-434c-b911-f63ad11cd4d9, which states: "The Safe Rides Fee supports the operation of the Uber platform, including a background check process, development of safety features in the app, incident response, and other operational costs."

71. Defendants' verified responses indicate that they estimate the transaction cost of issuing a payment to a rider's default payment method for all payment types is approximately $.07. Defendants state this estimate is based on the charges that Uber currently incurs from the companies with which it does business in the context of riders' payment methods on file with Uber. This includes credit card companies, PayPal, Google Wallet, etc. Defendants further state that this estimate is based on the assumption that the Court will approve a payment methodology that only makes one attempt at paying a rider's default payment method, and that the attempt is with respect to only the payment information on file with Uber and without further verification of any kind.

**EXCERPTS OF DOCUMENTS PROVIDED BY DEFENDANTS**

72. As noted above, Defendants provided thousands of pages of documents, both before and after the First Stipulation. Defendants also provided discovery from related cases, included depositions and expert reports from related cases. This section of my declaration describes the documents provided by Defendants that are attached to my declaration and cited in the accompanying motion for preliminary settlement approval.

73. Exhibit B to this declaration is a document titled *Just a Better Taxi? A Survey-Based Comparison of Taxis, Transit, and Ridesourcing Services in San Francisco*, bearing bates numbers PMM00065023-PMM00065033.

74. Exhibit C to this declaration is a document titled Expert Report of Jessie Stricchiola, bearing bates numbers PMM00070975-PMM00071030. It has been represented to me that this document is an expert report from the related *LA Taxi* case. I understand that the report has been designated as Confidential or Highly Confidential by Defendants.

75. Exhibit D to this declaration is a document titled Expert Report of John R. Hauser, SC.D., bearing bates numbers PMM00070622-PMM00070925. It has been represented to me that this document is an expert report from the related *LA Taxi* case. I understand that the report has been designated as Confidential or Highly Confidential by Defendants.

76. Exhibit E to this declaration are excerpts from a transcript of the Videotaped Deposition of Sandy Boyle. It has been represented to me that, as the transcript excerpts indicate, the transcript is of a deposition from the related *LA Taxi* case of the 30(b)(6) deponent for the Orange County Transportation Authority, the organization that oversees taxis in Orange County, CA.

77. Exhibit F to this declaration is a document titled Overview of Limousine and Transportation Network Company Regulations, bearing bates numbers PMM00080348-PMM00080349. It has been represented to me that this document was previously publically available from the California Public Utilities Commission website and that it was downloaded by Defendants from that website.

78. Exhibit G to this declaration is a document titled Transportation Research Board Special Report 319, bearing bates numbers PMM00062341-PMM00062528.

79. Exhibit H to this declaration is a document titled Order No. 87957, bearing bates numbers PMM00080324-PMM00080347. This document is a publically available decision issued by the Public Service Commission of Maryland.

80. Exhibit I to this declaration is a document titled *Decision Adopting Rules and Regulations To Protect Public Safety While Allowing New Entrants To The Transportation Industry*, bearing bates numbers PMM00080248-PMM00080323. This document is a publically available decision issued by the California Public Utilities Commission, available at <http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M077/K192/77192335.PDF> (last visited May 30, 2017).

81. It has been represented to me that the plaintiffs in the *LA Taxi* case removed their confidentiality designations for all of the *LA Taxi* plaintiffs' deposition transcripts and all expert reports that have been provided to Plaintiffs as part of settlement discussions, with the exception of certain materials that have been redacted. I further understand that even though these expert reports or deposition transcripts may on their face have been designated as confidential by the *LA Taxi* plaintiffs,

that designation (but not any confidentiality designation by Defendants) has been removed by *LA Taxi* plaintiffs pursuant to an agreement between Defendants and the *LA Taxi* plaintiffs.

### CALCULATION OF CLASS MEMBERS' SETTLEMENT SHARES

82. Plaintiffs' Counsel calculate that, at 22,398,091 Class Members, each Class Member's Settlement Share will be, on average, approximately $1.07, which is significant in relation to the average initial Safe Ride Fee of $1.14 (paid by Class Members prior to disclosure of that fee after their first Uber ride).

83. Under the Amended Stipulation of Settlement, each Class Member's Settlement Share will be calculated based on the number of Safe Ride Services taken by the Class Member. Each Class Member will receive $.25 for his or her first Safe Ride Service, and then approximately $.05 for each subsequent Safe Ride Service according to Plaintiffs' Counsels' estimate. This formula was discussed between the parties, and agreed upon at the settlement conference with Chief Magistrate Judge Joseph C. Spero.

84. This estimate of the Settlement Share is based on the assumption that, as of the Effective Date, the deductions from the $32.5 million Settlement Fund will be: (1) $487,000 in Settlement Administrator's fees (Stip. Ex. I ¶ 37); (2) a Court approved award of a total of $2,500 in Service Awards ($500 per Class Representative); and (3) a Court approved award of $8.125 million in Attorneys' Fees and Expenses (25% of the Settlement Fund). Subtracting these amounts from the total Settlement Fund of $32.5 million leaves $23,922,500 for distribution to Class Members. At 22,398,091 Class Members and 403,477,437 Safe Ride Services, I believe that the Settlement Share under these assumptions will be approximately those amounts set forth in the prior paragraph. If instead the amount available for distribution were distributed on a per-ride basis, I believe the amount per ride would be approximately $0.06, and a large proportion of the Class, consisting of riders who took one to three rides, would receive only $0.06, $0.12, or $0.18.

85. Using the above assumptions, the formula is more precisely illustrated as follows: $.25 + ($18,322,977 / (403,477,437 - 22,398,091)) * (number of Safe Ride Services taken by the Class Member − 1)).

– 17 –
**DECL. OF ROBERT AHDOOT ISO MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT (CASE NO. 3:14-CV-05615-JST)**

86. To minimize the impact of rounding, the Parties may use a more precise per-ride figure to determine each Class Member's Settlement Share (e.g. $.048 per subsequent Safe Ride Service), and then round down to the nearest cent prior to payment.

87. In my view, the Settlement provides substantial benefits to the Class, especially when one considers the attendant expense, risks, delays, and uncertainties of litigation, trial and post-trial proceedings.

88. Based AW's investigation, research, document and information review, interviews, Defendants' verified responses, my firm's analysis, as well as my personal knowledge and experience, I believe that the Settlement is in the best interests of the Class and that the Settlement is fair, reasonable, and adequate. The benefits afforded by the Settlement reflect a reasoned compromise which not only takes into consideration the risks inherent in all complex, class litigation, but also the various issues in this case which had the potential to completely eliminate recovery available to the Class.

89. While I believe that the claims asserted in this action have merit and that the evidence developed to date supports those claims, I also recognize, based on my experience, the expense and length of time necessary to prosecute this case to judgment. I have also have taken into account the uncertain outcome and the risk of any litigation, as well as the difficulties and delays inherent in such litigation. I am also mindful of the inherent problems of proof in establishing the claims asserted in this action, and rebutting Defendants' possible defenses to those claims.

I declare under penalty of perjury under the laws of California and of the United States that the foregoing is true and correct. Executed this 1st day of June, 2017 in West Hollywood, California.

          /s/ Robert Ahdoot
          Robert Ahdoot

**DECL. OF ROBERT AHDOOT ISO MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT (CASE NO. 3:14-CV-05615-JST)**